Post-It™ Fax Note    ,571   | Date | # of pages ▸ |
To _M. Mills_ | From |
Co./Dept. | Co. |
Fax # _276-4152_ | Phone # |
| " |

Mark C. Manning
Mark C. Manning, P.C.
431 W. 7th Ave., Ste 204
Anchorage, Alaska 99501
(907) 278-9794 Fax: 278-1169
Counsel for Global Seafoods

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| FMI FOOD MARKETERS INTERNATIONAL, LTD, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | DOCKETED |
| GLOBAL SEAFOODS NORTH AMERICA, LLC | ) ) ) | |
| Defendants. | ) ) ) | No. 3:06-cv-00011 JWS |

## GLOBAL SEAFOODS' SUPPLEMENTAL INTERROGATORY RESPONSES

**INTERROGATORY NO. 1:**

Describe in detail each and every fact and/or averment supporting Global's position that it has a right to continue to hold FMI's $110,000.00 "deposit" payment. Your response should include a specific description of any amount Global asserts it is owed by FMI, or which Global claims a right to offset against the $110,000 deposit.

**RESPONSE:**

Global was very concerned about FMI's ability to open timely and appropriate letters of credit and that transactions would be executed appropriately under those credits. In 2004, FMI had not been able to arrange a timely and appropriate letter of credit for the amount of product it had said it wanted to purchase. Transactions may be manipulated to interfere with collection under such credits, conferring bargaining advantage on buyers and resulting in expensive demurrage expenses and collection problems. Global understood that FMI did not itself have the resources to arrange for its own letters and had to rely on transferable letters from its buyers. Global also understood that FMI did not have the resources to pay a large claim, in the event of breach. Therefore, if any problem developed with execution by FMI's buyers under the transferable letters FMI provided, Global was exposed to the risk of no real recourse. In 2005, FMI did not give

cc: MAG
MRM
Client

Global an opportunity to review draft letters of credit before presentation. When the first letter was opened in August, the risk of problems developing was apparent. As problems with deliveries and execution under letters did in fact begin to develop, as reflected in e-mails between Global and FMI to which FMI is referred, Global demanded a cash deposit to protect itself against FMI's inability to obtain amendments to letters of credit, as well as unwarranted demurrage and other potential losses. The charges Global asserts against the deposit are reflected in documents that have been produced, namely a package labeled " re-sale of 7 containers," and, as to a second group of 13 containers, an invoice to FMI for $11,678.80 in demurrage, and a check number 120 from Young Ocean, Inc., bearing a debit note for the demurrage.

INTERROGATORY NO. 2:

Describe in detail Global's total production and sales of pink salmon in 2005 (of all quality levels) including: the total quantity of #1 quality pink salmon processed by Global in 2005 (including, without limitation, the identity of the purchase (name, address, contact person), the date of purchase, the quantity sold, the price received, the terms of sale, and whether the product had been originally included in the Third or Fourth Shipments described in FMI's Complaint).

RESPONSE:

As to sales information, FMI is referred to reports and invoices that have been provided, as well as Dell Trading, LLC Purchase Contract. As to payment by buyers of substantial amounts of product other than FMI, it was by wire or check, as indicated below, upon or prior to delivery.

As to information concerning substantial buyers, it may be found on sales reports produced and as follows:

H&G

Chini Gimex Group, Ltd.          wire
27 Tevdore Mgvdeli St.
Skype: nanaegorova
Tbilisi, Georgia

Food Marketers International

T.M.C. Trading Co.          check
Chai Tai Ung
1 714 952 3850
8948 Knott Avenue
Buena Park, CA  90620

2



| | |
|---|---|
| Kevin Chae<br>Young Ocean, Inc.<br>11810 NE 8th St., Ste. H<br>Bellevue, WA 98005<br>(425) 709-3130 | check |
| Dell Trading, LLC<br>Sergey Morozovskey<br>+38 048 738 0042<br>942 Windemere Dr. N.W.<br>Salem, OR | wire |
| Fastgrade, LLP dba "Octopus"<br>Sergey Nosach<br>+ 7 4012 709 210<br>90 C Bury Old Road<br>Manchester, M8 5BW<br>England | wire |
| TCHUP "Baltoexpress"<br>Cheslav Poplavski<br>−375 17 286 6682<br>21-35, Uruchskaja Str/<br>Minsk, Belarus | wire |
| Evimare Fish<br>Olga Maroussina<br>+31 255 51 55 14<br>1e Industriewarsstraat 3<br>1976 DD IJmuiden<br>The Netherlands | wire |

<u>FILLETS</u>

| | |
|---|---|
| Fastgrade, LLP dba "Octopus"<br>90 C Bury Old Road<br>Manchester, M8 5BW<br>England | wire |
| KIMBEX, s.r.o<br>Salounova 40<br>703 00 )strava-Vitkovice<br>Czech Republic | wire |

3

8
Page 3 of 12

As reflected in reports and other documents produced, purchasers of amounts assumed to be too small to be of interest in this lawsuit are as follows. Global has generally incomplete information for these buyers that could be provided if pertinent.

<u>Small H&G Purchases</u>

Onega-Fisch

Regrave-Fish GMBH                    wire
Alexandr Grafov
+ +49 1 71 3101 201

Czerwone Jabluszko Restaurant

Yuri Liberman dba Garden Fresh

Zhivago

ZSB Trading Co.

Nikolay Osokin

Sakhalin, Inc.

P.W. Doryb
+48 87 629 0010
Piotr Basiewisz
Ul. Podmiejska 2A 19-300 Elk Poland

<u>Small Fillet Purchases</u>

Regrave- Fish GMBH

Best Seafood

Bon Appetite

Cinderella Restaurant- SF

Dakon Foods, Oakland

Michael Genkin

Good Neighbor

4



Inna Catering

King Buffet- Renton

King Buffet- Burien

Koreana Plaza, Sacramentao

Lucky Seafood- Beacon Hill

Maila Supermarket

Alexey Miretsky

M&M

Penang Gardeen Restaurant

Koreana Plaza- Oakland

Renton Halal

Safa Foods Co.

Sunset Super- King Dr. Daley C

Todai- Cup[ertino

Towa Foods Co., Ltd.

Gusakov

Maka Minimarket

Nikolay Osokin

Safa Foods Co.

5

Exhibit B
Page 5 of 12

INTERROGATORY NO. 3:

Describe in detail each and every fact supporting your assertion that the pink salmon processed by Global met the requirements of the Global Contract.

RESPONSE:

FMI is referred to the product reports Global has provided, the Johnson report, the Global plant inspection reports concerning the good condition of the fish Global has produced, and the contents of the parties' e-mails on the condition of the salmon and contract terms. The product delivered was within the specifications that appear in writing, as verbalized by Oleg Nikitenko in respect of the absence of any assurance concerning inside bruising, and as subsequently agreed concerning the blood-in, blood-out issue. In 2004, FMI purchased H&G pink from Global, with blood lines left in. In discussing purchasing 2005 H&G pinks, FMI expressed the desire that blood lines be removed. Global was willing to attempt to provide such a product, and a Global employee learned of equipment that the manufacturer claimed would remove blood lines at what would have been a satisfactory rate of speed. Global purchased the equipment, paying about half with its own funds and using an advance payment from FMI for approximately the other half. Unfortunately, the equipment could not be made to operate as represented by the manufacturer, so Global could not produce much blood-out fish due to limitations in processing equipment. Global so informed FMI. As reflected in contents of e-mails between the parties concerning the 1,000 MT± contracted for, FMI agreed to take blood-in product. Regardless of what the agreement might have been prior to that point concerning internal bruising, the agreement to take blood-in fish necessarily included acceptance of bruised appearance resulting from blood lines left in the fish.

INTERROGATORY NO. 4:

Describe in detail what Global intended to mean by inserting the work "outside" into the February 16, 2005 acceptance of the Global Contract (FMI 00013, 00014-15).

RESPONSE:

The insertion was intended to make FMI's draft document more clearly reflect the understanding in contract negotiations that Global made no commitment in respect of internal bruising.

INTERROGATORY NO. 5:

Explain what additional terms of sale Global believes exists that Global implies by the phrase "though not necessarily all terms of sale" in paragraph 11 of its Amended Answer and Counterclaim, which description should include the nature of such terms, who proposed them, what consideration was offered in exchange for such terms, and how the other party manifested its consent to such terms.

6



RESPONSE:

See the response to interrogatory 3. To the extent the points are deemed not to be memorialized in the writing, they are additional terms of sale. Oleg Nikitenko addressed the internal bruising issue on more than one occasion with Bent Holme during negotiations prior to the arrival of FMI's writing. The interrogatory's focus on proposing, consideration and consent indicates the interrogatory does not intend to elicit reference to terms implied by law.

INTERROGATORY NO. 6:

Describe in detail all facts supporting or related to your assertion that FMI failed seasonably to provide letters of credit.

RESPONSE:

FMI failed to give Global a copy of a proposed letter of credit form in advance, for approval of terms. The contract provided that FMI was to provide L/C's opened prior to shipments, payable at sight, and providing for specified "documents required." L/C's conforming to this requirement were never provided. Further, the L/C's contained unreasonably short periods for faxing, presentation and couriering of documents, and tender of original bill of lading before payment, to which Global never agreed. The first letter of credit contained a mis- spelling, "non-wood mararial," that raised a risk of dishonor. Also, if FMI claims it had any right to purchase containers shipped out before a letter was opened, or, if after, before the letter(s) was opened in an amount sufficient to pay for containers being shipped out, no seasonable opening had occurred. Whole pink salmon are delivered to Global's Kodiak plant in a flood, over a relatively short season. Product is packaged and packed into APL containers that are closed and shipped out of Kodiak at the rate of approximately 3 to 5 per day. A large amount of capital is tied up in this product. It is imperative that the flow be kept continuous and that relaible means of payment are in place for containers being shipped out.

INTERROGATORY NO. 7:

Describe in detail all facts supporting or related to your assertion that FMI obstructed timely presentation of documents for payment on letters of credit.

RESPONSE:

In addition to providing letters with an insufficient 8 day period for presentation, FMI impeded preparation and presentation of documents within that period by delaying and/or altering bookings and thereby delaying completion of document preparation. For example, see the revision of booking for 2895, reflected in ETS' 9/19/05 e-mail.

Exhibit 8
Page 7 of 12

**INTERROGATORY NO. 8:**

Describe in detail all efforts made by Global to sell or resell the Third Shipment (i.e. the 7 containers of fish described in Paragraph 28 of your Answer). Your answer should include a complete description of the party or parties with whom Global communicated regarding sale of the 7 containers; a specific description of any offers made (including party making offer, price, terms and conditions, date made, and response); the results of the offer; and how Global came to offer the same fish to FMI in December of 2005.

**RESPONSE:**

Shortly after it became apparent that there was a problem with acceptance of these containers, Oleg Nikitenko phoned potential buyers and was able to arrange re-sale to one or more of the European parties who ultimately purchased the containers. Faced with the cost of having to ship the containers to Europe, however, and believing that these would-be purchasers would be willing to relinquish the containers, Global re-offered them to FMI, in the expectation that FMI and its buyers could take them where they were. When it became apparent FMI would not take them, Global proceeded to re-sell them to the parties that appear on the invoices and reports provided. See also documents in package 3- Re-sale that has been produced.

**INTERROGATORY NO. 9:**

Describe in detail all facts supporting or related to your averments in Paragraph 25 of your Answer that Global informed FMI that the letter of credit mechanism was "unsatisfactory" and that the "letter of undertaking form" had "deficiencies." Your answer should include a description of how the letter of credit mechanism was "unsatisfactory;" a description of exactly what the "deficiencies" were in the "letter of undertaking form;" a description of how Global informed FMI of these issues (i.e. the identity of the Global representative, the identity of the FMI representative, the date the communication was allegedly made, the format of the communication, the specific substance of the communication, and the specific substance of the response.)

**RESPONSE:**

Use of the word "undertaking" was a mistake, and should be "letter of credit form," in conformity with the reference to the letter of credit mechanism referred to earlier in the paragraph. Please see answer to Interrogatories 6 and 7, and e-mails between the parties for additional details.

**INTERROGATORY NO. 10:**

Describe in detail any and all complaints that Global received regarding the quality of pink salmon processed by Global in 2005 (other than from FMI), including but

not limited to the party making the complaint, the date, the specific complaint made, the type and quantity of fish purchased by the complaining party, the details of shipments, Global's response to the complaint, whether any quality inspection was performed, the date, nature, and results of any such inspection, and how the complaint was resolved.

RESPONSE:

None.

INTERROGATORY NO. 11:

In light of the terms of the Global Contract, describe in detail any claim or right or justification under which Global sold "significant qualities of processed salmon to other customers in 2005" to the extent "processed salmon" includes #1 quality pink salmon.

RESPONSE:

FMI never cured the breaches in respect of the L/C requirements discussed above. In addition, FMI breached the contract by wrongfully claiming non-conformity, effectively putting Global on notice that additional shipments would not be accepted. Global did not commit not to sell to other customers, but only to accord a refusal right as to product available once the first 1,000 MT were shipment of the first 1,000 MT. To Global, "available" meant product left over after it met commitments to all its buyers. There was no such available product. Finally, the right of first refusal applied to the blood-out product specified by the contract. There was never any change on this point in respect of product that might have been subject to any right of first refusal, and Global produced little or no blood-out product that was not delivered to FMI as part of the first 1,000MT ±.

INTERROGATORY NO. 12:

Explain why Global asserts in paragraph 32 of its Amended Answer and Counterclaim that "it did not expressly offer FMI any processed fish over and above the 1,000 MT ± 10.0T FMI apparently wanted..." when the Global Contract specifically acknowledged FMI's right of first refusal.

RESPONSE:

Please see answer to Interrogatories 6 and 11.

INTERROGATORY NO. 13:

Describe in detail each and every claim of right or justification under which Global withheld the release of "documents concerning certain shipped containers" until it

9

received a "$110,000.00 deposit for future deliveries," as described in Paragraph 25 of your Answer.

RESPONSE:

Please see answers to interrogatories 1, 3, 5, 6, 7 and 9. Given how matters were developing, Global concluded it needed protection against dishonor of payment on letters of credit for additional containers that had been shipped before closing the transaction on those containers to which the documents pertained.

DATED this 15th day of September, 2006, at Anchorage, Alaska.

MARK C. MANNING, P.C.

By: _____
    Mark C. Manning
    Counsel for Global Seafoods

State of Washington
King County

Oleg Nikitenko, being duly sworn, states the following on oath:

I am President of Global Seafoods North America, LLC. I have reviewed the foregoing interrogatory answers, and declare that they are true and correct to the best of my knowledge.

_____

SUBSCRIBED AND SWORN to before me this 15th day of September, 2006.

_____
NOTARY PUBLIC in and for Washington State
My commission expires _____

10

received a "$110,000.00 deposit for future deliveries," as described in Paragraph 25 of your Answer.

<u>RESPONSE</u>:

Please see answers to interrogatories 1, 3, 5, 6, 7 and 9. Given how matters were developing, Global concluded it needed protection against dishonor of payment on letters of credit for additional containers that had been shipped before closing the transaction on those containers to which the documents pertained.


DATED this 15th day of September, 2006, at Anchorage, Alaska.

MARK C. MANNING, P.C.


By:_____
        Mark C. Manning
        Counsel for Global Seafoods


State of Washington
King County

Oleg Nikitenko, being duly sworn, states the following on oath:

I am President of Global Seafoods North America, LLC. I have reviewed the foregoing interrogatory answers, and declare that they are true and correct to the best of my knowledge.


SUBSCRIBED AND SWORN to before me this 15th day of September, 2006.


NOTARY PUBLIC in and for Washington State
My commission expires ___2/1/07___

OFFICIAL SEAL
THOMAS P. HENNESSEY
NOTARY PUBLIC
STATE OF WASHINGTON
My Commission Expires Feb. 1, 2007

10

CERTIFICATE OF SERVICE

I hereby certify that, on 9/15/06,
a copy of this document was served
by mail / hand on

Michael R. Mills, Esq.
Michael A. Grisham, Esq.
DORSEY & WHITNEY
1031 West 4th Avenue, Ste. 600
Anchorage, AK 99501

11