Michael R. Mills, ABA# 8911074
Michael A. Grisham, ABA# 9411104
DORSEY & WHITNEY LLP
1031 West Fourth Avenue, Suite 600
Anchorage, AK 99501-5907
(907) 276-4557

Attorneys for FMI Food Marketers International, Ltd.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FMI FOOD MARKETERS INTERNATIONAL, LTD.<br><br>                    Plaintiff<br><br>vs.<br><br>GLOBAL SEAFOODS NORTH AMERICA, LLC<br><br>                    Defendant | Case No. 3:06-CV-00011 JWS |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

## TABLE OF CONTENTS

FACTUAL BACKGROUND ……………………………………………………….. 2
.
2005 DEBACLE IN DETAIL ……………………………………………………... 5

    Global's Price Increase and Grant of Right of First Refusal …………………..… 7

    Global's Unilateral Change In Specifications ………………………………… 9

    The 2005 Production Season ………………………………………………… 10

    First Shipment of Fish ………………………………………………………... 11

    Quality Issues and Inspection of the First Shipment …………………………. 12

    Subsequent Shipments And Other Issues ……………………………………. 15

    Second Shipment and Quality Issues ……………………………………… 17

    Third Shipment and Quality Issues ………………………………………..… 18

APPLICABLE LAW …………………………………………………………… 23

I.     STANDARD ON SUMMARY JUDGMENT ……………………………….. 23

II.    APPLICABLE SUBSTANTIVE LAW ………………………………………. 24

ARGUMENT …………………………………………………………………….. 25

I.     GLOBAL BREACHED ITS CONTRACT WITH FMI …………………………25

    A.    Application of the U.N. CISG…………………………………………26

    B.    The Salmon Shipped By Global Failed To Meet The Quality
            Provisions of the Contract …………………………………………….9

          1.    First Shipment Quality Issues ……………………………….32

          2.    Second Shipment Quality Issues …………………………….34

          3.    Third Shipment Quality Issues …………………………….35

          4.    Global Failed To Take Any Measures To Produce Fish
              of the Required Quality Grade …………………………….36

          5.    Conclusion …………………………………………..……..37

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

B.     Global Breached The Quantity Provisions Of Its Contract With FMI ..... 38

C.     Global Breached The Right Of First Refusal Agreement ................…....40

D.     Global Breached Its Duty of Good Faith and Fair Dealing ................…42

    1.     Global's Duty of Good Faith and Fair Dealing Toward FMI
        Required It To Refrain From Injuring FMI's Rights Under The
        Contract And To Deal With FMI In A Manner That Was
        Objectively Fair ...……………………………………………….……42

    2.     Global Breached Its Obligation of Good Faith As A Matter
        of Law With Respect To the First Shipment to Ylufa……………...43

    3.     Global Breached Its Obligation of Good Faith With Respect
        To the Right of First Refusal …………………………………… 48

    4.     Global Breached Its Obligation of Good Faith By Failing to
        Allow Inspections And Using Threats to Ship The Fish To
        Other  Purchasers In Order To Extract Advance Payment ……....49

    5.     Global Breached The Covenant of Good Faith By Failing to
        Inspect and Grade the Salmon and Failing to Take Any
        Actions to Ensure That FMI Received the Quality of Fish
        It Had Contracted To Receive ……………………………….....51

II.     GLOBAL'S ACTIONS WERE IN VIOLATION OF THE ALASKA
    UNFAIR TRADE PRACTICES ACT……………………………………....…..52

A.     Global's Failure To Offer the Promised Quality of Fish Was
    A Violation of the Unfair Trade Practices Act …………………...53

B.     Global's Failure to Meet The Promised Quantity Provisions Was
    In Violation of the Unfair Trade Practices Act …………………...53

C.     Global's Wrongful Refusal To Return The $110,000 Advance
    Payment Is An Unfair Trade Practice ……………………………54

D.     Global's Misrepresentations Regarding The Right Of First Refusal
    Were In Violation of the Unfair Trade Practices Act………………...55

E.     Global's Actions With Respect To The QC Johnson Report
    Were In Violation of the Unfair Trade Practices Act………………...55

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

*FMI Food Marketers, Int'l v. Global Seafoods*

F.    Damages ...................................................................55

III.    GLOBAL INTERFERED WITH FMI'S CONTRACTS AND FUTURE BUSINESS OPPORTUNITIES ......................................................... 56

IV.    GLOBAL CONVERTED $110,000 OF FMI'S FUNDS ............................57

V.    GLOBAL'S COUNTERCLAIM IS MERITLESS ...................................58

**CONCLUSION ...................................................................... 60**

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

Michael R. Mills, ABA# 8911074
Michael A. Grisham, ABA# 9411104
DORSEY & WHITNEY LLP
1031 West Fourth Avenue, Suite 600
Anchorage, AK 99501-5907
(907) 276-4557

Attorneys for FMI Food Marketers International, Ltd.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

FMI FOOD MARKETERS
INTERNATIONAL, LTD.

                         Plaintiff

vs.

GLOBAL SEAFOODS NORTH
AMERICA, LLC

                         Defendant          Case No. 3:06-CV-00011 JWS

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff FMI Food Marketers International, Ltd., ("FMI") hereby moves this

Court, pursuant to Federal Rule of Civil Procedure 56(c), for an order granting partial

summary judgment in favor of FMI and against Defendant Global Seafoods North

America, LLC, ("Global").

FMI seeks an Order granting summary judgment in FMI's favor on its claims of

breach of contract, tortious interference with contract / business opportunity, violation of

the Alaska Unfair Trade Practices Act, and conversion, and dismissing Global's

counterclaim. The Order requested by FMI should establish Global's liability for

damages to FMI in the base amount of $345,397 as well as FMI's entitlement to treble

damages and attorney's fees under the Alaska Unfair Trade Practices Act, and FMI's entitlement to have a jury consider its claims for loss of reputation damages and for punitive damages against FMI.

## FACTUAL BACKGROUND

FMI is a Vancouver-based seafood broker, which purchases seafood from processors in the U.S. and Canada and re-sells it to international wholesale customers, primarily in Asia.[1]  FMI's business is focused on Pacific salmon, and it has long been an active participant in the Alaska salmon market.[2]  Global owns and operates a fish processing plant in Kodiak, Alaska, and sells processed fish.[3]

Global contracted in both 2004 and 2005 to sell very specifically defined top quality "grade #1" pink salmon[4] to FMI.  In 2004, the dealings between the parties went well for all concerned.  The contract had carefully defined quality provisions – provisions that were identical to the quality terms used in 2005.[5]  Since the pinks were being shipped to end buyers in China, the parties used a documentary letter of credit mechanism, which is very common in international fish sales.[6]  This letter of credit mechanism was precisely the one used in 2005.[7]  The FMI-Global dealings in 2004 went off without a hitch – Global delivered pinks of appropriate quality, FMI's end customers (the same customers

---

[1] See Affidavit of Bent Holme ("Holme Affidavit"), submitted concurrently herewith, at ¶ 2.
[2] *Id.*
[3] *See* Clerk's Docket 21 (Amended Answer).
[4] The quality description is even more essential to transactions involving pink salmon since pinks are, generally speaking, the lowest level of the five species of Pacific salmon. It is imperative that the pinks meet carefully defined quality standards.
[5] Exh. 1; Exh. 2.
[6] *Id.*
[7] *Id.*

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Case No. 3:06-cv-00011 JWS

as in 2005 for the most part) were satisfied, and the letter of credit mechanism functioned without incident. Based on Global's behavior and actions in 2004, there was no reason for FMI to believe that continued dealings in 2005 would be any different.

2005, however, was a very different story. As demonstrated below, at every turn in 2005, FMI attempted to accommodate Global and worked in good faith to ensure the smooth operation of the contract. Global's actions, on the other hand, present a polar opposite picture of self-dealing and bad faith that literally crossed the line into outright thievery:

| FMI's ACTIONS | GLOBAL'S ACTIONS |
|---|---|
| • FMI agreed to advance Global $52,500 toward the purchase of a vacuum cleaning machine to remove bloodlines from the fish mechanically; | • Global sold significant quantities of fish to other customers without notice to FMI, in clear violation of FMI's valuable right of first refusal; |
| • FMI agreed to an increase in the guaranteed price paid to Global in order to accommodate Global's wish to take advantage of the rising prices for #1 quality pinks; | • Global repeatedly threatened to sell its fish elsewhere, in contravention of its contract with FMI, in order to extract concessions from FMI, and made groundless claims that FMI had failed to pay for shipments; |
| • FMI convinced its customers to accept fish with the bloodline still in (even though Global had promised to produce fish with the bloodline removed) with no | • Global took no measures to ensure that FMI received the quality of fish it had contracted to get; |

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

decrease in price, simply to accommodate Global's inability to produce fish with the bloodline out;

- FMI accommodated customers' requests for price adjustments due to the poor quality of the fish produced by Global out of its own pocket;

- FMI made significant and largely successful efforts to get customers to amend letters of credit to allow payment to Global, despite Global's consistently late presentation of documents;

- FMI made some payments by couriered check to accommodate Global's impatience about getting paid;

- FMI provided a $110,000 cash payment in advance in order to accommodate Global's demand for an extra-contractual advance payment on a shipment.

- Global refused to deal with customer quality complaints and refused to stand behind the quality of the product it produced;

- Global unreasonably delayed sending a quality inspector to deal with quality complaints, and then hid the inspection report and misrepresented its contents;

- Global refused to accommodate a customer's reasonable request to inspect a shipment, instead demanding an unconditional advance payment that it had no absolute contractual right to receive;

- Global induced FMI to make a $110,000 advance payment in cash through threats of non-delivery, then failed and refused to deliver any of the fish covered by this advance, but nonetheless refused to return the money to FMI;

- Global failed to mitigate, by refusing reasonable quality adjustments (which

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*FMI Food Marketers, Int'l v. Global Seafoods*

Case No. 3:06-cv-00011 JWS

would have cost it $30,000), falsely representing to FMI that it had sold to other customers the fish FMI was slated to receive under the contract, but then failing to sell the fish and keeping it in excessively costly demurrage for months.

In short, FMI suffered substantial damages due to Global's breaches of contract, bad faith, and tortious actions.[8]

## 2005 DEBACLE IN DETAIL

In February of 2005, FMI and Global entered into a contract under which Global agreed to supply FMI 1,000 metric tons (± 10%) of frozen Alaskan pink salmon at a guaranteed price of $1,150 per metric ton.[9] The contract specified that the salmon was to be headed and gutted, with the bloodline removed, and that the salmon was to be of the highest "grade #1" quality.[10] This quality provision incorporated a number of specific industry standards, calling for fish that had: an Alaska Seafood Marketing Institute ("ASMI") meat color rating of P.3 or above; an ASMI skin color rating of "A" – "D"; no meat in a jelly-like or chalky condition, and; no severe bruising.[11] The contract also allowed for the quality to be reviewed and required that all claims regarding the quality

---

[8] See damage analysis attached as Exhibit 3.
[9] Exh. 2.
[10] *Id.*
[11] *Id.* Oleg Nikitenko, Global's President, interlineated the word "external" before the word "bruising." *Id.*

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Case No. 3:06-cv-00011 JWS

of the product covered by the contract were to be made within 15 days after the arrival of the goods.[12]

As noted above, FMI is a seafood broker – it re-sells the fish that it purchases to wholesale customers.[13]  In this matter, FMI contemporaneously entered into a contract with an Asian fish broker, Sang Jin Trading Co. ("Sang Jin"), to re-sell the Global salmon.[14]  As is clear on the face of the Sang Jin Contract, it mirrors the Global Contract in all ways except price – FMI agreed to re-sell the salmon at $1,280/MT, making a resale profit of $130/MT on this contract.[15]  This arrangement allowed both FMI and Sang Jin to focus on their respective business strengths – FMI used its knowledge of producers in Alaska and Sang Jin used its knowledge of customers in Asia.

The obvious benefit of this contract arrangement for all parties was that it provided certainty for the upcoming production season.  FMI (and in turn Sang Jin and its customers) was assured a source of salmon, and Global was assured of a buyer for its

---

[12] *Id*.  The Global Contract also specifically called for Global's payment to be made through a "transferable documentary letter of credit," payable "at sight."  *Id*.  This is a standard payment mechanism for international transactions, and indeed was the method used by Global and FMI for their dealings in 2004.  *See* Exh. 1.  The contract specifically referenced the documents that Global would be required to present in order to receive payment pursuant to the letters of credit: the original commercial invoice; the original packing list; the "clean on-board" ocean bill of lading; a certificate of origin; a health certificate; and a non-wood packing material designation.  *See* Exh. 2.  Where the contract references "3/3," it means that Global was required to present all 3 of the 3 original signed documents.  Global did not make any specific requests or negotiate any specific terms regarding the document presentation requirements during the negotiations of the Global contract.  The time frames and required documents were precisely the same in 2005 as in 2004 when no issues arose.  *C.f.* Exh. 2 (2005 contract), Exh. 1 (2004 contract).  A diagram outlining the letter of credit process is attached as Exhibit 4.
[13] Holme Affidavit at ¶ 2.
[14] Exh. 5.
[15] *Id*.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

fish.  The risk, of course, is in the guaranteed price.  If the market price for salmon fell, FMI would be burdened with overpriced fish that might be hard to re-sell.  If the market price increased, Global would have to pay more for the round fish it processed, and so would face diminished profits.  The nature of such futures contracts, however, is that the parties absorb this risk in exchange for security in markets or supply.

<u>Global's Price Increase and Grant of Right of First Refusal</u>

As it happened, the market price for high-quality pink salmon continued to rise throughout early 2005.[16]  In order to protect itself from the effect of this market change, Global requested FMI to accept a price increase of $170 per metric ton (from $1,150 to $1,320).[17]  In consideration for this price increase, Global offered FMI a right of first refusal for all additional pink salmon that Global produced beyond the ±1,000 metric tons covered by the contract.[18]

FMI communicated Global's April request for a price increase and its offer of a right of first refusal to Sang Jin, and requested that Sang Jin offer FMI a concomitant price increase in exchange for the right to get the additional salmon that FMI could get from Global under a right of first refusal.[19]  Sang Jin was, of course, reluctant to simply agree to an increase in price.[20]  However, based on Global's representations, FMI told Sang Jin that it would be able to get significant additional quantities of #1 quality pink salmon if the harvest was good, and Sang Jin reluctantly agreed to Global's price increase

---

[16] Holme Affidavit at ¶ 3.
[17] Exh. 6; Exh. 7.
[18] Exh. 7.
[19] Exh. 6.
[20] *Id*.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

in a contract amendment mirroring Global's proposed amendment of the Global

Contract.[21]  Sang Jin expended significant goodwill with its customers in getting them to

agree to the proposed price increase.[22]

Having convinced Sang Jin to accept the increased price, FMI was free to agree to

Global's proposed change.  Global and FMI signed a contract amendment on April 29,

2005.[23]  This contract amendment incorporated all other terms and conditions of the

February agreement, specifically referencing the requirement that the salmon be of "#1

quality," but increasing the price and including the agreed right of first refusal.  FMI and

Sang Jin then signed a contract amendment that mirrored the Global amendment.[24]

By its terms, the contract amendment memorializing FMI's right of first refusal

covered any salmon produced by Global beyond the ±1,000 metric tons it was already

obligated to produce for FMI.[25]  At the time it requested a price increase and offered the

right of first refusal in consideration, Global did not inform FMI of plans to sell

significant quantities of #1 pinks directly to other customers.[26]  Nonetheless, Global

actually did enter contracts obligating to other customers the same salmon it had

promised FMI the right of first refusal to purchase.[27]

---

[21] Exh. 6; Exh. 8.
[22] Exh. 6.
[23] Exh. 7.
[24] Exh. 8.
[25] Exh. 7.
[26] Holme Affidavit at ¶ 4
[27] *See e.g.* Exh. 9; Exh. 10.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

Global's Unilateral Change In Specifications

On August 9, 2005, **prior to** Global's first shipment of fish, Global informed FMI that it was having trouble with the vacuum system it had purchased (with a loan from FMI) to remove the bloodlines from its processed fish.[28]  The Global Contract required Global to produce salmon with the bloodline removed ("b/o"), and FMI had loaned Global the money to purchase a vacuum system for this specific purpose.[29]  Nonetheless, Global asked FMI to accept salmon with the bloodline in ("b/i"), without any downward adjustment in the price Global would receive, stating that removing the bloodlines by hand would be "too expensive."[30]  At that point, the market price for pinks was still rising.[31]  Global's requested deviation from the contract terms would benefit Global, by protecting Global from the effect of increased market prices for the fresh caught fish it purchased for processing.  During discussions on this issue, Global continued to assure FMI that the pink salmon Global was processing was of #1 quality, that Global would meet the quantity requirement of the Global Contract, and that Global expected to have additional salmon available for FMI to purchase pursuant to FMI's right of first refusal.[32]  Based on Global's assurances regarding the quality and quantity of the fish it would produce, and in a demonstration of its good faith commitment to Global under the contract, FMI agreed to accept approximately 50% of the salmon with the bloodline still

[28] Holme Affidavit at ¶ 5.
[29] Exh. 11.
[30] Exh. 12.
[31] Holme Affidavit at ¶ 3.
[32] Exh. 12.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*FMI Food Marketers, Int'l v. Global Seafoods*

Case No. 3:06-cv-00011 JWS

in, with no downward adjustment of the price.[33]  In order to agree to this, FMI and Sang

Jin had to convince their customers to accept b/i salmon, which meant that these

customers would have to remove the bloodlines themselves.  Through extensive effort

and expenditure of good will, FMI and Sang Jin convinced their customers to accept this

adjustment.[34]

Soon thereafter, Global forwarded to FMI a series of photographs, purportedly of

the fish Global had processed, which was intended to demonstrate for the customers the

quality of the fish they were going to receive.[35]  The fish in the photograph sent by

Global were clearly of #1 quality, premium grade fish.  They showed no bruises or

discoloration, and the meat and skin color were excellent.[36]  FMI forwarded these

photographs to Sang Jin, who shared them with the customers – the photographs sent by

Global thus set the baseline expectations regarding the fish Global was to produce.[37]

<u>The 2005 Production Season</u>

The quantity of fish that Global had promised to provide would amount to

approximately 45 cargo containers, weighing just over 20 metric tons per container.[38]

FMI and Sang Jin understood that the fish would be shipped in stages, with shipments

being made as the salmon catch came into Global's plant and was processed.[39]  The fish

was to be transported from Global's plant in Kodiak to Dutch Harbor, where it would be

---

[33] *Id.*
[34] *Id.*
[35] *Id.* at (FMI 53).
[36] *Id.*
[37] *Id.*
[38] Holme Affidavit at ¶ 6.
[39] *Id.*

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

loaded onto cargo ships bound for Asia.  As in 2004, FMI was to inform Global of the final shipping destination of the product when the product was ready to ship.[40]

The fishing season is short, and Sang Jin was under significant pressure to deliver fish to its clients in a timely fashion.[41]  FMI and Sang Jin also recognized that Global would have to ship product expeditiously in order to meet its 1,000 MT contractual quota and still have fish to offer under the right of first refusal.[42]  Sang Jin had clients clamoring for as much fish as they could get, and it was anxious to obtain the 1,000 MT of fish to be produced by Global under the contract, and to obtain as much additional fish as possible under the right of first refusal.[43]

First Shipment of Fish

Global's first shipment of ±200 MT of frozen pink salmon amounted to seven (7) containers of fish.[44]  The end customer for this shipment, the Qingdao Yilufa Group Co., Ltd., of Qingdao, China ("Yilufa"), opened a letter of credit in the amount of $264,000, with Global as the second beneficiary, on August 11, 2005.[45]  Global was faxed a copy of that letter of credit on August 11, and forwarded a copy to its shipper (ETS Cargo) on August 16, 2005.[46]  FMI and its shipper were thus on notice prior to shipment that the required documents had to be presented at "the counter of HSBC Bank Canada [FMI's

---

[40] Holme Affidavit at ¶ 6.
[41] Exh. 13.
[42] *Id.*
[43] *Id.*
[44] Exh. 14.
[45] Exh. 14 at ETS-0007-10.  The principal letter of credit amount of $264,000 was sufficient to pay Global its contract rate of $1320 per metric ton on a shipment of 200 metric tons of salmon.
[46] *Id.*

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Case No. 3:06-cv-00011 JWS

bank in Vancouver] within 8 days after the date of shipment."[47]  The first container was shipped from Dutch Harbor on August 23, 2005, making the presentation deadline August 31, 2005.[48]

FMI worked with Global to ensure that the required documents for payment under the letter of credit were properly prepared.[49]  Global, however, was tardy in presenting the required documents to release payment under the letter of credit.[50]  Yilufa nonetheless agreed to accept Global's discrepant documents, and instructed its bank to amend the letter of credit, at Yilufa's expense, to allow the late-presented documents.[51]  The issuing bank agreed, and payment was released to Global.[52]

Quality Issues and Inspection of the First Shipment

Yilufa soon notified FMI that Global's first shipment did not meet the contractual quality requirements.[53]  There was significant bruising of the fish, the meat color did not meet the specified ASMI range, and a significant amount of the meat was in poor condition.[54]  Because of the substandard condition of the fish, Yilufa demanded a 15% – 19 % discount on the price, based on the estimated amount of the fish that was unsuitable for Yilufa's purposes due to its deviation from the applicable quality standards.[55]

---

[47] *Id.*
[48] The first container arrived in Qingdao, China, on September 6, 2005.  *Id.* at ETS 4. The remaining six containers followed shortly after the first container, and arrived shortly after.  Exh. 15 at ETS 42.
[49] Exh. 14 at ETS 12-23.
[50] Exh. 16; Exh. 17.
[51] Exh. 18; Exh. 17.
[52] Exh. 19.
[53] Exh. 20.
[54] *Id.*
[55] *Id.*

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

Concerned about this quality issue, FMI urged Global to stand behind its product and send an inspector to Qingdao to examine the shipment.[56]  Global, however, dragged its feet on sending an inspector.  Global's principal Oleg Nikitenko ("Nikitenko") first would not agree that any inspection was necessary, and accused the customer (and FMI) of trying to steal from him.[57]  Nikitenko would not agree to send an inspector unless FMI paid his $1500 expenses, and even after FMI agreed to pay the inspection expenses FMI still had to battle a great deal of resistance and lack of communication from Global in coordinating the date and time of the quality inspection.[58]  The inspection was initially scheduled on September 22, 2005, but, Global kept putting it off due to Global's unwillingness to coordinate with the inspector.[59]  Eventually, on October 10, 2005, nearly a month after the initial quality complaint and after significant effort on the part of FMI, Global's quality inspector Johnson Zhang (referred to in the correspondence as "QC Johnson") examined the shipment in Qingdao, along with representatives of Sang Jin and Yilufa.[60]

Zhang prepared a report, which was sent to Global's President, Oleg Nikitenko, on October 10, 2005.[61]  Global, however, refused to release the report to FMI, despite the fact that FMI had paid for the inspection and demanded on numerous occasions to see the report.[62]  Global repeatedly and confusingly insisted that FMI had no right to see the

---

[56] *Id*. at FMI 210.
[57] Exh. 21.
[58] Exh. 22.
[59] Indeed, after Global had promised the inspector would be there, the inspector informed Sang Jin that he had not even purchased a plane ticket.  *Id*. at FMI 315.
[60] Exh. 23.
[61] Exh. 24.
[62] Exh. 25.  After significant delay and threats of motions to compel, Global finally

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

report, because it had paid "only for expenses."[63]  Global then falsely represented that the report was positive, and that it demonstrated no quality problems.[64]

Global's real reasons for hiding the report from FMI are obvious on its face.  QC Johnson reported significant quality problems with the shipment, including a "bruise percentage … between 15%-16%" that was likely created during processing, or because of "pollution" of the fish due to Global's inability to produce bloodline-out fish as it had promised.[65]  More egregiously, Johnson plotted with Nikitenko to go behind FMI's back and sell the salmon to the end customer themselves, cutting FMI and Sang Jin out of the deal they had worked so hard to put together.  QC Johnson suggested that "my idea is to do the business directly with Yilufa not through so many brokers," and that Nikitenko should "wash [his] hands as soon as possible."[66]

By withholding the inspection report from FMI, however, Global deprived FMI of the ability to defend Global's product.  FMI had only Global's oxymoronic insistence that there had been no breach of the quality provisions of the contract, but that FMI could not review the inspection report.[67]  FMI's only actual information regarding the quality of the shipment thus came from Yilufa and Sang Jin principal Sam Lim, who reported QC Johnson's remark that the salmon was "the worst product [he had] seen in a long time."[68]  Sang Jin and Yilufa's detailed reports of problems with Global's product were also

---

produced a copy of this report in August 2006, during the course of this litigation.  *See* Clerk's Docket 31 (Motion to Compel).

[63] Exh. 25.

[64] Exh. 26.

[65] Exh. 24.

[66] *Id*.

[67] Exh. 25.

[68] Exh. 27; Exh. 23.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

backed up by photographs.[69]  Given this evidence that the product did not comply with the contract's quality provisions, Global's obstinate refusal to deal with the quality issue or even communicate about it, and Global's threats that it would simply stop delivery under the contract, FMI was forced to act unilaterally in order to salvage its relationship with Sang Jin and Yilufa.  FMI provided, from its own funds, a payment of $35,394 in order to satisfy Yilufa's damages due to Global's breach of the quality provisions of the contract.[70]  Global, however, refused to offer any rebate or credit to FMI, instead simply continuing to insist that there had been no breach of the quality provisions, all the while refusing to supply any information or evidence to support its position.[71]

Subsequent Shipments And Other Issues

While the inspection issue played out, the 2005 fishing season continued. Unbeknownst to FMI, Global had made arrangements to ship #1 quality fish to other customers, despite its promise in the right of first refusal amendment to offer such fish to FMI first.  In one such contract, Global agreed in August of 2005 (months after it had promised FMI a right of first refusal) to ship #1 quality H&G pinks to an outfit called Dell Trading, at a price of $1,850 MT – significantly higher even than the $1,320 price it had received from Global after the right of first refusal amendment.[72]  Global has indicated that it did not receive any quality complaints from these customers, despite the

---

[69] Exh. 28; Exh. 29.  These photographs and inspection reports indicated that the problems were more significant than the simple bruising identified by Johnson.
[70] Exh. 30.
[71] Exh. 25; Exh. 26.
[72] Exh. 7.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

uniform quality problems identified by FMI's customers.[73]  Sang Jin, however, suspected that Global was purposefully falling short of its contractual obligations to FMI.  Sang Jin had heard that the catch in Kodiak was good, and so did not understand why Global was not delivering fish more quickly – as noted above, the right of first refusal was valuable to Sang Jin, as Sang Jin had given valuable consideration for that right and it had customers clamoring for as much high quality fish as they could get.[74]  Sang Jin was concerned that Global would not meet the contracted amount of 1,000MT, and did not understand why Global had not offered fish pursuant to the right of first refusal.[75]  Sang Jin correctly suspected that Global was selling fish to other customers behind FMI's back, and was not honoring the contract quantity, quality, or right of first refusal provisions.[76]  Despite its significant volumes of shipments to other consumers, Global did not offer any fish to FMI at all under the right of first refusal in 2005.[77]

At the same time as Global was refusing to deal with the quality issues raised by its first shipment and was shipping large amounts of fish under contract to other purchasers, Nikitenko became obstreperous with FMI regarding Global's perceived payment issues under the contract.  Nikitenko repeatedly and groundlessly accused FMI of some form of breach of contract, insisting that he was not being paid for shipments, and threatening to sell his fish elsewhere.[78]  This continued even though FMI

---

[73] *See* Exh. 31; Exh. 10 (showing no quality complaints); Exh. 32; Exh. 22 at FMI 231.
[74] Exh. 13; Exh. 33.
[75] Exh. 13; Exh. 34; Exh. 35.
[76] *Id.*
[77] Holme Affidavit at ¶ 4.
[78] Exh. 36.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

demonstrated on numerous occasions that the required letters of credit were actually in place.[79]  Nikitenko's complaints were both groundless and difficult to understand.[80]

<u>Second Shipment and Quality Issues</u>

Global's second shipment of salmon amounted to six (6) containers of frozen pink salmon.  All six containers were purchased by YS Trading Co., which directed that four (4) of these containers go to Chotiwat Manufacturing in Bangkok, Thailand, which had demanded that it only receive fish with the bloodline removed.[81]  The other two containers were sent by YS Trading to Yijia Foodstuffs' branch office in Qingdao.[82]  The Chotiwat and Yijia shipments were paid in full by couriered check.[83]

These customers again discovered substantial quality issues with the fish produced by Global.[84]  FMI and Sang Kin arranged to have all of the fish in this second shipment inspected by Wolfgang Plath, Ltd., a well-respected international seafood inspector.[85]  Plath prepared a report regarding these fish clearly demonstrating that they fell far short of the "#1 quality" provisions of the contract.  The report shows that significant amounts of fish were outside of the meat color range allowed by the contract.[86]  There were also issues with bad smell, and with meat consistency.[87]  Finally, the bruising of the fish was so significant that it could not be considered of the high quality the contract required.[88]

---

[79] Exh. 37.
[80] *Id.*; Exh. 36.
[81] Exh. 38.
[82] Exh. 39.
[83] Exh. 40.
[84] Exh. 41.
[85] *Id.*
[86] Exh. 29; Exh. 60.
[87] *Id.*
[88] *Id.*

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

Chotiwat and Yijia, of course, requested a price concession based on these quality breaches.[89]  Global's breach put FMI in a difficult position.  FMI and Sang Jin both had an interest in maintaining good customer relationships, to facilitate future business deals and build a reservoir of good will.  Moreover, the end customer's complaints were valid.[90]  As Yijia's claim had been timely asserted, FMI in good faith could not reject it, and paid $16,820 of its own funds to settle that claim.[91]  In order to mitigate the damages it could be caused by FMI's breaches of the quality provisions, however, FMI was forced to reject these valid complaints, because they were raised after the contractual 15-day deadline.[92]  Although the customer was obliged to bear the financial burden of Global's breach, however, FMI's customer relationship was damaged.[93]

<u>Third Shipment and Quality Issues</u>

The breaking point came with Global's third shipment of salmon under the contract.  This shipment amounted to seven (7) containers of fish, 5 of which were shipped to Fusheng Foods in Qingdao, and 2 of which were again shipped to Yilufa in Qingdao.[94]  Fusheng had opened letters of credit in favor of Global on August 30 and September 6, 2005, which were increased on September 9 and September 8, respectively.[95]  These amended letters of credit, as FMI explained exhaustively, were

---

[89] Exh. 41.
[90] Exh. 29.
[91] Exh. 42.
[92] Exh. 41.
[93] *Id.*
[94] Exh. 43.
[95] Exh. 44.  Fusheng's first L/C was for $198,000, and was increased by $89,760 for a total L/C of $287,760.  *Id.*  Fusheng's second L/C was for $132,000, and was increased by an additional $132,000.  *Id.*  The total amounts available to Global under Fusheng's letters of credit was $541,760, more than sufficient to pay for its proposed 411 MT of

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

more than sufficient to cover the approximately 411 MT of fish slated to go to Fusheng.[96] Moreover, Yilufa's original letter of credit still had more than sufficient value to cover the second shipment.  The shipment left Dutch Harbor on September 6, 2005.[97]

Again, Global was tardy in presenting the necessary documentation to trigger the release of funds under the letter of credit.[98]  After the debacle with Global's first shipment, Yilufa in particular was understandably concerned about the quality of the product it was to receive.[99]  Moreover, news of the problems with Global's first shipment had spread through the docks in Qingdao, and Fusheng was aware of this issue as well.[100] As such, Yilufa and Fusheng were only willing to pay for an amendment of the letter of credit and to accept Global's discrepant tardy presentation of documents if Global agreed to allow them to inspect the salmon first.[101]  They were not asking to take possession of the salmon, but only to *inspect* a selected cross-section of fish to determine, prior to payment, whether it was of the required quality.[102]  After this inspection showed that the fish was of the necessary quality, Fusheng and Yilufa would take the necessary steps to release payment to Global.[103]  This request was consistent with the 15-day review and complaint mechanism in the Global Contract.

---

fish.  *Id.*
[96] Exh. 19; Exh. 45; Exh. 46.
[97] Exh. 43.
[98] Exh. 47.
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.*

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

Global, however, flatly refused this reasonable accommodation.[104] Global refused in advance to make any adjustment to the price (which had not even been requested yet), and, more significantly, refused to allow any inspection of the fish to ensure it was of the contractually promised quality.[105] Moreover, Global continued to make obstreperous and confusing accusations that FMI had breached its contract, asserting that some aspect of the contract gave it an unfettered right to advance payment on the shipments, and that FMI's customers (again, the same customers who purchased the Global fish from FMI in 2004 without quality complaints) were inventing phony quality complaints to justify demands for discounts, late payment, or non-payment.[106] Global threatened to curtail its future shipments of fish to FMI and to sell them instead to other customers.[107]

In the midst of this, the second shipment to Fusheng of 13 containers was shipped from Dutch Harbor.[108] Global became confused and obstreperous regarding the letter of credit mechanism for this shipment, after FMI informed it that there were two letters of credit, and so there needed to be two sets of documents to secure payment under those letters.[109] Global incorrectly insisted that there were not sufficient funds to pay for the shipment, despite FMI's clear demonstrations to the contrary.[110] Global demanded that, instead of using the letter of credit mechanism that had been agreed upon for 2004 and 2005, it receive an advance cash payment of $110,000 for this shipment.[111] In order to

---

[104] Exh. 36 at FMI 245; Exh. 48; Exh. 49.
[105] *Id.*
[106] Exh. 35; Exh. 37; Exh. 48; Exh. 49.
[107] Exh. 35; Exh. 36.
[108] Exh. 51.
[109] Exh. 12 at FMI 259; Exh. 19; Exh. 49.
[110] Exh. 19; Exh. 37.
[111] Exh. 22 at FMI 311-12; Exh. 49.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

bolster its bargaining position on this issue, Global withheld release of customs documentation for the 4 containers of fish previously-shipped to Chotiwat, **even though Chotiwat was in no way involved in the dispute and Global had been fully paid for those 4 containers**.[112] Global stated that it would not release the documentation (which was necessary to allow the purchasers to take the fish through customs) until FMI wired $110,000 to Global.[113] Global also threatened that, if such payment were not made, it would retain the shipment of 13 containers that was on its way to Fusheng in Qingdao, and sell that fish to other purchasers.[114] Upon receipt of the demanded funds, Global said it would release the documents for the 4 containers, absorb demurrage charges, and deliver the 13 containers to Fusheng.[115] FMI, in order to prevent such losses to its customers, believed it had no choice and forwarded $110,000 to Global on September 29, 2005 as an advance payment on future deliveries of frozen pink salmon.[116]

The standoff with respect to the inspection of the 7 containers shipped to Fusheng and Yilufa, however, proved intractable. Global would not allow any inspection or release the salmon unless Yilufa agreed to accept Global's tardy presentation of the letter of credit documents and release full payment prior to inspection. Yilufa and Fusheng, however, refused to amend their letters of credit unless Global allowed an inspection, and FMI was caught in the middle.[117] FMI made many efforts to get Global to agree to allow

---

[112] *Id.*
[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] Exh. 52.
[117] Exh. 53.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Page 21                                             Case No. 3:06-cv-00011 JWS

the reasonable accommodation that Yilufa and Fusheng had requested, only to be rebuffed in the most inflammatory terms.[118]  Global continued to threaten FMI and to insist that FMI had somehow broken the contract.[119]  Global, in fact, seemed flatly confused, or seemed to be talking about other contract arrangements altogether – although it had been paid in full for all of the fish it produced, despite the quality issues uniformly raised by the customers, and had even received a $110,000 <u>cash</u> payment *in advance* on future shipments, Global repeatedly accused FMI of failing to procure payment.[120]  Global's assertions were confusing and downright nonsensical, and FMI was left unable to figure out what Global was even talking about, much less reach any accommodation.[121]

In the end, however, there was nothing FMI could do.  Yilufa and Fusheng refused to accept the shipment without an inspection, and Global refused to allow any inspection in advance of full payment.  FMI made demand upon Global to live up to its contract obligations and release the fish, but Global refused, instead informing FMI that it had sold <u>and shipped</u> the salmon promised to Yilufa and Fusheng (both the original 7 and next 13 containers) to other customers.[122]  The fish was, according to Nikitenko, gone. Global continued to insist that FMI had somehow breached the contract, although FMI

---

[118] Exh. 49; Exh. 46.
[119] Exh. 36.
[120] Exh. 48 at FMI 358.
[121] Exh. 49.
[122] *Id.*; Exh. 54; Exh. 55.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

could not understand what breach Global might have been talking about, as Global had been paid in full for all shipments.[123]

Global had only shipped 750.8 MT of pinks under the Global contract, well short of the required 1,000 MT. What's more, of the fish that had been shipped, Global re-directed 455.7 MT – more than half of its total actual shipments – to other customers due to its meritless payment and inspection disputes. FMI's principal demanded return of the $110,000 cash advance, reminding Nikitenko that it had come from his personal retirement account and that it had been for future fish that were never delivered.[124] When Nikitenko informed FMI that he would not release the $110,000 cash advance on future shipments, even though he had made no such shipments, and told FMI's principle that he was "full of shit," it was clear that there was no way to salvage the situation.[125] The present lawsuit followed.

## APPLICABLE LAW

### I.    STANDARD ON SUMMARY JUDGMENT

A party is entitled to summary judgment when the record shows that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law.[126] The initial burden rests with the moving party to establish that the evidence raises no genuine issue of material fact.[127] If the moving party meets this

---

[123] Exh. 49.
[124] Exh. 49; Exh. 57.
[125] Exh. 57; Exh. 20 at FMI 420; Exh. 58.
[126] Fed. R. Civ. P. 56(c); *California Architectural Building Procuts, Inc. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir. 1987).
[127] *Celotex Corp. v. Catrett* , 477 U.S. 317, 106 S. Ct. 2548 (1986).

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

burden, the party opposing the motion then must demonstrate that a genuine issue of material fact exists.[128]  The party opposing the motion cannot meet its burden by alleging disputes over irrelevant, insubstantial, or tangential facts, and such disputes will not preclude a grant of summary judgment.[129]  A "material" fact is "one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense."[130]

Civil Rule 56 "mandates the entry of summary judgment" against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[131]

II.     APPLICABLE SUBSTANTIVE LAW.

FMI has brought claims for breach of contract (including breach of specific terms of the contract and breach of the implied covenant of good faith and fair dealing), violation of the Alaska Unfair Trade Practices Act, interference with contract and with prospective economic advantage, misrepresentation, and conversion, seeking both compensatory and punitive damages.[132]

---

[128] *Id.* 477 U.S. at 321.
[129] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2513 (1986).
[130] *Id.*
[131] *Celotex*, supra, 106 S. Ct. at 2552.
[132] *See* Clerk's Docket 1 at Exh. 4 (Complaint).

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

This matter was removed to federal court on the basis of federal question jurisdiction over the contract claims, based on application of the United Nations Convention on the International Sale of Goods ("CISG" or "U.N. Convention").[133]  The parties do not dispute that the CISG is the substantive law applicable to the contract claims.[134]

This Court has pendant or ancillary jurisdiction over FMI's other state law claims.[135]  In exercising this jurisdiction, this Court is to apply the law of the State of Alaska to FMI's other state law claims, as such claims are not preempted by the CISG.[136]

## ARGUMENT

I.    GLOBAL BREACHED ITS CONTRACT WITH FMI

FMI submits that, based on the incontrovertible record in this case, Global breached its contractual commitments to FMI, including the contractual provisions regarding product quality, product quantity, the right of first refusal, and the implied covenant of good faith and fair dealing.  There is no material question of fact as to any of these aspects of Global's breach of contract.  Global did not ship the #1 quality fish required by the contract, as clearly demonstrated in all of the inspection reports regarding Global's shipments. including Global's own inspection.  Global failed to honor – indeed,

---

[133] Clerk's Docket 1 (Notice of Removal).
[134] *Id.*
[135] *See Caterpillar, Inc. v. Usinor Industeel*, 393 F.Supp.2d 659, 673-75 (N.D. Ill. 2005); *Geneva Pharmaceuticals Technology Corp. v. Barr Labs., Inc.*, 201 F.Supp.2d 236, 286 (S.D.N.Y. 2002).
[136] *Id.*

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

it is clear that it never had any intention of honoring – FMI's right of first refusal, making arrangements to sell significant quantities of #1 H&G pinks (for significantly higher prices) to other customers without even informing FMI of the fish.  FMI clearly violated the quantity requirement of the contract – after the first 750 MT, less than half of which was actually delivered to FMI's customers, Global simply stopped shipping fish to FMI's customers, even though appropriate letters of credit were in place and FMI had provided a $110,000 cash advance payment.  Finally, Global's actions throughout 2005 are also clearly in violation of its obligations of good faith and fair dealing toward FMI – Global's clearly established dishonesty and double-dealing, clearly established in the record, deprived FMI of the benefit of its contract, and were simply and objectively unfair.

A.      Application of the U.N. CISG

As noted above, the parties agree that the U.N. CISG applies to the contract claims.[137]  The CISG is a self-executing agreement between the United States and other signatories, including Canada, that generally fulfills the function of the Uniform Commercial Code ("UCC") in international transactions.[138]  The CISG "embodies … a

---

[137] Of course, FMI has raised a number of other claims under Alaska state law, to which the CISG does not apply.  *See* Clerk's Docket 1, Exh. 4.  *See* John Honnold, *Uniform Law for International Sales Under the 1980 United Nations Convention* (hereinafter "Honnold") at 60-62 (2d ed. 1991) (addressing principles for interpretation of CISG).

[138] Under the CISG, parties may by contract choose to be bound by a source of law other than the CISG.  *See* CISG (reproduced at 15 U.S.C. A. App. at 340) Art. 1.  Where the agreement is silent as to choice of law, however, the Convention applies if both parties are located in signatory nations.  *Id*.  The Global Contract has no choice of law provision.  *See* Exh. 2.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Case No. 3:06-cv-00011 JWS

strong preference for enforcing obligations and representations customarily relied upon by others in the industry."[139]

There is little U.S. case authority applying and interpreting the CISG, leaving courts to figure out appropriate ways to fill in the gaps. Where the CISG is not entirely clear, courts can "look to its language and to 'the general principles' upon which it is based."[140] A more useful guide, however, is the UCC and the applicable case law. As noted above, the CISG is intended to act in the same capacity as the UCC for international transactions, and relies upon most of the same principles of law.[141] UCC case law "is not *per se* applicable," but in situations where the language of the relevant CISG provisions tracks that of Article 2 of the UCC, courts may also appropriately refer to such analogous UCC provisions and to the interpreting case law.[142] Courts may also be appropriately guided by the general principles of the applicable state common law in interpreting and applying the provisions of the CISG.[143]

The CISG provides alternative remedies for what it terms a "fundamental" breach. The buyer may either require delivery of substitute goods[144] or declare the contract void[145] and seek damages.[146] With respect to damages, the CISG provides:

---

[139] *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.*, 201 F.Supp.2d 236, 281 (S.D.N.Y. 2002), *citing MCC-Marble Ceramic Center, Inc. v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384, 1387 (11th Cir. 1998); *Delchi Carrier Spa, v. Rotorex Corp.*, 71 F.3d 1024, 1028 (2d Cir. 1995).
[140] *Delchi Carrier Spa*, *supra*, 71 F.3d at 1028, *quoting* CISG Art. 7(2).; *see also* Honnold, *supra*, at 60-62.
[141] *See* Honnold, *supra* at 60-62.
[142] *Delchi Carrier Spa*, *supra*, 71 F.3d at 1028; *Orbisphere Corp. v. U.S.*, 726 F.Supp. 1344, 1355 (Ct. Int'l Trade 1989).
[143] *Id*.
[144] CISG Art. 46.
[145] CISG Art. 49.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

> Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach.  Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract.[147]

This provision is "designed to place the aggrieved party in as good a position as if the other party had properly performed the contract."[148]

Article 25 of the CISG defines a "fundamental" breach of contract as follows:

> A breach of contract committed by one of the parties is fundamental if it results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract…."[149]

A breach that involves "important determinants of the product's value" is properly deemed "fundamental" under the CISG.[150]

The CISG specifically identifies quality terms of a contract as fundamental.[151] "Article 35 of the CISG provides that the seller must deliver goods of the quality and description required by the contract ….  Article 36 establishes the seller's liability for any

---

[146] *Delchi Carrier Spa*, *supra*, 71 F.3d at 1029.
[147] CISG Art. 74.
[148] Honnold, *supra,* at 503.
[149] CISG Art. 25.
[150] *Delchi Carrier Spa*, *supra*, 71 F.3d at 1029.
[151] *See* CISG Art. 35, 36; 15 U.S.C.A. App. at 342, 343.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

lack of conformity."[152]  The CISG thus supports claims for breach of implied and express quality warranties.[153]

CISG case law particularly emphasizes the importance of samples or exemplars as establishing the applicable quality standards in international transactions.[154]  Where a producer has held out samples or exemplars of a certain quality to be representative of his product, the producer is responsible for meeting the expectation of quality such exemplars reasonably create.[155]

B.     The Salmon Shipped By Global Failed To Meet The Quality Provisions of the Contract

In *Delchi*, the court held that, under the CISG, a buyer has a claim for a "fundamental breach" arising from the delivery of nonconforming goods.[156]  Under Article 35 of the CISG, the seller must deliver goods which are of the quantity, quality, and description required by the contract.[157]  Additionally, Article 36 of the CISG states that the seller is liable in accordance with the contract and the Convention for any lack of conformity.[158]

---

[152] *Caterpillar, Inc. v. Usinor Industeel*, 393 F.Supp.2d 659, 676 (N.D. Ill. 2005).
[153] *Id.*
[154] *Delchi Carrier Spa*, *supra*, 71 F.3d at 1029.
[155] *Id.*
[156] *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024 (2d Cir. 1995).
[157] *Id.*
[158] *Id.*; *see also Mitchell Aircraft Spares, Inc. v. European Aircraft Service AB*, 23 F.Supp.2d 915 (N.D.Ill. 1998); *Magellen Intern. Corp. v. Salzgitter Handel GmbH*, 76 F.Supp.2d 919 (N.D. Ill. 1999).

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Page 29                                            Case No. 3:06-cv-00011 JWS

The facts in *Delchi* mirror the facts in this case.  A manufacturer (Delchi) contracted with a specialty cooling system manufacturer (Rotorex) to supply parts for air conditioning units.[159]  Prior to shipment, Rotorex sent Delchi a sample product and written performance specifications.[160]  Delchi accepted one shipment, released payment under a letter of credit, and had a letter of credit in place to cover a second shipment.[161] While the second shipment was en route, Delchi's inspection of the first shipment indicated that it did not conform with the written quality specifications or with the sample product sent by Rotorex.[162]  On these facts, the Second Circuit affirmed the district court's grant of summary judgment on liability, holding that "there was thus no genuine issue of material fact regarding liability, and summary judgment was proper.[163]

The same is true here.  The Global contract specifically required Global to deliver "#1 Quality" H&G pink salmon.[164]  "#1 quality" is an accepted and uniformly understood industry standard referring to a specific quality range of fish.[165]  The Global Contract,

---

[159] *Delchi, supra,* 71 F.3d at 1026-27.
[160] *Id.*
[161] *Id.*
[162] *Id.*
[163] *Id.* at 1028.
[164] Exh. 7.
[165] Holme Affidavit at ¶ 7 .  Global also used this same terminology in its contracts with other customers in 2005, establishing that Global knew and understood the meaning of the phrase.  Exh. 9.  This commonly understood meaning was, under the CISG, incorporated into the Global Contract.  *Geneva Pharmaceuticals, supra,* 201 F.Supp.2d at 281, *citing* CISG Art. 9, 15 U.S.C.A. App. at 340 ("The usages and practices of the parties or the industry are automatically incorporated into any agreement governed by the Convention, unless expressly excluded by the parties."); *see also Treibacher Industrie, A.G. v. Alleghany Technologies, Inc.,* --- F.3d ----, 2006WL2595225 (11th Cir. Sept. 12

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Page 30                                            Case No. 3:06-cv-00011 JWS

however, left even less to chance, laying out in specific detail the quality standards

applicable to the contract by reference to independent ASMI standards regarding meat

quality, firmness, consistency, and color.[166]  A glance at the face of the contract itself

indicates that these quality provisions constitute the vast majority of the agreement

between the parties.[167]  While Global interlineated a handwritten amendment to the final

provision regarding bruising (the meaning and enforceability of which is open to

question), it indisputably accepted the prior, more comprehensive quality

requirements.[168]  The Global Contract also contained a 15-day period within which the

parties could make claims, which, in this type of contract, means quality claims.[169]  The

existence of this claim period, of course, means that the parties understood and agreed

that purchasers had the right to and might make claims based on poor product quality.  As

quality provisions were central to the contract, it is also clear that the parties were aware

of and accepted the possibility that purchasers might make quality claims and demand

satisfaction in this regard.

Global went even one step further, forwarding photographs of fish that Global

itself purported to be representative of the product it was to ship.[170]  These photographs

---

2006).
[166] Exh. 8.
[167] *Id.*
[168] *Id.*
[169] *Id.*
[170] Exh. 12 at FMI 53.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Page 31                                                     Case No. 3:06-cv-00011 JWS

showed fish with no significant bruising, excellent meat and skin color, and no mushy or chalky meat.[171]   FMI and Sang Jin relied on this representative sample to demonstrate the quality Global was to ship to their customers.[172]   FMI also relied upon Global producing at least the quality of steps to deal with the deficient quality assertions.

Global, however, failed in each and every shipment it made to meet the quality provisions of its contract with FMI.  Indeed, it took no efforts to ensure that the fish met the quality provisions of the contract and refused to take any good faith or responsible steps to deal with the deficient quality assertions.[173]   These failures to meet the essential quality provisions of the contract amount to a "fundamental breach" under the CISG, entitling FMI to damages for its losses.

1.     First Shipment Quality Issues

As discussed above, Global's first shipment of ±200 MT of frozen, #1 quality H&G pink salmon amounted to seven (7) containers of fish, and was shipped to Yilufa in Qingdao, China, on August 23, 2005.[174]   Yilufa timely opened a letter of credit in the amount of $264,000, with Global as the second beneficiary, as required by the contract, on August 11, 2005.[175]   Upon delivery of the fish, Yilufa agreed to accept Global's late,

---

[171] *Id.*
[172] *Id.*
[173] Global's internal records indicate that it performed no quality inspections.  Exh. 59.
[174] Exh. 14.
[175] The principal letter of credit amount of $264,000 was sufficient to pay Global its contract rate of $1320 per metric ton on a shipment of 200 metric tons of salmon. *Id.* at ETS 7-10.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

discrepant documents, and instructed its bank to amend the letter of credit, at Yilufa's expense, to allow the late-presented documents.[176]  Global received full payment.[177]

Yilufa notified FMI within the 15-day claim period that Global's shipment did not meet the contractual quality requirements.[178]  Yilufa reported significant bruising of the fish, the meat color did not meet the specified ASMI range, and a significant amount of the meat was in poor condition, leading Yilufa to demand a 15 – 19 % discount on the price.[179]

FMI raises other issues below regarding Global's inappropriate response to this quality claim.  With respect to the quality provisions of the contract, however, the bottom line is that there were severe quality problems with this shipment.  Global's own quality inspector reported severe bruising rendering 15%-16% of the fish unusable.[180]  Sang Jin principal Sam Lim was present at the inspection and reported QC Johnson's remark that the salmon was "the worst product [he had] seen in a long time."[181]  Yilufa's report of problems with Global's product was backed up by photographs.[182]  Yilufa's inspection report found not only massive bruising (up to 80% in some of the fish), but a significant amount of the fish had meat and skin color outside of the acceptable range.[183]  The photographs of that shipment show that the meat was so significantly damaged from

---

[176] Exh. 16; Exh. 17.
[177] Exh. 18; Exh. 17.
[178]  Exh. 20.
[179] *Id.*
[180] Exh. 24.
[181] Exh. 27; Exh. 23.
[182] Exh. 60.  This Wolfgang Plath inspection report includes inspection of the first seven containers shipped to Yilufa in Qingdao (Exh. 29 at FMI 586-627) and the two containers shipped to Yijia in Qingdao (*Id.* at FMI 628-641).
[183] *Id.*

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

bruising and other issues that it was simply unfit for use, and could not properly be labeled "#1 quality."[184]

In short, Global's first shipment did not comply with the contract's quality provisions, and did not match the quality of the fish that Global had held out as examples of its product. The inspection reports indicated that Yilufa had accurately claimed that 15-19% of the product shipped was not suitable for use.[185] FMI, which was forced to act unilaterally in order to salvage its relationship with Sang Jin and Yilufa, provided from its own funds a payment of $35,394 – 13.4% of what Yilufa had paid – in order to satisfy Yilufa's damages.[186] Global, which was responsible for the quality problems, owes this money to FMI for its breach of the quality provisions of the contract.

  2.    Second Shipment Quality Issues.

As noted above, Global's second shipment of salmon amounted to six (6) containers of frozen pink salmon. YS Trading, the purchaser, directed that four (4) of these containers go to Chotiwat Manufacturing of Bangkok, Thailand (which had demanded that it only receive fish with the bloodline removed), and that the other two containers go to Yijia in Qingdao.[187] Again, Global was paid in full for all of these containers by couriered check.[188]

The Wolfgang Plath inspection report of the Chotiwat fish clearly demonstrated that they fell far short of the "#1 quality" provisions of the contract. The report shows

---

[184] *Id.*
[185] *Id.*
[186] Exh. 30.
[187] Exh. 38; Exh. 39.
[188] Exh. 40.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

significant amounts of fish were outside of the meat color range allowed by the contract.[189]  There were also issues with bad smell, and with meat consistency.[190] Finally, the bruising of the fish was so significant that it could not be considered of high quality.[191]  FMI was forced to deny Chotiwat's quality claims because they had not been made within the required 15-day period.[192]  By supplying poor quality fish and denying these valid quality complaints, however, FMI has lost the ability to sell fish to this customer in the future.[193]

The Yijia shipment was also of poor quality.  This shipment was inspected along with the Yilufa shipment in Qingdao, and demonstrated the same quality problems of poor meat color, poor skin color, and bruising so pervasive and massive that it rendered the fish unsuitable for any reasonable use.[194]  It also failed to match the quality of the photos FMI had sent out as examples.  Yijia had made a timely claim, and so FMI was forced, in good faith, to pay $16,820 in settlement of this claim.[195]

3.    Third Shipment Quality Issues

Global's third shipment of seven (7) containers of fish to Yilufa and Fusheng in Qingdao, China left Dutch Harbor on September 6, 2005.[196]  Again, Global was tardy in presenting the necessary documentation to trigger the release of funds under the letter of

---

[189] Exh. 61; Exh. 41 at FMI 558-83; Exh. 29.
[190] *Id.*
[191] *Id.*
[192] Exh. 41 at FMI 556-57.
[193] Exh. 41; Holme Affidavit at ¶ 8.
[194] *See* Exh. 29 at FMI 628-641.
[195] Exh. 42.
[196] Exh. 62.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

credit.[197]  Yilufa was willing to pay for an amendment of the letter of credit and to accept Global's discrepant tardy presentation of documents if Global agreed to allow it to inspect the salmon first, a clearly reasonable request.[198]  Yilufa was not asking to take possession of the salmon, but only to *inspect* a selected cross-section of fish to determine, prior to payment, whether it was of the required quality.[199]  After this inspection showed that the fish was of the necessary quality, Yilufa agreed it would take the necessary steps to release payment to Global.[200]  This request was consistent with the 15-day review and complaint mechanism in the Global Contract.

Global, however, refused to stand behind the quality of the fish it had produced.[201] Global would not allow any inspection of the fish to ensure it was of the contractually promised quality.[202]  Global's actions amount to an outright repudiation of the quality provisions of its agreement with FMI.  Due to Global's actions, FMI lost its entire re-sale profit on this shipment.

      4.    <u>Global Failed To Take Any Measures To Produce Fish of the Required Quality Grade</u>

Despite the fact that Global had promised to meet very specific quality standards, and that it had reinforced those promises through exemplary photos, Global's records indicate that it took no steps whatsoever to grade the salmon it produced.[203]  Ungraded

---

[197] Exh. 47.
[198] *Id.*
[199] *Id.*
[200] *Id.*
[201] Exh. 35 at FMI 245; Exh. 36 at FMI 358-60; Exh. 49.
[202] *Id.*
[203] Exh. 31; Exh. 59.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

salmon are properly labeled "ocean run," and should be sold as the lowest quality.[204] Because they were ungraded, Global could not properly have sold the fish it shipped to Global as fish that met any particular grade – much less the premium or "#1 grade" Global promised, as specifically defined in the contract. Global's failure to take any actions to ensure that FMI received the quality of salmon it had promised under the contract was an outright repudiation of the quality provisions of that agreement.

5.    **CONCLUSION**

Global promised a specific quality of fish to FMI, and reinforced that promise with photographs that it represented were exemplary of the quality of fish it was to produce. Global, however, took no steps to ensure that it would meet the quality provisions of the contract. It did not inspect the fish it produced, nor did it take any steps to grade the fish, essentially repudiating any duty to produce fish of any particular quality in its demands for unconditional advance payment.[205] As a result, the fish that Global shipped to FMI, as demonstrated conclusively above, fell far short of the specifically defined #1 quality Global was obligated to provide. This unquestionably damaged FMI's reputation and impaired its ability to fulfill its own contracts with customers, costing it the amounts it had to refund the customers, future business with such customers, and its resale profits on the shipments that were refused. Global's actions cost FMI $52,214 ($35,394 to Yilufa and $16,820 to Yijia) in hard damages, and considerably more in the value of future business from lost customers.

---

[204] Holme Affidavit at ¶ 7.
[205] Exh. 31; Exh. 59.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

### B.   Global Breached The Quantity Provisions Of Its Contract With FMI.

The Global Contract specifically called for the delivery of 1,000 MT of #1 quality pink salmon.[206]  FMI made its contract agreement with Sang Jin in reliance on this provision, and Sang Jin in turn made agreements with various customers.[207]  Like the quality provisions, this quantity provision is a fundamental determinant of the value of the contract, and its breach is a "fundamental breach" under the CISG.

It is indisputable in this case that Global simply stopped shipping salmon to FMI after the third shipment (7 containers) to Fusheng and Yilufa and the fourth shipment of 13 containers to Fusheng.[208]  FMI anticipates that Global will raise some form of "anticipatory repudiation" style of argument, as raised in previous correspondence.[209]

---

[206] Exh. 2.
[207] Exh. 5.
[208] Exh. 49; Exh. 54; Exh. 55.
[209] As discussed in detail above Global has persisted in a confusing assertion that FMI is somehow in breach of the Global contract.  *See* Exh. 49; Exh. 54; Exh. 55; Exh. 36 at FMI 358.  Global appears to insist that it had some right to be pre-paid for each shipment of salmon under the letters of credit, and that Yilufa's request to inspect the fish prior to asking its bank to amend the letter of credit to allow acceptance of Global's late-presented documents is somehow a breach of contract.  *Id.*  The Court will search the Global contract in vain, however, to find a provision granting Global an unfettered right to pre-payment.  *See* Exh. 2.  With respect to payment, the contract simply provides that Global is to be paid through documentary letters of credit, and specifies the documents Global is to present.  *Id.*  Global did not request any specific presentation period for the documents, nor did Global demand pre-payment on all shipments, and the contract contains no such provisions.  *Id.*  Without specific contractual provisions in this regard, the contract incorporates the industry standard practices with respect to the payment mechanism.  *See Geneva Pharmaceuticals*, *supra*, 201 F.Supp.2d at 281, *citing* CISG Art. 9, 15 U.S.C.A. App. at 340 ("The usages and practices of the parties or the industry are automatically incorporated into any agreement governed by the Convention, unless expressly excluded by the parties.").  All documentary letters of credit, including those at

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Case No. 3:06-cv-00011 JWS

FMI, however, did nothing that could even remotely be deemed a justification for Global to simply stop shipping the remaining fish it had promised, especially where, as here, Global had received a $110,000 *cash advance*.[210]

Global promised FMI 1,000 MT of fish. As set forth in detail above, Global was paid in full for all shipments actually accepted by the customers, had the contractual letter of credit protection for all shipped products, with letters of credit opened for funds sufficient to cover all of the product, and had received a good faith $110,000 cash advance.[211] Despite this set of facts Global only shipped 750.8 MT of fish.[212] Of that fish, less than half ever made it to FMI's customers – based on its meritless positions regarding advance payment and refusal to allow inspections, Global told FMI that it was redirecting 455.7 MT of fish to other customers, so that it only actually delivered 295.1

---

issue here, have document presentation periods. *See, e.g.*, Exh. 14 at ETS 7-10. If documents are presented outside of that period, they do not specifically match the requirements of the letter of credit, and there is no obligation to pay under the letter of credit unless the issuing bank, the confirming bank, if any, and the applicant **all** agree to it. *See* International Chamber of Commerce Publication No. 500, Uniform Customs and Practice for Documentary Credits, 1993 Revision (the "UCP 500"), Article 9(d); *see, also*, *Courtaulds North America, Inc. v. North Carolina National Bank*, 528 F.2d 802 (4th Cir. 1975); *AMF Head Sports Wear v. Ray Scott's All-Am. Sports Club*, 448 F. Supp. 222, 223-25 (D. Arizona, 1978); *Leaseamerica Corp. v. Northwest Bank Duluth, N.A.*, 940 F.2d 345 (8th Cir. 1991) (upholding bank's right not to amend LC). Because the banks can unilaterally, under the clearly established and understood rules regarding the use of letters of credit in international transactions, refuse to pay where documents have been presented late, neither FMI nor the end customers could have been under any obligation to "require" amendments to the letters of credit – they did not, as a matter of law, have such authority. *Id.* Under the applicable provisions of the CISG, Global is bound to this common understanding under international law.

[210] Exh. 52.
[211] *Id.*; Exh. 19; Exh. 37.
[212] Exh. 49.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

MT of the promised 1,000 MT.[213]  Global actually delivered less than a third of its

promised quantity.  Through its re-sale contract with Sang Jin, FMI was guaranteed a

profit of $130 per MT.  Global's failure to deliver the promised quantity cost FMI

$91,637.00 in lost profit damages.[214]

### C.     Global Breached The Right Of First Refusal Agreement.

Global's grant of a right of first refusal to FMI required it to provide FMI the

opportunity to purchase "any/all additional #1 quality pinks which Global produce [sic]

in 2005," over and above the 1,000 MT it had contractually promised to Global.[215]  In

consideration, Global received an increase in its guaranteed price of $170 per metric ton

(from $1,150 to $1,320).[216]  Despite this clear and enforceable obligation to offer its #1

quality pinks to FMI first, however, Global went around FMI and made contracts with

other customers, including Dell Trading, to purchase #1 pinks at significantly higher

prices.[217]

No more clear example of a breach of contract could be imagined.  Global simply

and entirely ignored any duty it might have had toward FMI with respect to the right of

first refusal that it had given FMI, despite the fact that it had received in exchange the

consideration of a significant increase in its guaranteed price – an increase that FMI was

---

[213] *Id*.; Exh.53; Exh. 55.
[214] *See* Exh. 3.
[215] Exh. 6; Exh. 7.
[216] *Id*.
[217] Exh. 9; Exh. 10.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                 *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

not required to grant.[218]  There is no evidence that Global ever offered FMI any of the

salmon that it eventually sold to other customers.  Of course, Global could have lost

money selling this fish to FMI at the guaranteed price, but that was the risk Global took

when it signed the right of first refusal contract.  Had there been a decline in the market

price, Global could have benefited significantly from this agreement – it had no right to

ignore its contractual obligation simply because it was more financially advantageous to

do so.

FMI's damages are equally clear.  FMI's arrangement was that it would make a

profit of $130 /MT on any fish brokered through Sang Jin.[219]  Sang Jin had the

demonstrated ability to sell these fish to other high-volume customers in Asia. and was,

though the course of the 2005 season, desperately looking for additional fish to satisfy its

customers' demands.[220]  FMI and its partner Sang Jin could have sold any additional

quantities of fish.

Global's production records indicate that it produced  1,067.4 MT of #1 quality

H&G pinks that were not directed to FMI.[221]  Of those, 249.2 MT should have been

---

[218] Indeed, given Global's behavior, FMI believes now that Global never had any intention of honoring this right of first refusal, but simply made empty promises in order to obtain an increase in the guaranteed price of the fish.  FMI alternatively asserts that FMI's behavior with respect to the right of first refusal is in breach of the implied covenant of good faith and fair dealing.
[219] Exhs 8, 5, 6.
[220] Exh. 13; Exh. 33.
[221] Exh. 10.  These internal records demonstrate that Global produced a total of 2,353,221.25 lbs. of #1 H&G pinks in 2005.  As 1 Metric Ton = 2,204.6 lbs., Global's

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Page 41                                                            Case No. 3:06-cv-00011 JWS

shipped to FMI under the contract; the rest (818.2 MT) should have been offered to FMI under the right of first refusal.  FMI's arrangement with Sang Jin provided it with a guaranteed profit of $130 per MT.  Global's breach of the right of first refusal thus damaged FMI in the amount of $106,366.00.

### D.    **Global Breached Its Duty of Good Faith and Fair Dealing.**

FMI asserts that the actions indisputably taken by Global were, as a matter of law, in violation of Global's obligation of good faith and fair dealing under its contract with FMI.  FMI is thus entitled to summary judgment as to its claim that Global breached this aspect of its duty to FMI.

> 1.    <u>Global's Duty of Good Faith And Fair Dealing Toward FMI Required It To Refrain From Injuring FMI's Rights Under The Contract And To Deal With FMI In A Manner That Was Objectively Fair</u>.

Global's obligation to deal in good faith under the CISG is co-extensive with the same obligation under the UCC and Alaska contract law.  The CISG is specifically "intended to ensure the observance of good faith in international trade…."[222]  Article 7(1) of the CISG mirrors the provisions of the UCC and Alaska law imposing an obligation of good faith in all contracts.[223]  Furthermore, insofar as the obligation of good faith under

---

total non-FMI production is 1,067.4 MT.
[222] *Geneva Pharmaceuticals*, *supra*, 201 F.Supp.2d at 281, *citing* CISG Art. 7(1), 15 U.S.C.A. App. at 336.
[223] *See, e.g.* AS 45.01.203 (adopting UCC §1-304); *Kobuk Eng'g & Contracting Servs. v. Superior Tank & Constr. Co-Alaska, Inc.*, 568 P.2d 1007 (Alaska 1977).

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

the CISG has not been clearly spelled out, the Court should look to the standards generally understood to be applicable in this area of the law.[224]  As such, the obligation of good faith under the CISG is the same as the obligation of good faith and fair dealing implied in all contracts under the UCC.[225]

Thus, under Alaska law as well as the specific terms of the CISG, "[t]he basis for [the obligation of good faith] is a hybrid of social policy and an effort to further the expectations of the contracting parties that the promises will be executed in good faith."[226]  Simply stated, the obligation of good faith in contracting requires "that neither party will do anything which will injure the right of the other party to receive the benefits of the agreement."[227]  "[T]he covenant has both subjective and objective elements.  The subjective aspect prohibits one party from acting to deprive the other of the benefit of the contract.  The objective element requires each party to act 'in a manner that a reasonable person would regard as fair.'"[228]

2.    Global Breached Its Obligation of Good Faith As A Matter of Law With Respect To the First Shipment To Yilufa.

Global's actions in dealing with the quality complaint raised by Yilufa with respect to Global's first shipment of salmon in 2005 were in violation of its obligation of

---

[224] *See* Honnold, *supra*.
[225] *Kobuk Eng'g, supra*, 568 P.2d at 1010; *see also* UCC §1-201(20).
[226] *Alaska Pacific Assurance Co. v. Collins*, 794 P.2d 936, 947 (Alaska 1990).
[227] *Guin v. Ha*, 591 P.2d 1281, 1291 (Alaska 1979); *McConnell v. State, Dept. of Health and Soc. Servs., Div. of Med. Assistance*,  991 P.2d 178, 184 (Alaska 1999).
[228] *Mcconnell, supra*,  991 P.2d at 184, *quoting Chijide v. Maniilaq Ass'n*, 972 P.2d 167, 172 (Alaska 1999) (internal citations omitted).

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Case No. 3:06-cv-00011 JWS

good faith and fair dealing toward FMI.  Subjectively, Global deprived FMI of the benefit of the contract by depriving FMI of any ability to defend the quality of the product shipped by Global.  Furthermore, Global's actions – including delaying sending an inspector, forcing FMI to pay for the inspector, but then refusing to release any information to FMI regarding the quality of the product and refusing to otherwise assist FMI in defending the product – were simply objectively unfair to FMI under any reasonable interpretation of the circumstances.  FMI is thus entitled to summary judgment on this claim.

After Yilufa notified FMI of its quality concerns with respect to Global's first shipment, FMI immediately notified Global and requested Global's assistance in dealing with the issue.[229]  Global was, of course, responsible for ensuring that the fish it produced complied with the quality provisions of the contract, and so it was reasonable for FMI to expect that Global would take the necessary actions to deal with this quality complaint. Indeed, both because the processor is ultimately responsible for quality and because the processor has a reputation to uphold, it is standard practice in the industry for the processor to step forward to defend against any quality-based claims.[230]  FMI expected that Global would do exactly that.[231]

---

[229] Exh. 20.
[230] Holme Affidavit at ¶ 9.
[231] Exh. 20.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

Instead, however, Global initially refused to send an inspector.[232]  Global then

demanded that FMI pay for the costs of the inspection of *Global's fish*, even though

Global represented that it had a quality control inspector who worked regularly for

Global.[233]  Global and its inspector were then uncooperative with respect to scheduling

the inspection.[234]  This delay was caused by Global and resulted not only in a delay to

finding a resolution of the quality complaint issue, but placed FMI in a very difficult

position in dealing with irate customers.  FMI had already relied on Global's (grudging)

representations that it would send its inspector – it had paid for the inspection (costs

including flight, lodging, etc.), and so did not then have time or resources to locate an

alternative inspector who could make it to Qingdao in time to inspect the fish before

Yilufa had to make use of it.[235]

Eventually, Global's inspector Johnson Zhang ("QC Johnson") inspected the

salmon and prepared a report, which was sent to Global's President, Oleg Nikitenko, on

October 10, 2005.[236]  QC Johnson's report indicated significant quality issues with the

fish, and indicated that the amount of fish unusable because of these problems (15-16%)

was consistent with Yilufa's claims (15-19%).[237]  Moreover, the nature of the report, as

---

[232] Exh. 36 at FMI 218; Exh. 22.
[233] *Id.*
[234] *Id.*
[235] *Id.*
[236] Exh. 24.
[237] *Id.* (showing that 15-19% of meat had serious bruising problems).

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                     *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Page 45                                              Case No. 3:06-cv-00011 JWS

described above, is clear evidence of Global's unwillingness to deal with FMI fairly and in good faith.[238]

FMI, of course, was aware of none of this – it only knew that it had an unsatisfied customer, and that it was relying on Global's inspector to assist it in dealing with the customer's quality complaints. Global, however, was clearly interested not in helping FMI defend the quality of the salmon produced by Global, but in keeping its money. Global simply refused to release the report to FMI, despite the fact that FMI had paid for the inspection and demanded on numerous occasions to see the report. Worse still, Global **specifically misrepresented** the nature of the report to FMI. When FMI asked about the report, Nikitenko stated "QC report was good, quality better than last year."[239] There was no mention by Nikitenko of the problems specifically discussed in the report, which QC Johnson admitted had led to reasonable quality claims by Yilufa with a specific recommendation that Global discount the product.[240]

Beyond this, Global repeatedly and confusingly insisted that FMI had no right to see the report, because it had paid "only for expenses."[241] It is obvious now why Global had no interest in producing this report: first, it demonstrated a quality breach, and

---

[238] *Id.*
[239] Exh., 26.
[240] Exh. 24 at 364.
[241] Exh. 10. After significant delay and threats of motions to compel, Global finally produced a copy of this report during the present litigation in August of 2006. *See* Clerk's Docket 31.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

second, it demonstrated how Global and its inspector – who in fact, was a fish broker –

were plotting (on FMI's dime) to maneuver around FMI and sell fish directly to the

customers FMI and Sang Jin had identified.  In short, it clearly shows a breach of

Global's obligation of good faith.

Moreover, it is not just that Global failed to provide the report that FMI had paid

for – Global refused to provide <u>any</u> information regarding the results of the inspection,

other than a bullheaded insistence that there were "no quality problems."  Global's

actions thus left FMI completely in the dark.  If Global had actually asserted the position

in September/October 2005 that it has subsequently taken – that the only issue with the

fish was internal bruising, and that it is not covered by the contract – then FMI could

have taken this to the customer and worked with them.  FMI's only substantive

information regarding the quality of the shipment, however, came from Yilufa and Sang

Jin principal Sam Lim.  In addition, Mr. Lim reported to FMI that Global's inspector

agreed with Yilufa that the salmon was "the worst product [he had] seen in a long

time."[242]  In short, by withholding the inspection report from FMI, Global deprived FMI

of the ability to defend the product.  FMI was forced to act unilaterally in order to salvage

its relationship with Sang Jin and Yilufa, providing, from its own funds, $35,394 in order

---

[242] Exh. 27; Exh. 23.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

to satisfy Yilufa's damages.[243]  This payment by FMI resulted in the customer waiving the timing discrepancy that allowed Global to receive funds from the letter of credit.

Global's actions, as conclusively demonstrated by the written record, were both subjectively and objectively unfair and in bad faith.  Global's inspector, on FMI's dime, conspired with Global to maneuver around FMI and sell FMI's fish to the end customer to cut out FMI's profit.[244]  Global then refused the very assistance that FMI reasonably expected from Global under the contract – it refused to assist FMI defend the quality of Global's product.  This damaged FMI in the amount of the $35,394 reimbursement it was forced to make.[245]

3.    <u>Global Breached Its Obligation of Good Faith With Respect To the Right of First Refusal</u>.

Global's actions with respect to the right of first refusal have been discussed in detail above.  By April of 2005, Global had been watching the market price for pinks rise significantly, and was obviously worried about its ability to make a profit at the guaranteed price it had given FMI.[246]  In order to get an additional $170 per metric ton on the guaranteed price, Global offered in consideration a right of first refusal.[247] This was not a small concession – it would have given Global an additional $170,000 over the

---

[243] Exh. 30.
[244] Exh. 24.
[245] FMI was also required to pay $16,820 to another customer (Yijia) to settle what have proven to be legitimate quality complaints.  Exh. 42.
[246] Exh. 6.
[247] *Id*.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Page 48                                                    Case No. 3:06-cv-00011 JWS

entire contract, and FMI's re-seller Sang Jin had to expend considerable effort and goodwill to get the end customers to agree to it.[248]

It is clear from Global's actions, however, that it never had any intention of honoring this valuable promise. It instead entered specific contracts as late as August of 2005 in which it promised #1 quality H&G pinks to other customers, without offering FMI the opportunity to purchase these fish.[249] Its records show significant other shipments to other customers of #1 H&G pinks in 2005, which were not offered to FMI.[250] Global did not offer a single fish to FMI under the right of first refusal, even though it clearly produced significantly more than 1,000 MT, and thus produced fish subject to the right of first refusal.[251] Global, in short, never intended to honor the right of first refusal, and took no steps toward honoring it – it was simply an empty promise made to extract a price concession out of FMI. FMI submits that these actions are in bad faith, and constitute an independent violation of the implied covenant.

4.     Global Breached Its Obligation of Good Faith By Failing to Allow Inspections And Using Threats To Ship The Fish To Other Purchasers In Order To Extract Advance Payment

As discussed in detail above, quality was the sole component of the value of the fish produced under the Global contract. Global, as the producer, was singularly

---

[248] *Id.*
[249] Exh. 9.
[250] Exh. 10.
[251] *Id.*

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

responsible for producing fish that met the quality and quantity requirements of the contract.  As the responsible party, Global had in good faith an obligation to stand behind the quality of its product, and to work toward delivering the promised quality.  Instead, however, Global's entire course of conduct was simply oriented toward leveraging itself into a position where it could extract advance payment while washing its hands of any obligation to address the quality problems.  These actions were in violation of Global's duty of good faith, and damaged FMI.

Yilufa's and Fusheng's demand to inspect the salmon was not unreasonable – it was made within the 15-day claims period, and quality was the most significant component of the value of the fish.[252]  Global was asking a favor of Fusheng and Yilufa – Global had been late in presenting documents, and required Fusheng and Yilufa to amend the letter of credit.[253]  This would be at Fusheng's and Yilufa's expense, however, and neither they nor their bank were under any obligation to amend.  All Global had to do was allow an inspection of the fish, and its payment would have been released.[254]  Not only did Global refuse to do so, but it phrased its refusal in the most inflammatory terms, accusing FMI, without justification, of misconduct and breach, using inappropriate language, threatening to curtail (and actually curtailing) future shipments that it was

---

[252] Exh. 47.
[253] *Id*.
[254] *Id*.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

obligated to make under the contract, and keeping possession of FMI's $110,000 advance, Global simultaneously said it would resell the already delivered product and also stopped making additional shipments of contractually required quantities of pink salmon.  Global took all of these bad faith positions simply to improve its bargaining position.[255]

This behavior is the essence of thuggish bad faith.  Instead of cooperating with a reasonable request, Global tried to intimidate and coerce the other parties into releasing payment prior to inspection.  Because of this unreasonable and bad faith behavior, in addition to the $110,000 advance wrongfully converted by Global, FMI lost its re-sale profit on the shipment to Yilufa and Fusheng, and its future profits on the shipments Global redirected or refused to make, as described above.

> 5.   Global Breached The Covenant of Good Faith By Failing to Inspect And Grade The Salmon And Failing To Take Any Actions To Ensure That FMI Received The Quality Of Fish It Had Contracted To Receive.

As noted in detail above, Global contracted to provide a specific quality level of fish, and provided exemplary photographs demonstrating fish that were of prime quality meat and skin color, and without bruising.  *See* § I.B.4, *supra*.  Global, however, took no actions whatsoever to grade or inspect the fish it produced.[256]  It gave FMI "ungraded"

---

[255] Exh. 35; Exh. 37; Exh. 36 at FMI 358-60; Exh. 49.
[256] *See* Exh. 31; Exh. 59.

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

fish, instead of the contractually required prime quality fish it had promised to provide.

Global thus deprived FMI of the benefits of its agreement with respect to quality.[257]

## II.     GLOBAL'S ACTIONS WERE IN VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES ACT.

The Alaska Unfair Trade Practices Act is a remedial statute of broad application,

covering many commonplace commercial transactions.[258]  The Act contains a list of

actions that are specifically deemed "unfair trade practices, which include the following:

> (4) representing that goods or services have … characteristics, … or quantities that they do not have …;
> (6) representing that goods or services are of a particular standard, quality, or grade, … if they are of another; …
> (8) advertising goods or services with intent not to sell them as advertised; …
> (12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged; …
> (14) representing that an agreement confers or involves rights, remedies or obligations which it does not confer or involve, or which are prohibited by law ….[259]

The statute explicitly notes that this list is not exclusive, stating that "[t]he unlawful acts

and practices listed in (b) of this section are in addition to and do not limit the types of

---

[257] FMI alternatively asserts that the actions described herein constitute actionable misrepresentations on Global's part, subjecting it to tort liability as well.  *See Cousineau v. Walker,* 613 P.2d 608 (Alaska 1981).
[258] *See* AS 45.50.471.
[259] *Id.*

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

unlawful acts and practices actionable at common law or under other state statutes."[260]

These statutory protections apply in the context of commercial transactions.[261]  FMI

submits that Global's actions, as described in detail above, independently constitute

breaches of the Unfair Trade Practices Act, entitling FMI to treble damages and

attorney's fees under that statute.[262]

> A.   Global's Failure To Offer The Promised Quality Of Fish Was A Violation of the Unfair Trade Practices Act.

Global specifically represented it was to be selling #1 quality H&G pinks, as that

term was defined through a specific series of industry standard ASMI protocols.[263]  As

described in detail above, the quality of Global's fish was not as advertised or as

promised, in violation of AS 45.50.471(b)(8).  This, and Global's actions in hiding the

QC Johnson report, in failing to take any action at all to ensure that the fish were of the

promised quality, and in the other quality-related breaches described in detail above, are

all unfair trade practices prohibited by the Act.

> B.   Global's Failure to Meet The Promised Quantity Provisions Was In Violation of the Unfair Trade Practices Act.

Global specifically represented that it would provide 1,000 MT of #1 quality H&G

---

[260] *Id.* at §(c).
[261] *Western Star Trucks, Inc., v. Big Iron Equipment Service, Inc.*, 101 P.3d 1047, 1050-54 (Alaska 2004) ("The act applies to all unfair or deceptive acts 'in the conduct of trade or commerce,'" and so applies in commercial transactions.)
[262] In addition to the specific actions discussed below, FMI submits that Global's course of behavior and conduct in violation of the implied covenant of good faith as described above are objectively "unfair trade practices" and prohibited by the Act.
[263] Exh. 2.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

Page 53

*FMI Food Marketers, Int'l v. Global Seafoods*

Case No. 3:06-cv-00011 JWS

pinks meeting the specific quality standards of the contract.[264]  As described above, this was an important determination of the value of the contract.  As described above, however, Global used its control over the quantity provision of the contract to threaten and intimidate FMI into providing extra-contractual advance payments.  FMI submits that these inappropriate threats regarding the resale of product promised to FMI, and stoppage in further shipments – which Global eventually carried out – in order to extract advantages beyond the contract rights of the parties constitute an unfair trade practice under the Act.

C.     Global's Wrongful Refusal To Return The $110,000 Advance Payment Is An Unfair Trade Practice

As described in detail above, Global extracted, through inappropriate threats of non-performance, a $110,000 cash advance as a good faith gesture to gain Global's cooperation in fulfilling its contract terms.  Global, however, informed FMI that it had sold and shipped the remaining 20 containers of fish to other customers, despite the fact that letters of credit sufficient to pay for the 20 containers were in place.[265]  Nonetheless, it kept the $110,000, essentially defrauding FMI.[266]  FMI asserts that this was an unfair trade practice prohibited by the Act.

---

[264] *Id.*
[265] Exh. 55; Exh. 54.
[266] Again, these actions are independent bases for liability in tort for misrepresentation. *Cousineau, supra,* 613 P.2d at 611; *State v. First Nat'l Bank of Anchorage,* 660 P.2d 406 (Alaska 1982).

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

D.     Global's Misrepresentations Regarding The Right Of First Refusal Were In Violation of the Unfair Trade Practices Act.

As discussed in detail above, Global never took any steps toward fulfillment of its contractual promise of a right of first refusal to FMI.  AS 45.50.471(b)(12) prohibits "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale … of goods …."  Global's promise of a right of first refusal was a "false promise," and its failure to offer FMI the additional fish it produced, or even to inform FMI of such production amounted to concealment or suppression of a material fact under the Act.

E.     Global's Actions With Respect To The QC Johnson Report Were In Violation of the Unfair Trade Practices Act.

As described above, FMI reasonably relied upon Global, the producer, to provide an inspector to deal with the quality issues raised by Yilufa.  Global, however, unreasonably and unfairly suppressed QC Johnson's inspection report (which FMI had paid for), hiding from FMI essential information regarding the quality issues.[267]

F.     Damages

The amount of damages suffered by FMI for Global's violations of the Unfair Trade Practices Act are the same as those outlined above for the breach of contract claims.  FMI does not seek a double recovery of such base damages.  The Unfair Trade

---

[267] Indeed, even through the course of this litigation, Global unreasonably delayed providing this undeniably relevant report.  *See* Clerk's Docket 31.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

Practices Act, however, provides for treble damages and full attorney's fees.[268]  As FMI's base damages as described above are $343,347, FMI is entitled to receive $1,030,191 in treble damages, and an award of full attorney's fees to be determined at the conclusion of this action.

### III.    GLOBAL INTERFERED WITH FMI'S CONTRACTS AND FUTURE BUSINESS OPPORTUNITIES

The Alaska Supreme Court has defined the elements of the tort of intentional interference with contractual relations as follows:  "(1) a contract existed, (2) the defendant ... knew of the contract and intended to induce a breach, (3) the contract was breached, (4) defendant's wrongful conduct engendered the breach, (5) the breach caused the plaintiff's damages, and (6) the defendant's conduct was not privileged or justified. *Geolar, Inc., v. Gilbert/Commonwealth Inc. of Michigan*, 874 P.2d 937, 940 (Alaska 1994), *citing RAN Corp. v. Hudesman*, 823 P.2d 646, 648 (Alaska 1991) (quoting *Knight v. American Guard & Alert, Inc.*, 714 P.2d 788, 793 (Alaska 1986)).

With respect to these claims, FMI incorporates by references the sections above setting forth Global's various breaches of contract.  It is indisputable that FMI, in reliance on the Global contract, entered into a mirror contract with Sang Jin, and that Sang Jin in turn entered into other contracts with end customers.[269]  It is indisputable that Global was aware of these other contracts, as it was told of these relationships by FMI and was directly shipping to these customers.  Nonetheless, Global committed the breaches

---

[268] AS 45.50.571.
[269] Exhs. 5 and 7; Exh. 2.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

described above, knowingly depriving FMI of its ability to fulfill its contracts with Sang Jin and with Sang Jin's customers.[270]  Because Global's breaches of its contracts with FMI knowingly deprived FMI of its opportunities with respect to the other contracts discussed herein, Global is independently liable in tort to FMI, which exposes FMI to claims for punitive damages.[271]

FMI submits that Global's actions as described herein, including but not limited to its bad faith false promises of a right of first refusal and bad faith failures to make any steps toward fulfilling that contractual obligation, its misrepresentations regarding the QC Johnson report and its refusal to release that report, its bad faith efforts to maneuver around FMI and cut FMI out of its own contracts, its refusal to make deliveries of salmon for which it had already been pre-paid, and its efforts to intimidate and bully FMI and its customers into releasing all payments prior to product delivery, all constitute conduct sufficiently outrageous and beyond the norms of acceptable commercial activity to authorize FMI's claims for punitive damages to go to the jury.

## IV.    GLOBAL CONVERTED $110,000 OF FMI'S FUNDS

Finally, FMI is entitled to summary judgment as to its claim of conversion.  This claim is as simple as it is fundamentally outrageous.  It is indisputable that FMI, at Global's demand, wired Global a good faith advance payment of $110,000.[272]  It is

---

[270] *See* §§ I, II, *supra.*
[271] *See Reeves v. Alyeska Pipeline Service Co.,* 56 P.3d 660 (Alaska 2002) (Punitive damages are recoverable in contract context where conduct constituting breach is also a tort for which punitive damages are recoverable.)
[272] Exh. 52.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

indisputable that the purpose of this money was to secure Global's cooperation in releasing documents Global was holding for product already paid and to secure Global's cooperation in making future shipments of salmon, the payment being deemed necessary in light of Global's threats to stop shipping fish.[273]  Finally, it is also indisputable that after Global refused to deliver additional fish under its contract with FMI, it also *refused to return the advance payment*.[274]  This is simple theft.  Global got the $110,000 based on a promise of future deliveries, refused to make the future deliveries, and just kept the money.  Such conduct could even warrant time in prison.[275]  It is clearly and grossly unacceptable in the conduct of commercial transactions.

FMI is entitled to the return of its stolen $110,000, with interest, and is entitled to have a jury review Global's conduct to consider an award of punitive damages for this outrageous breach of commercial norms.

V.   GLOBAL'S COUNTERCLAIM IS MERITLESS

Global's counterclaim is based on demurrage costs for the fish that Yilufa had refused to accept due to Global's refusal to allow a quality inspection.[276]  "Article 77 of the CISG requires a party claiming breach of contract to 'take such measures as are reasonable in the circumstances to mitigate the loss.'"[277]  FMI believes that Global failed to act reasonably in mitigating its losses, allowing the shipment to sit in extremely

---

[273] *Id.*
[274] Exh. 57; Exh. 25 at FMI 420; Exh. 58.
[275] *See* AS 11.46.100; 11.46.120; 12.55.125.
[276] *See* Clerk's Docket 21.
[277] *Treibacher Industrie, A.G. v. Alleghany Technologies, Inc.*, --- F.3d ----, 2006WL2595225 (11th Cir. 2006), *quoting* CISG Art. 77.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

expensive demurrage storage when less expensive alternatives were available, and delaying the sale of the fish for months when it had previously identified the customers to whom it eventually sold the fish. The patently unreasonable nature of Global's actions is made manifest by comparing the demurrage costs to the potential quality claim Global sought to avoid. Even if Yilufa had made a quality claim similar to its first one, it would have been at most been approximately $30,000 (at approximately 15% of the value of the fish). Global seeks demurrage costs, however, of approximately $127,000 – **4 times the cost of the potential quality claim**. This clearly demonstrates that Global did not act reasonably as a matter of law.

This motion, however, also relies upon different grounds for dismissal of Global's counterclaim. Global specifically informed FMI on October 22, 2005, that it had <u>already sold and shipped</u> the fish rejected by Yilufa to another customer, and that FMI "owed" it demurrage costs of $11,678.80.[278] Global now asserts that this representation was false, and that Global was still holding onto this fish for its own reasons.[279] The counterclaim damages Global seeks arose from demurrage costs that were incurred <u>after</u> this misrepresentation had been made.[280]

FMI, however, had every right to rely on Global's representations, and cannot be held responsible for any damages purportedly arising after this representation was made. To hold otherwise would be manifestly unfair to FMI. Had it known that the fish had not

---

[278] Exh. 55; Exh. 54; Exh. 64; Exh. 49 at FMI 371; Exh. 54.
[279] *See* Clerk's Docket 21.
[280] The damages Global purports to have suffered are for demurrage costs that are over 10 times greater than the demurrage Global initially stated it had incurred. Exh. 54; Exh. 55; Exh. 66.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

been sold, FMI could have identified customers and taken other steps to help mitigate the loss – Global's misrepresentations deprived FMI of any ability to protect itself.  Global cannot be allowed to recover inflated damages based on its own misrepresentations.

## CONCLUSION

For the reasons set forth in detail above, FMI is entitled to an Order granting summary judgment in its favor on its claims of breach of contract, tortious interference with contract / business opportunity, violation of the Alaska Unfair Trade Practices Act, and conversion, and dismissing Global's counterclaim.  Global is liable for base damages to FMI in the amount of $345,397, plus interest and costs, as well to treble damages and attorney's fees under the Alaska Unfair Trade Practices Act  and under Alaska Civil Rule 82 for its state law claims.  FMI is further entitled to have a jury consider its claim for loss of reputation and punitive damages against FMI.

DATED this <u>30th</u> day of November, 2006, at Anchorage, Alaska.

DORSEY & WHITNEY LLP


By: <u>/s/Michael R. Mills</u>
    Michael R. Mills, ABA# 8911074
    Michael A. Grisham, ABA# 9411104
    DORSEY & WHITNEY LLP
    1031 West Fourth Avenue, Suite 600
    Anchorage, AK 99501-5907
    (907) 276-4557

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

PLAINTIFF'S MOTION FOR PARTIAL                    *FMI Food Marketers, Int'l v. Global Seafoods*
SUMMARY JUDGMENT

Page 60                                                        Case No. 3:06-cv-00011 JWS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 30, 2006, a true and correct copy of this document was served on:

Mark C. Manning
431 West 7th Avenue, Suite 204
Anchorage, AK  99501

by first class regular mail, if noted above, or by electronic means through the ECF system as indicated on the Notice of Electronic Filing.

/s/ Michael R. Mills
Michael R. Mills

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

*FMI Food Marketers, Int'l v. Global Seafoods*

Case No. 3:06-cv-00011 JWS

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557