Mark C. Manning
Mark C. Manning, P.C.
431 W. 7th Ave., Ste 204
Anchorage, Alaska  99501
(907) 278-9794 Fax: 278-1169
Counsel for Global Seafoods

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| FMI FOOD MARKETERS INTERNATIONAL, LTD, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| GLOBAL SEAFOODS NORTH AMERICA, LLC | ) ) ) | |
| Defendants. | ) ) | No. 3:06-cv-00011 JWS |

**OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

Global Seafoods North America, LLC, is a relatively small fish processor in a capital intensive business. *Exh. A, Declaration of Oleg Nikitenko, ¶ 2.* Its sole member is Oleg Nikitenko. *Id.* Its small administrative and sales office is in Bellevue, Washington, and its single fish processing plant is in Kodiak. *Id.* It purchases and processes fish caught in Alaskan fisheries during seasons throughout most of the year. *Id.*

Global's survival depends on avoiding large disruptions in payment for its products. *Id. ¶* 3. Taking the 2005 pink salmon season as an example, a flood of fishing vessel deliveries to Global's processing plant was underway by early August and continued through the month until the season wound down in early September. *Id.* Global has to guaranty payment to fishermen, and can make such commitments only after it has made agreements with buyers. *Id.* Whole fish needed to be

accepted at Global's dock, processed into headed and gutted fish or fillets, frozen, packed, loaded into shipping containers, which are picked up by a carrier at Global's dock and shipped to their final destinations via Dutch Harbor, where the containers are loaded into freighters. *Id.* This operation required a staff of over 100 processors, quality control inspectors, maintenance personnel, and Kodiak office management and support staff, resulting in a large payroll. *Id.* The fishermen who delivered the fish had to be paid within a week or so. *Id.* In addition, Global was generally responsible for the cost of shipping the product to the primarily foreign destinations designated by its customers. *Id.*

As the pink salmon season wound down, processing of other species continued into the fall. *Id.* ¶ 4. In order to keep this operation going, to meet ongoing expenses, Global had to timely recapture at least most of the capital tied up in the container loads of processed fish in the pipeline flowing out from Kodiak. *Id.* In other words, customers had to pay their bills on time. *Id.* This requirement also constituted a potentially serious vulnerability: great pressure to discount the sales price could be brought on Global if the stream of payments for product delivered were interrupted. *Id*.

One means of assuring payment that Global relied upon was a letter of credit. *Id.* ¶ 5; *E.g., FMI's memorandum at 11 & Exh. 14 at ETS 0007-10.* This arrangement was to protect Global against non-payment for the goods. *Exh. A ¶ 5.* With this instrument, a credit was opened in Global's favor at Global's bank, Wells Fargo, sometimes before product is produced but in any event before shipment of product, on which Global could draw for payment of product sold by presenting to Wells, after shipment but normally well before delivery, bills of lading and other "documents required." *Id.; Exh. 14 at ETS- 0008.*

Global developed a customer base for its pink salmon. *Exh. A ¶ 6.* To preserve that customer base, it needed to and did assure those customers that Global would provide them with product in the coming season. *Id.* In particular, Mr. Nikitenko did so prior to the 2005 season. *Id.*

In 2004, Mr. Nikitenko negotiated a pre-season written contract with FMI for the purchase and sale of about 500 metric tons of headed and gutted pink salmon. *FMI memo at 2 & Exh. 1.* The contract provided for payment by means of a transferable letter of credit "payable at sight." *Id.* This

expression means that the bank that issued the letter of credit is bound to pay a draft on the credit upon presentation of required documents, provided the terms and conditions of the credit are complied with. *ICC Uniform Customs & Practice for Documentary Credits Article 9 (January 1, 1994)*.

Global delivered its standard product under this contract, and no quality- or product-specification related claim was ever communicated to Global. *Exh. A ¶ 7.* There were multiple problems with timely presentation of documents in order to draw on the pertinent letters of credit, however. *B. Holme Affidavit December 18, 2006 ¶ 3.* Failure to meet such a deadline constitutes a "discrepancy." *Id.* If documents are not presented within the time period required in a credit, a "discrepancy" arises barring the beneficiary in Global's position from drawing on the letter until and unless the discrepancy is cured or waived. *Exh. B ¶ 5.* The problem was that the letters of credit contained unrealistically short deadlines on the presentation of documents, in light of the number of people and offices that had to contribute to their preparation and presentation. *Id. ¶ 4.* Global had no input on the short deadlines provided, and would have certainly provided for longer periods had it been able to specify them. *Id.*

For the FMI contracts, preparation of the required documents required the involvement of FMI, the carrier, APL, Global's freight forwarded, ETS, Global and NOAA at the U.S. Department of Commerce, which issued a Certificate of Health. *Id. ¶ 2.* Changes introduced by FMI could cause late presentation. *E.g., Exh. 20 at 3.* NOAA issued its certificate after APL issued booking information. *Exh. B ¶ 2.* The Certificate of Health may be issued in as little as 2 business days, but commonly 5 to 7 business days are required. *Id.* The Bill fo Lading was usually issued within 5 days of issuing the booking information. These documents were prepared in the Seattle area, and tendered as required to Global's bank in Seattle, Wells Fargo. *Id.* The original documents then had to be couriered to HSBC Bank. *Id.* As it happened, however, the unreasonably short deadlines did not matter because all timeliness discrepancies were waived. **FMI's Supplemental Affidavit of B. Holme at ¶ 3.**

Following the 2004 season, Mr. Holme of FMI expressed an interest to Mr. Nikitenko in purchasing more H&G pink salmon in 2005. *Exh. A ¶ 8.* In 2004, Global had sold FMI "blood line

in" salmon, meaning salmon from which the kidney, which runs longitudinally under the fish's backbone, had not been removed. *Id.* For 2005, Mr. Holme expressed interest in "bloodline out" salmon. *Id.* Accordingly, the parties agreed that FMI would purchase pink salmon with blood line removed from Global in 2005, with FMI to advance part of the funds for the purchase of the machinery. *FMI memo at 2 & Exh. 2.* In 2005, Global did not plan to make any blood line out product. *Id.* Mr. Nikitenko explained to Mr. Holme that Global could not afford the investment that would require. *Id.* He had plans for different upgrades in the May-June 2005 period and could not afford to purchase the salmon processing machines necessary to produce blood line out fish. *Id.* Since only FMI expressed any great interest in blood line out product, Mr. Nikitenko asked FMI if they were willing to make a pre-season investment that would benefit both companies. *Id.* The advance was to be repaid from payments for product under the contract, and ultimately it was repaid. *Id.* Global purchased a Ryco unit, comprised of 2 different machines for about $110,000.00. *Id.* All information Global had about the research for and details of this unit was sent to Mr. Holme. *Id.*

Mr. Nikitenko is certain that, in negotiations concerning the 2005 season, he informed Mr. Holme that Global would be selling pink salmon to other members of its customer base in 2005 and that Global could not afford to put all its eggs in one basket, due to the financial risk of doing so. *Id. ¶ 9.* He is also certain that he advised Mr. Holme that Global could not be responsible for bruising on the inside of the H&G fish. *Id.* Mr. Holme had mentioned some dissatisfaction with internal bruising in the 2004 product. *Id.* Mr. Nikitenko told Mr. Holme that Global could not be responsible for internal bruising and said to him that he could not see through the fish, meaning Global could not identify and eliminate H&G salmon that had internal bruises. *Id.* Mr. Holme said that in 2004 they had not had any problems about bruising, so OK. *Exh. A ¶ 9.* Accordingly, when Mr. Holme sent him a written contract to sign, he inserted the word "outside" to modify "severe bruising" to correct the failure to limit the specification concerning extreme bruising to bruising on the outside of the fish.

Mr. Holme admits noticing the change right away upon receipt. *Exh. E at 4-6.* He spoke to Nikitenko about this change, and recalls Nikitenko saying something about not being able to see inside the fish, but no other detail. *Id. at 6 & 8.* Mr. Holme did not object to this change. *Id.* at

9-10.

Subsequent to the signing of the contract, it became apparent that the market price to fishermen for pink salmon was rising. *Exh. A ¶ 10.* Accordingly, FMI and Global agreed to an increase in the contract price. *Id.; FMI memorandum at 8 & Exh. 7.* They also agreed that if any additional Global #1 quality pinks "became available" after Global produced FMI's first 1,000 MT, then FMI would have the right of first refusal on the purchase of them. *Id.* Mr. Nikitenko understood that pinks would only become available if Global experienced a good enough year that it could file the 1,000 MT FMI order and deliver enough pinks to others of its customer base to maintain those relationships and keep those customers from being motivated to look for other sources. *Id.* Global had some flexibility there, because it had no binding pre-season contracts with any other customers. *Id.*

Only 12 days before shipment of the first container for FMI out of Dutch Harbor, Global was provided a copy of the first transferred letter of credit. *FMI memorandum at 11-12.* It provided that the documents required for presentation to draw on the credit had to be received within 8 days by HSBC Bank Canada. *Id.; Exh. 14 at 9.* This was the same period as in the 2004 FMI letters of credit. *Exh. E at 3.* No draft form of letter of credit had been provided to Global for approval beforehand, and in particular Global had not approved the 8 day presentation period. *Exh. B ¶ 6.* All letters of credit had similar short deadlines. *Id. & 31-51.* The experiences in 2004 with discrepancies resulting from untimely document presentation made it clear that such short periods would be bound to produce discrepancies in 2005, nullifying the highly desirable protection against non-payment, unless the course of dealing established in 2004 of waiving discrepancies arising from untimely document presentation was honored. *Id.*

The short time periods in the first letter of credit Global received in 2005, prior to its first shipment of FMI product, was unsatisfactory. *Id.* When Hennessey expressed to Holme his concern about the short time provisions, Holme assured him that all time discrepancies would be waived. *Id.* Only this assurance induced Global to ship based on the first and the later 2 letters of credit, which also had time limitations that were too short. *Id.*

It also emerged in early August that the Ryco machine purchased to remove blood lines to

accommodate FMI's desire for blood-out fish could not be made to process fish as expected. *Exh. A ¶ 11.* Global could not keep up with fish production if it tried to produce blood-out fish by hand. *Id.* Though Global shipped a few containers of blood- out fish for FMI, FMI agreed to accept approximately 50% of its 1,000 MT order as blood in fish, at the contract price. Id. ; *Exh. 12.* There was no discussion about or agreement to amend the blood-out specification which applied to the right of first refusal. *Id.* Global abandoned production of blood out fish, hoping that eventually FMI would be satisfied to accept blood-in fish as it had in 2004. *Id.* Accordingly, Global sold no more than 45 MT of blood out fish to other customers. *Id. at ¶ 16.*

The first FMI container was shipped on board the APL CHINA on August 23. *FMI memorandum at 32; Exh. 14 at 3.* Another 6 containers shipped on board the APL AUSTRALIA on August 28 produced a total of 7 containers FMI represents were shipped to its customer, Yilufa. *Exh. 15 at 5.* The Yilufa shipment produced another letter of credit discrepancy due to late presentation of documents but Global was paid. *FMI memorandum at 33.*

FMI notified Global that its customer had communicated a complaint about the quality of the fish in one of the first container. *FMI memorandum at 33; Exh. 20.* The only specific complaint was bruising. *Id.* While FMI advised that its customer had rejected the delivery, FMI did not state whether it would accept or reject. *Exh. A ¶ 12.* Based on e-mail and telephone communications with Mr. Holme at FMI, Mr. Nikitenko understood that the key complaint concerned internal bruising. *Id.* He was surprised there was any complaint because the 2004 and 2005 FMI contract specifications were essentially the same, except for a slight change in the meat color range and the 2005 "outside bruising" provision. *Id.* There had been no claim from FMI about the 2004 product, and there had been no changes to Global's operation in 2005 that would affect quality adversely. *Id.* He received no report from the plant manager or quality control personnel that there was any quality problem. *Id.* The complaint was about blood-in fish, and that was all Global had sold FMI in 2004. *Id.*

Given his belief that Global had contracted out of responsibility for inside bruising, Mr. Nikitenko did not feel the complaint raised a genuine potential claim under Global's contract with FMI. *Id. ¶ 13.* Further, the complaining party was FMI's customer, not Global's. *Id.* In Mr.

Nikitenko's opinion, there is no custom or practice in the industry pursuant to which Global was obligated to FMI to step in and defend the quality claim by FMI's customer. *Id.* At the same time, when end customers do raise a quality concern, when the claim is felt to have merit it is common for the processor to participate in a settlement that usually involves either a discount of the sale price or sale of the product to another buyer. *Id.*

Mr. Nikitenko did get in touch with a Chinese fish broker he knew, whose judgment he felt he could trust, and arranged to have the broker go and inspect the fish. *Id.* ¶ 14. There was substantial delay before the visit occurred, presumably due to an intervening Chinese holiday, and the fact that the broker had his own business to run. *Id.* Ultimately, the broker's report to Mr. Nikitenko was that the fish he was shown that purportedly were shipped by Global had significant internal bruising, an issue Mr. Nikiktenko believed was not Global's problem under the contract. *Id.*

Meanwhile, a second shipment of containers was dispatched. There were no letter of credit-related problems because this shipment was paid for by check. *Plaintiff's Memorandum at 17.* FMI made no written claim to Global in writing within 15 days of arrival in China. *Exh. A ¶ 18.* A third shipment, of 7 containers, was shipped in reliance on a letter of credit. *FMI memorandum at 18.* Again a time-related discrepancy arose, precluding payment for this fish absent waiver. *Id. at 19.* An offer was made to provide a waiver if Global first allowed FMI's purchaser to inspect. *Id.* Nikitenko declined to agree to this change in the course of dealing. *Id.* Global had shipped in reliance on Holme's assurance that discrepancies would be waived. *Exh. B ¶ 6.* As to the proposed inspection, Nikitenko declined out of concern about that purchaser access to the containers before they cleared customs was illegal. *Exh. A ¶ 20.* In addition, Global could not agree to a new course of dealing that eliminated the waiver of discrepancies it had been promised, and conditioned waiver on inspection, since that opened the door to further delay in payment and potential pressure to discount over unwarranted claims**.** *Exh. A ¶ 20.* To protect itself against loss and expenses incurred from the failure to honor the assurance of waiver, Global succeeded in obtaining a $110,000.00 deposit from FMI. *Exh. A ¶ 19.* The value of the 7 containers to Global was $ 206,644.68. *Exh. 14 at 4; Exh. 133,349; Exh. 7.*

A much greater problem was looming for Global.  Thirteen more containers were on vessels that had reportedly left Dutch Harbor for a delivery port or ports.  *Exh.  A  ¶  21*. Additional discrepancies had arisen with respect to letters of credit pertinent to those containers, and it was apparent that Global would again not be paid in due course, with a waiver.  *Id.;  Exh.  E at 15 & 18.* *(*"This year the buyers are unwilling to allow discrepant documents.")  The wholesale value of these 13 containers totaled about $400,000.00.  *Exh.  51 at 6 & 20 (302,273 KG times $1,320.00 per MT).* If they were not paid for in the agreed course, the company would suffer serious problems.  Exh.  A ¶ 21; *Exh.  B ¶ 9.*  In light of the unwillingness to routinely waive discrepancies, Nikitenko told Holme and Guenther of FMI several times that the letters of credit would have to be amended to allow increase times for document presentation and Global could not continue.  *Exh.  A  ¶ 21.* Receiving no indication that the presentation time problem would be remedied by amendment or otherwise, Global redirected its product to other buyers.  *Id.*          As to the 7 containers that comprised the third shipment, Nikitenko mistakenly told FMI at one point that they had been sold. *Exh.  A ¶ 22.*  This advice was corrected; Global was not able to recover the documents necessary to re-sell until late November.  *Exh.  B ¶ 11.*  The fish were then re-offered to FMI via December 6, 2005, e-mail.  *Exh.  A ¶ 22.*  The containers were rejected.  *Exh.  A ¶ 22.*  They were eventually re-sold, after incurring demurrage and other expenses that, together with demurrage charges for the group of 13 redirected containers, totaled more than $110,000.00.  *Ex.  A ¶ 22.*

## ARGUMENT

I.     OBJECTIONS TO EXHIBITS

Many of FMI's exhibits are or contain e-mails, faxes, reports, photographs and other materials apparently prepared by persons abroad who are not parties to this case and who have not provided affidavits to these items' authenticity.  Further, these items are or contain hearsay and contents the foundation for which is not established.  In addition, communications from FMI to Global and from FMI to others also contain hearsay recountings and information from unauthenticated documents.  This material includes statements, reports, photographs and other materials purporting to refer to Global's product, conduct, motivations and so forth.  As to much of this material, it is unclear whether FMI intends that it be considered by the court.  Documents that

are offered as evidence   must be accompanied by affidavits showing their admissibility into evidence, or the admissibility of whatever parts of the materials FMI wishes the court to consider. Fed. R. Civ. P. 56(e).  Global objects to the following exhibits on the grounds of authenticity, foundation and hearsay: 4; 12-13; 17; 20 pp. 1-2, 4-7; 20 p. 3 as to product quality; 21 as to product quality; 22 p. 1 as to product quality; 22 p. 4-19, 23-25; 27-30; 32 as to quality and comments about customer;  32- 33; 34 pp. 2-3; 35; 36 as to quality and comments about customer;  41; 46 as to quality; 47 p. 1; 53; portions of 55 referring to product quality; 60-61.

## II.    GLOBAL DID NOT BREACH ITS CONTRACT WITH FMI

A.    FMI has not proven Global breached quality terms.

FMI has not produced admissible evidence that there was a problem with Global's fish.  Even the broker, Johnson, only reported what he saw, and had no foundation to determine that he was in fact looking at Global's product.  Even if there were admissible evidence, Global Seafoods'primary defense is that it simply did not breach its contract with FMI.  The alleged non-conformity around which this case revolves is severe bruising inside the processed pink salmon.  FMI claims the alleged severe inside bruising breached a contract specification against severe bruising.  Global asserts that the contract specification only applied to outside bruising, or bruising on the skin of the fish, and that the parties agreed that Global was not to be responsible for inside bruising.

Holme and Nikitenko negotiated the 2005 contract.  In the course of the negotiation, Nikitenko said that Global was not to be responsible for any inside bruising.  He said that because, unlike inspection of the outside of the skin, bruising in the meat cannot be seen. Holme said "OK." At the conclusion of the negotiation, the men had a deal that Holme would memorialize.

In contrast to the UCC, under Article 11 of the CISG

> A contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirement as to form.  It may be proven by any means, including witnesses.

United Nations Convention on Contracts for the International Sale of Goods, 19 I.L.M. 671,

reprinted at 15 U.S.C. app. 52.

When Holme faxed his signed attempt to memorialize the deal to Nikitenko, Nikitenko observed that the "severe bruising" specification was not restricted to the outside of the fish. Accordingly, he inserted the word "outside" into "severe bruising," signed the contract and faxed it back. Holme saw the change and did not object to it.

Accordingly, there are two pieces of evidence that the agreement was that Global was not to be responsible for inside bruising. The first is Nikitenko's testimony to the effect that it was an agreed term that Global would not be responsible for inside bruising. The contract had no integration clause, nor does the CISG contain any provision that, if a sale agreement is reduced to writing, the writing will be the exclusive source of terms. Accordingly, Nikitenko's testimony stands on its own to establish the term.

Second, Nikitenko's annotation of Holme's memorialization attempt in conjunction with signature evidences the agreement on the term Nikitenko asserts occurred. *Exh. 2 at 1.* These 2 pieces of evidence raise an issue of fact as to whether the Global was liable for internal bruising. In addition, the fact that Holme did not object to a substantial modification of a product quality specification in his attempt to memorialize an agreement concerning the purchase of $1,150,000.00 worth of processed fish is highly significant. It permits the inference of an admission that the correction was warranted, because a denial or objection would normally be expected if limiting the extreme bruise specification to outside bruising was not correct. *Jones on Evidence* §13.49 Bancroft-Whitney Co. (6th ed. 1972).

Contrary to FMI's assertion, Global did not contract to provide "#1 quality pinks" as that term is allegedly established by ASMI. First, nowhere in the February contract was there reference to "#1" or "premium." There were simply specifications to be met. The only reference to #1 is in the addendum, in conjunction with "as originally contracted" and "Global #1 quality." If contract language establishes anything as the a relative standard for #1 for purposes of this matter, what Global was to produce within the contract specifications was #1. Second, there is no ASMI #1. *Exh. C ¶ 5.* Third, to the extent there is an industry recognition of generally what a "#1 pink" is, the FMI contract specifications are outside the boundary of that rubric, because even under FMI's more

restrictive position on contract specifications salmon with moderate bruising on the inside and/or outside are permitted. *Exh. C ¶ 5*. Fourth, to contend that fish produced in accord with the FMI contract specifications should be rated as lowest quality is wrong, just as it is wrong to claim that fish with moderate bruising inside or out are top quality. *Exh. A ¶ 26; Exh. C ¶ 5*.

FMI claims that some fish photographs forwarded on August 9, 2005, somehow pertains to its breach of contract claim. *FMI memorandum at 31 & Exh. 12 at 7*. But the contract was struck in the preceding February. There is no evidence that the photographs were provided in connection with any contract specification negotiation or modification. Further, any photos of unbruised fish Nikitenko sent to FMI were not intended to represent what had been contracted for, nor would Nikitenko expect FMI to have thought otherwise. *Exh. A ¶ 23*. Under any understanding of the contract, some inside bruising was permitted. *Id.* Nikitenko would expect a customer to view such photos as representative of eh optimal fish it would receive, not that all fish would look that good. *Id.*

FMI also claims that Global had some duty to come forward and address the first shipment quality issues. Nikitenko does not share FMI's notions of the practice of processors in respect of responding to claims by end purchasers, especially when those claims appear to involve a specification for which the processor is not responsible, such as inside bruising in this case. *Id. ¶ 12- 14*.

FMI also contends that Global's records show it took no steps to grade the salmon it produced. Presumably, this refers to the #1 argument refuted above. FMI has put forward no evidence that the specifications in its contract fall into any established grade, ASMI or otherwise, especially as to permitted moderate inside and outside bruising. As the referenced Global records reflect, Global did follow a HAACP plan, followed quality control measures, and inspected round and processed fish. Quality control manager Portillo provides additional details. Exh. C ¶ 3.

FMI's problem apparently was that it failed to harmonize its back-to-back contract with Sang Jin Trading Co. *Exh. 5 at 1*. It did not contain a restriction on the extreme bruising specification to outside bruising. Consequently, when Sang Jin raised an objection with FMI about internal bruising, FMI had no recourse against Global. But that did not mean there were no consequences for Global.

The course of dealing established with FMI during the first contract in 2004 was to waive discrepancies in letters of credit with short time provisions. FMI knew from extensive experience in 2004 the time periods in the 2005 letter of credit were too short. *Supplemental Affidavit of Bent Holme ¶ 3.* FMI informed Global that discrepancies would not be waived, which meant that Global would not be paid, unless Global submitted to an inspection process that could embroil it in disputes over internal bruising, further delaying payment. *FMI memorandum*

Bereft of hope of payment on the letter of credit pertinent to a shipment of 7 containers that had arrived in China, Global was able to obtain a $110,000.00 cash deposit to help secure against potential costs and loss on re-sale. *Exh. A ¶ 19.* The value of the 7 containers to Global was $206,644.68. *Exh. 14 at 4; Exh. 133,349; Exh. 7.* Accordingly, Global was only partly protected..

A much greater problem was looming for Global. Thirteen more containers were on vessels that had reportedly left Dutch Harbor for a delivery port or ports. *Exh. A ¶ 21.* Additional discrepancies had arisen with respect to letters of credit pertinent to those containers, and it was apparent that Global would again not be paid in due course, with a waiver. *Id.; Exh. E at 15 & 18* ("This year the buyers are unwilling to allow discrepant documents.") The wholesale value of these 13 containers totaled about $400,000.00. *Exh. 51 at 6 & 20 (302,273 KG times $1,320.00 per MT).* If they were not paid for in the agreed course, the company would suffer serious problems. Exh. A *¶ 21; Exh. B ¶ 9.*

In light of the unwillingness to continue to routinely waive discrepancies, Nikitenko told Holme and Guenther of FMI several times that the letters of credit would have to be amended to allow increase times for document presentation or Global could not continue. *Exh. A ¶ 21.* Receiving no indication that the presentation time problem would be remedied by amendment or otherwise, Global redirected its product to other buyers. *Id.*

B.    Global did not breach any right of first refusal.

Even if Global were not entitled to avoid the contract, Global did not breach any right of first refusal. That right pertained only to pink salmon that "became available" subsequent to the shipment of the first 1,000 MT contracted for. *Exh. 7.* No fish "became available" because Global's season was not

good enough to produce a surplus after selling 1,000 MT to FMI and selling enough fish to other customers to maintain the customer base. Exh. A ¶¶ 6 & 9. "Became available" meant pinks remaining after Global had distributed enough to its customers to maintain their relationships and sold FMI the 1,000 MT contracted for. *Id.* ¶¶ *9 & 10.* Holme knew that Global had a customer base, could not afford to risk putting all its eggs in one basket with FMI, and would be selling to others. *Exh. A ¶ 10.* When sales to others were mentioned to cite the absence of other claims, FMI did not protest. *Exh. 22 at 1*; *Exh. A ¶17.* Further, given his background, Holme must have known that there was a surge of pink salmon in August that had to be sold and that he was not opening sufficient letters of credit to purchase Global's production. *Id.*

In addition, according to FMI there were no #1 quality fish to which the right would apply because Global only produced "ocean run," since it did not grade fish. If that is true, then there were no fish to which the right would apply. Alternatively, taking Global's view, the right applied only to the Global product that was in accord with contract specifications, which included "bloodline removed." *Exh. 2.*

C.    Global did not breach any duty of good faith and fair dealing.

FMI claims that the Alaska duty of good faith and fair dealing applied to its contract with Global for the international sale of goods. But it cites no authority for the insertion of this Alaska law, or any other state's duty of good faith and fair dealing, into the realm governed by the CISG, especially in a contract that was not negotiated in Alaska. *Exh. A ¶ 26.*

FMI also cites no precedent for the application of the duty of the sale contract. The cases it does cite do not remotely approach a sale contract context. *Kobuk Engineering & Contracting Services v. Superior Tank & Construction Co-Alaska, Inc.,* 568 P. 2d 1007 (Alaska 1977)(reasonableness of sale under UCC- no discernable treatment of covenant); *Guin. v. Ha, 591 P. 2d 1281, 1291* (Alaska 1979)(right of insured versus insurer under liability policy); *McConnell v. State Department of Health and Social Services*, 991 P. 2d 178, 184 (Alaska 1999)(licensing of an Alaskan psychiatrist).

The covenant of good faith and fair dealing is to effectuate the reasonable expectations of the parties, not to add to them." *Casey v. Secco Energy, Inc.,* 92 P. 2d 379, 384 (Alaska 2004). The absence of precedent probably reflects the fact that, in a sale transaction, the parties' expectations are narrow, and

their rights and remedies are already governed by regimes such as the UCC or CISG. Accordingly, there is little, if any, scope for assistance by the covenant.

FMI's overboard approach to application of the duty of good faith and fair dealing would also make every breach of the CISG and of a term in a sale contract a breach of the duty. It offers no support for that view, which FMI asserts should be rejected.

In the case at bar, FMI entered into a contract for the purchase of goods. It did not contain any clause also offering the service of defending against the claims of entities to whom FMI might re-sell the goods. To imply such a service into a sale contract would surely constitute adding to the parties' reasonable expectations, not merely effectuating them.

FMI asserts the remarkable position that it had a reasonable expectation that FMI would handle the quality claims because of an alleged standard practice that would have a processor go anywhere in the world the middleman may choose to re-sell the goods and defend the middleman against "any quality based claims." *FMI's memorandum at 44.* Global disputes that there is any such standard practice. *Exh. A ¶ 13.* FMI would insert an impermissible new contractual obligation, not merely assistance to the realization of an existing one*. Casey v. Secco Energy, Inc.,* 92 P. 2d at 384 FMI does not assert any provision of the CISG or any decisional law that would support applying the duty to require this response by a processor. Further, given the reasons it claims processors involve themselves in quality claims, FMI should expect processors may elect not to address claims. FMI asserts that processors address quality claims not to benefit middlemen, but for their own interests concerning ultimate liability for product problems and reputation. *FMI's memorandum at 44.* Accordingly, FMI should expect that when a processor does not think it is in the processor's interest to get involved in a particular claim, it will not.

FMI never asserted there was any such practice or custom, when communicating about the complaint, which is evidence that there is none. *Exh. A ¶ 13.* Before Holme's notice on this point could be considered at all persuasive, he should provide some persuasive foundation for that view. That foundation should not be confused with the common remedy of resolving matters by settlement on a commercial basis. The CISG affords the buyer legal remedies should it qualify for them; the covenant does not go so far as to justify engrafting a supplemental benefits clause, providing defense services, in a contract for sale.

FMI complains that Global, in an unspecified way, deprived FMI of any ability to defend the quality of the product.  The only real complaint it has, however, is simply that Global declined to join a dispute between seller FMI and its buyer.  Surely middlemen would always prefer to lay the cost of disputes off when they can, but their sellers have no duty to bear them except where the UCC or CISG so provides.  It offers no evidence why, if its buyer had access to the goods for inspection, FMI could not have hired its own inspector to report to FMI the product's condition.

FMI may have wanted to receive Global's representative's report.  But there was no agreement the report would be shared and Nikitenko regarded the representative's report as confidential.  *Exh. A ¶ 25.*  Further, since the report concerned bruising for which Nikitenko did not consider Global responsible under its contract with FMI, Global did not appear implicated.  *Id. ¶ 14.* In addition, at this juncture Global was being placed under great pressure by the dishonor of FMI's assurances that discrepancies arising from provisions that would normally render letters of credit unacceptable would be waived.  Exh. A ¶¶ 3, 19-22; *Exh.* B ¶ 6 & 9.  Global understandably not interested in establishing precedent that payment could be withheld while Global was drawn into disputes, starving it to death of capital.

FMI also does not show that it has a bona fide claim of damages caused by the action and inaction of which it complains concerning the response to the quality claim. Global's representative's report, to the extent its is shown that he viewed product actually produced by Global, would not have been substantially helpful to FMI.  That is likewise true of the other criticisms of Global's response.  FMI claims to have incurred a loss due to product quality complaint, but makes no effort to show how that claim would have been avoided or reduced had Global done any of the things FMI claims it should have done.  There is a remedy under the CISG for a legitimate claim, and that it the only one that should be available to FMI.

There is also no scope for the covenant in FMI's claim for breach of the right of first refusal. Again, FMI cites no precedent that shows how the covenant might be applied in that area.  In fact, there is no scope for it, because any right of first refusal needs no assistance.  Either it exists or it does not; it was breached or it was not.  The right is vested with a remedy for its breach, and there is no need to craft more.  Even if the covenant did apply to a right of first refusal provision, however, for the reasons

discussed above in section B, there was no breach of the right.

The covenant also does not apply to FMI's claim that Global should have allowed inspection of the third shipment as a condition to obtaining a waiver of discrepancies and payment. Again, either FMI had a contractual right to such an inspection or it did not. If it did, then it may pursue a claim for breach of contract. There is no scope for the application of the covenant. Global also was not acting contrary to the expectations of the parties when it declined to allow inspection of product before the letter of credit payment mechanism was re-stored. There was no contractual provision conditioning the right to draw on letters of credit on inspection. The contract or the terms of the letters of credit might have tried to require that, but they did not. To the contrary of FMI's claim that its expectations were violated here, it was Global's reasonable expectation of routine payment on letters of credit, induced by FMI's assurances, that was being frustrated at the time. In refusing to allow insertion of a right to inspect as a condition to being able to draw on letters of credit, Global was taking a position that both was consistent with the parties' course of dealing and FMI's assurances, and thus expectations, and necessary to protect Global economically. In addition, Global had a concern about the legality of the end buyer's access to the containers prior to clearing customs. *Exh. A* ¶ 20.

The claim that Global attempted to wash its hands of quality problems is unsupportable. FMI does not try to show that Global took any action that would have interfered with FMI's recourse for damages under the CISG. FMI was at all times free to prepare and bring a claim for product non-conformity, seeking damages under the CISG. This recourse is the only reasonable expectation FMI had. Likewise, there is no foundation for asserting that all Global tried to do was leverage itself into a position to demand advance payment. The history rehearsed above shows that Global negotiated for the $110,000.00 deposit because the course dealing for payment on letters of credit, upon which it was entitled to rely, was discarded and it could not obtain the requisite curative amendments. *CISG Art. 9*. Accordingly, pending further developments it needed to protect itself with a deposit. Thus, Global reacted defensively, it did not initiate.

It was likewise not in bad faith for Global to decline to agree to allow inspection to become a condition of payment on letters of credit, supplanting the course of dealing on letters of credit. FMI refers to nothing about the parties' contract terms that would give rise to an expectation Global would do so.

The inspection obligation FMI advocates would have impermissibly added to Global's obligations. *Casey v. Secco Energy, Inc.,* 92 P. 2d at 384. Further, such a condition on drawing on letters of credit would have undercut Global's reasonable expectation of unconditional, timely payment, and would have exposed Global to economic pressure to discount. *Exh. A ¶ 20.*

Finally, FMI claims that Global breached the duty by taking no steps to assure FMI received the #1 prime quality it was entitled to. But the facts are that Global did have a quality control program. *Exh. C ¶¶ 2-3.* Further, its premise, that "#1" has the quality meaning it alleges and that it was promised that quality, is wrong. *Id. ¶ 5; Exh. A ¶ 15.*

## III.  GLOBAL RIGHTFULLY AVOIDED THE CONTRACT FOR FUNDAMENTAL BREACH

FMI breached its obligation to provide workable letters of credit, depriving Global of the payment mechanism it contracted for and needed. The CISG authorizes a party to avoid a contract for "fundamental breach." *Articles 25, 64, 71-73; Shuttle Packaging Systems, LLC v. Tsunamis*, 2001 WL 34046276 (W.D. Mich.) A fundamental breach is a breach that "results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract...." *Article 25; Shuttle Packaging Systems, LLC v. Tsunamis*, 2001 WL 34046276 at 8, citing *Delhi Carrier v. Raptores Corp.,* 71 F.3d 1024, 1028 (2d Cir. 1995)(discussing definition). Global was entitled, initially by combination of the letters of credit and Holme's assurances of discrepancy waiver and, after the assurances were no longer good, by amendment of the letters of credit, to expect the prompt and reliable payment mechanism it needed to avoid serious harm. The letters would not have been initially accepted otherwise. *Exh. B ¶ 6.* At the above-described juncture, payment for the third shipment was not made by waiver of discrepancies. As FMI's own briefing makes clear, payment for the third shipment, of 7 containers worth about $ 207,000.00, through waiver of letter of credit discrepancies was conditioned on Global submitting to an inspection process that exposed Global's vital cash flow to disputes, and further delay of payment due to non-waiver, over internal bruising for which Global was not contractually liable. A similar, though much greater problem financially since the product was worth about $400,000.00 to Global, loomed with the approach of 13 more containers to China.

Non-payment of the purchase price is a fundamental breach. *Shuttle Packaging Systems, LLC v. Tsunamis*, 2001 WL 34046276 at 8.  FMI withheld payment, deviating from the established course of dealing, and required Global to agree to expose itself to grave harm, an exposure it expected to avoid by means of letters of credit and the assurances of discrepancy waiver.  *Exh.  B ¶¶ 2, 3, 6 & 9.*  In view of the history of discrepancies in 2004, FMI must have known the assurance of waiver was fundamental to the acceptance of the letters of credit. Nikitenko warned FMI several times that it would have to re-direct its sales if the letters of credit were not amended to cure the exposure to discrepancies.  No amendment occurred.  Accordingly, Global was and is entitled to avoid the contract for fundamental breach.  Id.; Article 64.

## IV.    FMI HAS PROVEN NO UNFAIR TRADE PRACTICES ACT VIOLATIONS

As with the other theories, summary judgment on this cause of action is not possible under the present state if the evidence because there are too many factual issues.  Regardless, FMI provides no precedent or other analysis that would support applying a state Unfair Trade Practices Act to an international sale transaction governed by the CISG.  It should not be.  The CISG is a convention with no-doubt carefully worked out remedies, that the federal government has adopted for international trade from this country.  To apply the Act to such transactions would intrude into the conduct of foreign commerce, which is a distinctly federal area, and would certainly generate conflicts with provisions of the CISG, both those governing how the parties are to conduct international trade and the remedies that are to be available for breach.

This would be compounded by the asymmetry of application.  The Alaskan party could readily be held to the standards of the Act at the foreign party's election.  But the Alaskan party would have no assurance of any similar protection and recourse in respect of its foreign customer or trading partner.  The court is requested to take judicial notice of the fact that large parts of the world have poor or ineffective judicial recourse.

Second, as with FMI's other legal theories, FMI has not taken care to show how the particular acts or omissions of which it complains caused particular items of damage.  For none of its theories has it cited any basis for departing from the usual rules of causation of damages.

Third, as with all other claims, FMI has not introduced admissible evidence as to defects or deficiencies in Global's product. Even as to Johnson's report, there is no admissible evidence that the fish he was shown for inspection were in fact the product Global shipped.

Global will now address the 4 particular alleged violations of the Act. First, FMI alleges Global did not provide the quality fish it "advertised." Global disputes FMI's premise, which concerns its "AMI #1" allegation. *Exh. A ¶ 5 & 26; Exh. C ¶ 5*. Regardless, there is no evidence of advertisement, as that term is used in the Act. *E.g., Lee v. State*, 141 P. 3d 342, 345-346 (Alaska 2006).

Second, FMI alleges Global made inappropriate threats to re-sell product promised to FMI and to stop additional shipments in order to "extract additional advantages beyond the contract rights of the parties...." FMI does not specify what that is. In its discussion above, Global has shown that its reaction after the withholding of discrepancy waivers concerning the third and fourth shipments was simply designed to protect itself against the consequences of non-payment under the letters of credit, in the case of the $110,000.00 deposit, and to protect itself going forward, in the case of the corrective credit amendment it sought in light of the withdrawal of routine discrepancy waiver. Global only withheld objection to the terms of the credits in the first place because it was assured of waivers. *Exh. B ¶ 6*. Global took these positions only after the course of dealing established in 2004 and Mr. Holmes' prior assurances in 2005 that waivers would continue were abandoned. The FMI contract did not specify terms of letters of credit. It must necessarily follow that a payment mechanism called for by a contract must be provided in form and terms that will enable it to actually function as a payment vehicle. What Global expected was a payment vehicle that would produce payments in due course, uncoupled from inspections, claims and so forth. In the event claims arose, FMI would be free to pursue them. But in the meantime, Global's cash flow would be protected, and Global would not be placed in the position where its cash flow was held hostage to disputes between FMI and its buyer over differing bruising terms. Global would also avoid being held up for a discount over questionable claims. Once waiver was no longer available, nothing in the contract prevented Global from requiring an alternative approach to assuring payment, once the reliability of Mr. Holmes' assurance evaporated.

FMI was presented with an option. It could have declined to provide a deposit, and brought a claim against Global under the CISG for any loss under the contract. Or it could accept the informal

option Global offered.  It elected the latter.

Third, FMI complains that Global sold the 20 containers even though there were letters of credit in place, and kept the $110,000.00 deposit.  To the contrary, the whole problem at that juncture was that credits that Global could actually draw on were not in place. The $110,000.00 deposit was agreed upon when payment on the letters of credit was blocked by refusal to continue routine discrepancy waivers on credits.  The funds were to be returned if there were payment on the credits. *Exh.  A ¶ 19.*  That did not happen, so the funds were not returned.  *Id.*  The unfairness was inflicted on Global.  Global was induced to ship hundreds of thousands of dollars of product on an assurance of waiver that was not honored.  That Global would act to try to protect itself against that unfairness cannot itself be unfair.

Fourth, FMI claims that the right of first refusal was a false promise.  That is not true.  Global discussed above the fact that the right would be valuable, provided Global had a good season.  *Exh.  A ¶¶ 9- 10.*  Holme knew that Global would be selling to others.  *Id.*  Further, when Nikitenko told Holme that no other buyers had complained about fish quality, Holme did not protest the sales, as would have been expected if he thought FMI had an exclusive right.  *Id.  ¶ 17; I Exh.  22 at 1.*

Finally, FMI complains that Global suppressed QC Johnson's report, hiding from FMI essential information about quality issues.  Global has shown above that Johnson was its designee, and that there was no agreement to share his report with FMI.  *Id.  ¶¶ 11 & 25.*  Further, as also discussed, FMI has not shown that FMI was harmed by not having the report.

In summary, the present state of the evidence does not support a finding that any unfair trade practice occurred.

## V.    GLOBAL DID NOT TORTUOUSLY INTERFERE WITH ANY CONTRACT FMI HAD WITH A THIRD PARTY

FMI advances no legal authority that would support a finding of tortious interference with contract on the present state of the evidence.  It also advances no legal authority that would support a finding of tortious interference when the breach of a sales contract only coincidentally affects the would-be buyer's contract with a third party.  That is not the law.  A tortious interference claim may be made out when an actor intentionally tries to meddle with a party's contract with a third person.  *Knight v.  American Guard*

*& Alert, Inc.*, 714 P. 2d 788, 793 (Alaska 1986).  As discussed above, Global's actions were not directed at intentionally meddling with any FMI re-sale contract.  Nikitenko had no intention to do so.  *Exh.  A ¶ 24.*  Global's actions were obviously intended to try to protect itself from the consequences of non-payment under its own contract with FMI.

As to the factual allegations at page 57 of FMI's brief supporting the claim, Global has disposed of most of them more than once above.  Most of them suffer from no substantial claim that the alleged action caused damages, an essentially element of the tort. *Knight v.  American Guard & Alert, Inc.*, 714 P.  2d at 793.  None of them constitute tortious interference in FMI's other contracts. FMI may exceed its earlier allegations, though, in alleging several things.  First, it claims without support that Global tried to maneuver around FMI and cut FMI out of its own contracts.  There is no evidence that occurred, let alone that it caused FMI harm.  To the contrary, the evidence is very firm and consistent that the problem was simply payment; if FMI had restored the previous payment practice, Global would not have avoided the contract.

Second, FMI alleges Global refused to make deliveries of salmon for which it had already been paid.  The $110,000.00 deposit was not intended to pay for a delivery of salmon.  As to any other occurrence to which FMI might intend to refer, there is no effort to identify it or to show that it TORTUOUSLY caused damages. *Knight v.  American Guard & Alert, Inc.*, 714 P. 2d at 793.

Third, FMI alleges Global tried to intimidate and bully FMI and its customers.  There is no evidence of any such activities.  Global took a position to try to protect itself against the consequences of non-payment, but only after the change in how credits were paid.  That was not bullying or intimidation.

## VI.    GLOBAL DID NOT CONVERT $110,000 OF FMI'S FUNDS

The tort of conversion is defined as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the property." *McKibben v.  Mohawk Oil Co., Ltd.*, 667 P.  2d 1223, 1228 (Alaska 1983), quoting Restatement (Second) of Torts Sec.  222A (1965).  FMI

cites no legal authority, nor does it offer any legal analysis, to show that conversion occurred.

Preliminarily, the tort applies to chattel. There does not appear to be any Alaska authority that holds that a bank wire, such as that FMI states that it transmitted, is a chattel. *Exh. 52.* A "chattel" is a thing personal and movable. *Black's Law Dictionary* (5th ed. 1979). This does not describe the electronic transfer of a credit from one bank to another.

As importantly, if the wire were a chattel, FMI chose to have it transmitted to Global's bank, in connection with trying to resolve a dispute. The purpose was to protect Global against losses in the event payments for product was not received on the letters of credit. *Exh. A ¶ 19.* Accordingly, to the extent Global might be treated as having come into possession of the bank credit for $110,000.00, it was because FMI chose to resolve the problem that way, rather than by pursuing a claim. Global did not exercise any dominion or control; to the extent any was exercised, it was by FMI in causing the credit to go to Global's bank. When the letter of credit problem was not resolved subsequently and Global experienced expenses, that was what the deposit was for, as discussed above.

As with the other claims, the present conflict in the evidence also does not support a decision that conversion occurred. There are many issues of fact to be resolved.

## VII.    CONSIDERATIONS BEARING ON FMI'S DAMAGES CLAIMS

### FMI's lost profits claim must in any event be limited to profits on 418 MT

The contract provided that the product purchased was to be paid for with transferable letters of credit, opened prior to shipments. *Exh. 2.* FMI only ever transferred letters in the total amount of $815,760.00. *Holme Supplemental Affidavit Ex. A.* Of that, $264,000 was spent on the first shipment . FMI memorandum 11-12; Exh. 13, 14, 19. So FMI only had the capacity to purchase another $551,760.00 of product, or 418 MT. Since these were transferable letters of credit, FMI had to rely on some other entity or entities for them. It also was not making purchases with its own funds. On the present record, there is no basis for concluding FMI had the capacity to buy more than another 418 MT. Accordingly, if the court makes any determinations concerning lost profit

damages, Global urges that they be limited to this amount.

<u>FMI's lost profit rate of $130.00 per MT must be reduced to $94.60</u>

Again, if the court makes any determinations concerning lost profit damages, Global urges that the rate should be $94.60 per MT, not the $130.00 FMI claims. Holme deposition Exhibit 73 contains a worksheet of projected lost revenue, reflecting the transactional costs FMI would have experienced had the full 1,000 MT been delivered. *Exh. E at 11-14, 16.* Especially noteworthy is a 2% commission to San Jin that would have been calculated on FMI's re-sale price, $1,450.00 per MT. *Id.* This would have been deducted from FMI's $130.00 per MT gross. *Id.* This commission is not now owed, because the contract was not fulfilled. *Id.* at 11-12. Accordingly, the correct rate of recoverable loss of true profit, if any, is $94.60 per MT.

<u>FMI's recovery of lost profits on its right of first refusal claim must be limited to profits on 489.57 MT</u>

If the court reaches the amount of damages that FMI should recover on its right of first refusal claim, Global submits the claim is limited to profits on 489.57 MT. FMI asserts that Global's total 2005 "#1" H&G pink production in 2005 was 2,353,221.25 pounds, or 1,067.4 MT. *FMI memorandum at 41 n. 221.* That is incorrect; the exhibit cited in footnote 221 does not show that. Total production was 3,283,897.43 pounds, or 1,489.57 MT. *Exh. G at 2-10.* FMI contends its right of first refusal pertains to all #1 production over 1,000 MT. Accordingly, that claim, if otherwise valid, applies to 489.57 MT, not the 818.2 MT FMI refers to. *FMI memorandum at 42.*

<u>FMI's recovery of lost profits on its right of first refusal claim must be limited further to profits on 24.48 MT at most</u>

Again, if the court reaches the amount of damages that FMI should recover on its right of first refusal claim, Global submits the claim is limited still further to profits on 24.48 MT. While there was an agreement that the 1,000 MT quantity of the original contract could be up to 50% bloodline in, there never was any agreement to change the bloodline out requirement for any additional fish.

*Exh. A ¶ 11.* Accordingly, Global produced no more than about 24.48 MT of bloodline out product that was not taken by an FMI customer, so that is the maximum amount of fish against which any right might have been exercised. The Case Up Tally Summary shows that 97.9 MT of blood out was produced. *Exh. A ¶ 27; Exh. G 1-11.* In addition, another 27.58 MT of unlabeled bloodline out was produced. *Id.* The total was 125.48 MT. A total of 101 MT was sent to FMI's Thai customer. *FMI's memorandum at 34 & Exh. 38 & 40.* Thus, the most FMI might claim on its right of first refusal claim is its net profit on 24.48 MT.

## VIII. FMI'S MOTION AGAINST GLOBAL'S COUNTER-CLAIM MUST FAIL

Global has a counter-claim for demurrage based on re-sale of the 7 containers third shipment, for $124,833.00, and $11,678.80 for the 13 container group. Exh. B ¶¶ 9 & 10 and pages 4- 20. FMI moves against Global's claim for demurrage for the 7 containers on 2 grounds. First, FMI contends that the relationship between the demurrage cost and the potential quality clam discount is so great as to make the demurrage claim unreasonable as a matter of law. FMI cites no legal basis for this assertion. The clear response to this is that, if unreasonable due to delay, the proper remedy is reduction to a reasonable amount, nor dismissal of the claim altogether. Perhaps, as is suggested by the comparison FMI makes, it might have an argument that Global cannot fairly recover more than the sum that would have been paid to settle a quality claim on the product. But FMI is not making that argument.

Further, the delay was not Global's fault and therefore cannot be charged against it. There was delay in re-selling, but it was the result of a long period of delay in receiving back the documents originally submitted for payment under the pertinent letter of credit. *Exh. B ¶ 11.* Global needed to receive the documents back before it could re-sell. Global's claim is, of course, predicated on a breach of contract by FMI exposing Global to recoverable costs of re-sale. This being the case, as between the breaching party and the non-breaching party, it is fair and reasonable that the breaching party bear the consequences of the time for documents to move to and fro in the international banking system.

FMI's second ground cites Nikitenko's error in thinking the containers had been sold and

shipped. *Exh. A ¶ 22.* FMI claims that, had it but known the containers had not been re-sold, it could have re- sold them. There is no merit to this ground. Nikitenko offered the containers to FMI again in early December, 2005. *Exh. A ¶ 22.* If there were any merit to FMI's claim, it would now be putting forward evidence of what it did to help market the product once it became aware it was still unsold. Since this evidence would be available and helpful to FMI, it is proper to infer from its absence that there was no such effort. Regardless of whether Nikitenko thought he had the containers re-sold by October 22, 2005, he could not in fact re-sell them without their documents, which were not received back until late November. *Exh. B ¶ 11.* FMI would have been in the same position, so its position is doubly unfounded.

Global notes that FMI does not move against all damages on this ground, but only moves for the point that FMI "cannot be held responsible for any damages purportedly arising after this representation was made [on October 22, 2005.]" Accordingly, a grant of the motion on this ground would not dispose of Global's claim.

## IX. CONCLUSION

FMI's Motion for Partial Summary Judgment should be denied.

_____DATED this 21th day of January, 2007, at Anchorage, Alaska.

_____s/ Mark C. Manning_____
MARK C. MANNING, P.C.
Counsel for Defendant
431 West 7th Avenue, Ste. 204
Anchorage, AK 99501
Phone: (907) 278-9794
Fax: (907) 278-1169
manning@alaska.net
ABA No. 8110066

CERTIFICATE OF SERVICE

I hereby certify that, on 1/21/07 to, a copy
of this Motion and Proposed order were served
electronically on
FMI Food Marketers International

    s/Mark C. Manning