Mark C. Manning
Mark C. Manning, P.C.
431 W. 7th Ave., Ste 204
Anchorage, Alaska 99501
(907) 278-9794 Fax: 278-1169
Counsel for Global Seafoods

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| FMI FOOD MARKETERS<br>INTERNATIONAL, LTD,<br><br>            Plaintiff,<br><br>v.<br><br>GLOBAL SEAFOODS NORTH<br>AMERICA, LLC<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 3:06-cv-00011 JWS<br>) |

## DECLARATION OF OLEG NIKITENKO
28 U.S.C. §1746

Oleg Nikitenko states the following under penalty of perjury:

1. I am an adult, am competent to give testimony, and have personal knowledge of the facts set forth herein.

2. Global Seafoods North America, LLC, is a relatively small fish processor in a capital intensive business. I am the sole member. Global's small administrative and sales office is in Bellevue, Washington, and its single fish processing plant is in Kodiak. It purchases and processes fish caught in Alaskan fisheries during seasons throughout most of the year.

3. Global's survival depends on avoiding large disruptions in payment for its products. Taking the 2005 pink salmon season as an example, a flood of fishing vessel deliveries to Global's processing plant was underway by early August and continued through the month until the season wound down in early September. Global has to guaranty payment to fishermen, and can make such commitments only after it has made agreements with buyers.



Exhibit A

Page 1 of 8 Pages

Whole fish needed to be accepted at Global's dock, processed into headed and gutted fish or fillets, frozen, packed, loaded into shipping containers, which are picked up by a carrier at Global's dock and shipped to their final destinations via Dutch Harbor, where the containers are loaded into freighters. This operation required a staff of over 100 processors, quality control inspectors, maintenance personnel, and Kodiak office management and support staff, resulting in a large payroll. The fishermen who delivered the fish had to be paid within a week or so. In addition, Global was generally responsible for the cost of shipping the product to the primarily foreign destinations designated by its customers.

4.    As the pink salmon season wound down, processing of other species continued into the fall. In order to keep this operation going, to meet ongoing expenses, Global had to timely recapture at least most of the capital tied up in the container loads of processed fish in the pipeline flowing out from Kodiak. In other words, customers had to pay their bills on time. This requirement also constituted a potentially serious vulnerability: great pressure to discount the sales price could be brought on Global if the stream of payments for product delivered were interrupted.

5.    One means of assuring payment that Global has relied upon is a letter of credit. With this instrument, a purchaser opens a credit at Global's bank, Wells Fargo, sometimes before product is produced but in any event before shipment of product from Dutch Harbor, on which Global could draw for payment of product sold by presenting to Wells, after shipment but normally well before delivery, bills of lading and other documents listed in the letter of credit. This arrangement protected Global against non-payment for the goods.

6.    I have been largely responsible for developing Global's customer base for pink salmon. To preserve that customer base, I have needed to and have assured those customers that Global would provide them with product in the coming season. I did so prior to the 2005 season.

7.    Global delivered its standard product under its 2004 contract with FMI, and no quality- or product-specification related claims were ever communicated to Global. In late 2004, when negotiating a 2005 contract, Bent Holme of FMI mentioned some dissatisfaction with internal bruising in the 2004 product. I explained to him that I could not see through the fish, meaning Global could not identify and eliminate H&G salmon that had internal bruises.

8.    Mr. Holme expressed interest to me in purchasing bloodline out H&G pink salmon. In 2004, Global had sold FMI "bloodline in" pink salmon, meaning salmon from which



Exhibit A
Page 2 of 8 Pages

the kidney, which runs longitudinally under the fish's backbone, had not been removed.   In
2005, I did not plan for Global to make any blood line out product. I explained to Mr. Holme
that Global could not afford the investment that would require.  I had plans for different
upgrades in the May-June 2005 period and could not afford to purchase the salmon processing
machines necessary to produce blood line out fish. Since only FMI expressed any great interest
in blood line out product, I asked Mr. Holme if FMI were willing to make an investment that
would benefit both of us. Accordingly, Global and FMI entered into a contract for 2005 H&G
("headed and gutted") pink salmon with blood line removed, with FMI to advance part of the
funds for the purchase of the machinery.  The advance was to be repaid from payments for
product under the contract, and ultimately it was repaid. Global purchased a Ryco unit,
comprised of 2 different machines for about $110,000.00. All information we had about the
research for and details of this unit was sent to Mr. Holme.

     9.    I am certain that, in negotiations concerning the 2005 season, I informed Mr.
Holme that Global would be selling pink salmon to other members of its customer base in 2005.
I told him Global could not afford to put all its eggs in one basket, due to the financial risk of
doing so. I am also certain that I advised Mr. Holme that Global could not be responsible for
bruising on the inside of the H&G fish. Mr. Holme said that in 2004 they had not had any
problems with bruising, so OK. When Mr. Holme sent me a written contract to sign, I inserted
the word "outside" to modify "severe bruising" to correct the failure to limit the specification
concerning extreme bruising to bruising on the outside of the fish.  Mr. Holme did not object to
the correction after I sent a signed copy to him.

     10.    Subsequent to the signing of the contract, it became apparent that the market price
of pink salmon to fishermen was rising. Accordingly, FMI and Global agreed to an increase in
the contract price. We also signed an addendum to the contract that provided that if any
additional Global #1 H&G pink salmon "became available" after Global produced FMI's first
1,000 MT, then FMI would have the right of first refusal on the purchase of them. Such pinks
would only become available if Global experienced a good enough year that it could fill the
1,000 MT FMI order and deliver enough pinks to others of its customer base to maintain those
relationships and keep those customers from being motivated to look for other sources.  Global
had some flexibility there, because it had no binding pre-season contracts with any other
customers. I never would have agreed to place Global's entire production at FMI's disposal.



Exhibit ___A___
Page _3_ of _8_ Pages

Global needed to maintain its other customer relationships by selling to them. As to the reference in the April addendum to the Global-FMI contract to "#1 quality Pink Salmon as originally contracted against #FMI-224" and "Global #1 quality Pinks," I understood that to mean the fish quality and characteristics required by the original February contract. In connection with agreement to the addendum, there was no discussion or communication about changing any quality or characteristic of the fish to be sold.

11.     It became apparent in early August that the Ryco machine purchased to remove blood lines to accommodate FMI's desire for blood-out fish could not be made to process fish as expected. Global could not keep up with fish deliveries if it tried to produce blood-out fish by hand. Though Global shipped a few containers of blood-out fish for FMI, FMI agreed to accept approximately 50% of its 1,000 MT order as blood in fish, at the contract price. There was no discussion about or agreement to amend the blood-out specification which applied to the right of first refusal. On my instructions, Global abandoned ALMOST ALL production of blood out fish, hoping that eventually FMI would be satisfied to accept blood-in fish as it had in 2004.

12.     FMI notified me that a customer had communicated a complaint about the quality of the fish in the first container shipped on the FMI contract. FMI did not state whether it would accept or reject the container. Based on e-mail and telephone communications with Mr. Holme. I understood that the key complaint concerned internal bruising. I was surprised there was any complaint, because the 2004 and 2005 FMI contract specifications were essentially the same, except for a slight change in the meat color range and the 2005 "outside bruising" provision. There had been no claim from FMI about the 2004 product, and there had been no changes to Global's operation in 2005 that would affect quality or contract compliance adversely. I received no report from the plant manager, quality control personnel or anyone else that there was any quality problem with FMI product. The complaint was about blood-in fish, and that was all Global had sold FMI in 2004.

13.     Given my belief that Global had contracted out of responsibility for inside bruising, I did not feel the complaint raised a genuine potential claim under Global's contract with FMI. Further, the complaining party was FMI's customer, not Global's. In my opinion, based on marketing fish from Alaskan fisheries since 1999, and production and sale of Alaskan salmon products since 2003, there is no standard practice in the industry for fish processors to step in and defend against any the quality-based claim by a buyer's customer. At the same time,

Exhibit _A_
Page _4_ of _5_ Pages

when an end customer does raise a quality concern, the processor may respond, investigate and participate in a settlement, to protect its own interest.

14.     I did get in touch with a Chinese fish broker I knew, whose judgment I felt I could trust, and arranged to have the broker go and inspect the container. There was substantial delay before the visit occurred, presumably due to an intervening Chinese holiday and the fact that the broker had his own business to run. Ultimately, the broker's report to me was that the fish he was shown that purportedly were shipped by Global had significant bruising in the meat, which is internal bruising, an issue I considered was not Global's problem under the contract. The broker reported there was no complaint about the size, skin color or meat color, and noted no specific complaints other than bruising. There had been no Claims for bruising Prior to this, and none other than FMI's arose out of the 2005 season concerning pink salmon for any reason concerning bruising or any quality consideration. I do not recall that there were any quality complaints that did not become claims. I think there probably were none, but could have forgotten a minor complaint. I am certain there were none that were of any real size.

15.     I was the sole Global sales representative with FMI. I handled exclusively the negotiations with FMI in 2004 and 2005 that culminated in the contracts with FMI in those years for the purchase and sale of headed and gutted pink salmon. Both contracts contained the specifications of the product desired, and neither made reference to any other "#1 quality" salmon specifications. For the 2005 Global/FMI contract, "#1 quality" and "Global #1 quality" as used in the April 29, 2005, addendum meant salmon that met the criteria set forth in the contract itself. There were no negotiations and there was no agreement in respect of the addendum to any addition to or change in any product specification . While it is true that "#1 quality" generally refers to a high quality level of pink salmon, there is no industry standard as to what specific set of criteria constitute "#1." but in any event, allowing up to but not including extreme inside and outside bruising, which would be the application of fmi's reading of the extreme bruising term, would allow fish with moderate inside and/or outside bruising. These fish would not be "#1" as that designation is understood in the industry.   Further, "premium" is a higher grade than "#1."

16.     I am well acquainted with asmi standards and publications. I have never seen or heard of any ASMI #1 quality designation for h&g pink salmon, an strongly believe there is none. I never made any representation to anyone that Global was to be "selling #1 quality H&G



Exhibit A
Page 5 of 5 Pages

pinks, as that term is defined through a specific series of industry standard ASMI protocols" IN
2005 or at any other time.

17.    In September, I informed Bent Holme that none of our other buyers had
complained about fish quality, and he never responded with any sort of protest about those sales.
He must have known Global was selling to others: with his background, he must have known
that the burst of H&G pink production occurs in August, that containers are shipped out to
customers as fast as possible, and that he was not opening letters of credit in amounts sufficient
enough to purchase our production.

18.    I understand that FMI asserts at pages 17 and 18 in its memorandum there was A
quality complaint pertaining to the second shipment, of 6 containers. I understand further that
fmi asserts the claim relates to the the containers that were consigned to Qingdao Yijiia
Foodstuffs of Qingdao, China. I understand further that FMI claims to have paid $16,820.00 To
settle a quality claim. I understand further that FMI asserts this claim relates to product that
shipped on board at Dutch Harbor on September 13, 2005. The transit time to Qingdao is 10 to
15 days. Due to expensive demurrage that would have been charged for delay in taking delivery
of the containers after arrival, Yijiia almost certainly would have accepted them very shortly
after arrival. Therefore, Yijiia almost certainly had the containers by about October 1, 2005. I
understand further that this delivery was paid for by check. To the best of my recollection, there
never was a written claim made to me or Global about this, except to the extent one may have
been conveyed to our legal counsel after his engagement in early December. To the best of my
recollection, Global was never the opportunity to inspect this product for defects.

19.    With respect to the $110,000.00 deposit FMI paid Global, at the time I negotiated
that deposit with Harry Guenther, my information was that there were 7 containers in China and
13 more on the way. At that point, Mr. Holme's assurance that letter of credit discrepancies
would be waived was not being honored. If payments were not made, Global was exposed to
demurrage (cost of storage, which is considerable), other potential re-sale costs, and potential
loss on re-sale price. I made it clear to Mr. Guenther that I wanted a deposit for protection
against such losses. The money was to be returned if and when payment was made on the letters
of credit. That never happened; subsequently, I could obtain no agreement to waive
discrepancies on the letters of credit pertaining to the 7 and 13 containers, nor could I obtain



Exhibit _A_
Page _6_ of _8_ Pages

amendments to increase the deadlines for document presentation, to make the letters of credit acceptable. Expenses incurred in re-sale did occur, which I BELIEVE EXCEED $110,000.00.

20.    As to FMI'S proposal for inspection of containers before payment, I was concerned about the risk that a buyer's access to a container for inspection before clearing customs in China violated Chinese law, which would place Global's unpaid for product at risk. Also, Global could not agree to a new course of dealing that eliminated the waiver of discrepancies it had been promised, and conditioned waiver on inspection, since that would open the door to further delay in payment and potential pressure to discount over unwarranted claims.

21.    As I was negotiating for the $110,000 FMI deposit, a much greater problem was looming for Global. Thirteen more containers were on vessels underway. Additional time discrepancies had arisen with respect to letters of credit pertinent to those containers, and it was apparent that Global would again not be paid in due course, with a waiver. The wholesale value of these 13 containers totaled about $400,000.00. If they were not paid for in the agreed course, the company would suffer serious problems. In light of the unwillingness to routinely waive discrepancies, I told Mr. Holme and Mr. Guenther of FMI several times that the letters of credit would have to be amended to allow increaseD times for document presentation OR Global could not continue. Receiving no indication that the presentation time problem would be remedied by amendment or otherwise, Global redirected its product to other buyers.

22.    As to the 7 containers that comprised the third shipment, I mistakenly told FMI at one point that they had been sold. This advice was corrected and I re-offered them to FMI via December 6, 2005, e-mail. The containers were rejected. They were eventually re-sold, after incurring demurrage and other expenses that, together with demurrage charges for the group of 13 redirected containers, totaled more than $110,000.00.

23.    Any photos of unbruised fish I sent to FMI would not have been intended to represent what had been contracted for, nor would I have expected FMI to think that. Under any understanding of the contract, moderate inside bruising was permitted. I would expect any customer to view such photos as representative of the optimal fish they would receive, not that all fish would look that good.

24.    In reaching the outcome that Global did with FMI, I did not intend to interfere with any contract FMI had. While I knew FMI was re-selling the fish, it was not my intention to



Exhibit A
Page 7 of 8 Pages

interfere with such re-sales. My only intention was to protect Global against the consequences of the disruption of cash flow and non-payment for delivered fish and/or demurrage charges.

25.     FMI did not reasonably rely on Global to deal with Yilufa. Yilufa was not Global's customer. It was for FMI to attend to disputes it had with its customer. Global did not expressly undertake to handle Yilufa for FMI. In my opinion, there is no industry practice or custom that A PROCESSOR MUST OR SHOULD provide an inspector to deal with ITS buyer's customer's complaint or to otherwise protect or defend the buyer. To the best of my recollection, no one from FMI claimed that there was such a practice or custom while communicating with me about dealing with the problem. This was especially the case with Yilufa, given that the specific complaint concerned inside bruising, for which Global was not responsible under the contract. There was no agreement that FMI would receive Johnson's report; I regarded him as Global's expert or consultant, whose opinions were confidential.

26.     None of the 2005 Global/FMI contract negotiations occurred in Alaska.

27.     On the 2005 Global case up tally summary, "bo" means salmon with bloodline removed and "bi" means salmon with bloodline not removed. Early in the season, since we were endeavoring to make bo, there was no such labeling since all salmon was bo.


I declare under penalty of perjury that the foregoing is true and correct. Executed on January 21, 2007.

OLEG NIKITENKO