```
 1              UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF ALASKA

 3   ----------------------------------------------------

 4   FMI FOOD MARKETERS              )

 5   INTERNATIONAL, LTD.,            )

 6           Plaintiff,              )

 7        vs.                        )  NO. 3:06-CV-000111 JWS

 8   GLOBAL SEAFOODS NORTH           )

 9   AMERICA, LLC,                   )

10           Defendant.              )

11   ----------------------------------------------------

12           DEPOSITION UPON ORAL EXAMINATION

13                         OF

14                     BENT HOLME

15   ----------------------------------------------------

16                     11:35 a.m.

17                  November 30, 2006

18            1420 Fifth Avenue, Suite 3400

19                  Seattle, Washington

20

21

22

23

24   Lauren G. Harty

25   Court Reporter
```



```
              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ALASKA
---------------------------------------------------------
FMI,                        )
         Plaintiff(s),      )  No. 3:06-CV-000111 JWS
    vs.                     )  NOTICE OF READINESS
GLOBAL,                     )
         Defendant(s).      )  DATED 12·13·2006
---------------------------------------------------------
```

MR. BENT HOLME                    TAKEN ON: 11/30/2006
c/o MR. MICHAEL R. MILLS
Dorsey & Whitney
Attorneys at Law
1031 West Fourth Avenue, Suite 600
Anchorage, Alaska 99501-5907

The transcript of your deposition is ready for your reading and signing. You may purchase a copy from the court reporter, or you may read the original at Mills & Lessard, Court Reporters, 1218 Third Avenue, Suite 1709, Seattle, Washington 98101.

If you do not read and sign the deposition within 30 days from the date of this notice, signature shall be deemed for all purposes waived, and your deposition will be filed with the ordering attorney.

cc:
MR. MARK C. MANNING
Attorney at Law
431 West 7th Avenue, Suite 204
Anchorage, Alaska 99501-3583


                    NOTICE OF FILING

    We are today................filing the original deposition with MR. MARK C. MANNING.

Exhibit E
Page 2 of 8 Pages

WITNESS: BENT HOLME 11/30/2006 (MARK MANNING)                35

1  Q.  All right. And at what stage in that
2  process is -- does Global become able to draw on the
3  letter of credit?
4  A.  As soon as it gets to our bank, if the
5  documents are in conformancy with the required terms
6  and conditions and timing.
7  Q.  All right. Do you recall what the timing
8  requirements were in the 2004 agreement?
9  A.  Not offhand, because I didn't think we were
10  going back to 2004. Anyway, I believe it was eight
11  days, yeah.
12  Q.  And what was -- what was -- what did that
13  eight-day period pertain to?
14  A.  To the time of presentation until it reached
15  the bank in Korea.
16  Q.  Okay.
17  A.  And that was ongoing, quick.
18  Q.  So there's -- in order to -- in order for --
19  A.  Let me qualify. Eight days from date of
20  bill of lading.
21  Q.  Okay. All right. Okay.
22      And when was -- at what stage in the
23  shipment process was -- was the bill of lading issued?
24  A.  As soon as the stuff was on board the ship.
25  Q.  All right.

MILLS & LESSARD (206)292-9063 www.dep-reporters.com

Exhibit E
Page 3 of 19 Pages

WITNESS: BENT HOLME 11/30/2006 (MARK MANNING)   52

1   A.   No.
2   Q.   Okay.
3        Did -- well, was there any discussion
4   between you and Oleg concerning bruises prior to the
5   signing of Exhibit 5?
6   A.   No.
7   Q.   Did Oleg tell you prior to the signing of
8   Exhibit 5 that Global could make no commitment or
9   assurances concerning whether there would be bruising
10  inside of fish?
11  A.   To my knowledge, no.
12  Q.   All right.
13       I note on Exhibit 5 that the word "outside"
14  is inserted between severe and bruising.
15  A.   Yes.
16  Q.   Was that -- and there seems to be an initial
17  next to it.  Is it your understanding that -- that
18  Oleg Nikitenko inserted the word "outside"?
19  A.   Yes.
20  Q.   All right.  Did that have any meaning to
21  you?
22  A.   Not really.  Bruised is bruised, and I did
23  question him on it.
24  Q.   And what -- what did you do -- or what --
25  well, when did you question him?

1   A.   After we got the thing back with the word
2   "outside" added.
3   Q.   Do you -- do you happen to know whether you
4   got it on February 16th, at least by -- or at least a
5   copy of it by fax?  Seems to be --
6   A.   Well, there's a discrepancy there, because
7   it's sent on the 15th --
8   Q.   Right, yeah.  I see up at the top.
9   A.   -- but it's dated on the 16th, so I don't
10  know where it was between, but it was within those two
11  days.
12  Q.   Well, it -- it -- yeah.  I'll just note for
13  the record -- I don't know how Global's fax machine
14  works, but --
15  A.   Yeah, I don't know.
16  Q.   -- I don't know whether that's a re --
17  Global received or a Global transmitted.
18  A.   I think that's a Global transmitted, but --
19  Q.   Is it?
20  A.   Yeah, I think so.
21  Q.   Okay.
22       Do you -- let me ask it again.  I missed --
23  I missed it.  Did you -- do you recall whether you
24  received a copy back from him on February 16?
25  A.   I -- I believe it was on the 16th, because

1  that's what it says there, but then looking at that
2  date up there, I'm not sure.
3      Q.   All right.
4           Do you know whether this February 16 was the
5  date he signed or an intended effective date?
6      A.   I don't know.
7      Q.   All right.
8           How soon after you received a copy of this
9  contract bearing Oleg Nikitenko's signature did you
10 query him about the "outside" insertion?
11     A.   When -- when we received it --
12     Q.   All right.
13     A.   -- whatever date that might have been.
14     Q.   Okay.  So the answer would be more or less
15 immediately?
16     A.   Yes.
17     Q.   Okay.
18     A.   Yes.
19     Q.   Did you query him by phone or e-mail or in
20 some other way?
21     A.   By phone.
22     Q.   All right.  And what did he say in response
23 to your query?
24     A.   Well, he said that he would have difficulty
25 looking inside the -- on all the fish and so on, so

WITNESS: BENT HOLME 11/30/2006 (MARK MANNING)　　　　55

1　　forth, and my comment was that it didn't really matter
2　　so long as it would be the same quality as we had in
3　　the previous contract, 2004, which I was assured it
4　　would be, and we had absolutely no problem there with
5　　any bruising, inside or out.  Therefore, initially, it
6　　was no big deal in that sense.
7　　　　Q.    Did you communicate this -- well, let me --
8　　let's find -- do you recall with respect to the
9　　companion Sang Jin contract whether that contract had
10　　the same quality specifications as appear in the
11　　Global contract?
12　　　　A.    Identical.
13　　　　Q.    Right.
14　　　　　　  Did you communicate to Sang Jin that Global
15　　had added the word "outside"?
16　　　　A.    No.
17　　　　Q.    All right.
18　　　　　　  Was this document intended to memorialize an
19　　agreement that you considered had already been struck?
20　　　　A.    What do you mean by memorialize?
21　　　　Q.    I mean to distinguish between a written
22　　offer that is not intended to -- to write down an
23　　existing -- what is understood to have been an
24　　existing agreement versus a document that the -- the
25　　writer believes recites terms that have already been

1  agreed and you're simply trying to get it down in
2  black and white.
3     A.   Yes, the latter.
4     Q.   Okay.
5          So in talking to Nikitenko about why he
6  inserted in -- the "outside" he made some reference
7  about not being able to see the inside of the fish?
8     A.   Uh-huh.
9     Q.   Do you recall any more detail about it than
10 that?
11    A.   Not specifics, no.
12    Q.   All right.  Do you recall any conversation
13 prior to that, your -- your responsive query, do you
14 recall any other remark -- any remarks by Nikitenko
15 prior to that concerning the inability to see inside
16 the fish?
17    A.   No.
18    Q.   All right.
19         And no prior reference to not being able to
20 make any assurance if whether or not there'd be
21 bruises inside the fish.
22    A.   No.  All going by the 2004 contract it was
23 clear --
24    Q.   All right.
25    A.   -- the same way.

WITNESS: BENT HOLME 11/30/2006 (MARK MANNING)　57

1　Q.　Was there -- in the 2004 performance was
2　there ever any feedback from the end buyer about
3　internal bruising?
4　A.　No.
5　Q.　What did you understand Nikitenko to mean
6　when he said he couldn't see inside the fish in
7　respect of bruising?
8　A.　I thought it was more or less a joke, but it
9　was obvious he never made such a remark in 2004, and
10　certainly there was no problems in 2004 whatsoever.
11　Q.　I noticed that your initials don't appear
12　next to "outside" or next to his here.  Is there any
13　particular reason for that?
14　A.　Well, as I say, I didn't think that much
15　about it and -- no.  It's -- it wasn't that big a deal
16　initially, as far as I'm concerned, and I didn't even
17　bother about --
18　Q.　Okay.
19　A.　-- looking into that.
20　Q.　So you -- you didn't object to his addition
21　of the word "outside."
22　A.　I didn't think it would ever become an
23　issue.
24　Q.　All right.  Okay.  I understand.
25　A.　Yeah.

WITNESS: BENT HOLME 11/30/2006 (MARK MANNING)    58

```
 1        Q.   But is the answer no, you didn't object to
 2   it being an issue?
 3        A.   No, I didn't.
 4        Q.   All right.
 5             MR. MILLS:  I -- I guess I would only
 6   object.  I think it's inconsistent with what he
 7   testified a few minutes ago, indicating that he didn't
 8   accept the notion of outside versus inside as being a
 9   distinction.  So to characterize it as accepting the
10   "outside" would be I think a mischaracterization --
11             MR. MANNING:  No, and that's -- well --
12             MR. MILLS:  Accepting the notion of outside
13   as modifying the notion of what bruising meant in 2004
14   or what was intended would be misstating --
15             MR. MANNING:  Yeah, you're --
16             MR. MILLS:  -- his testimony.
17             MR. MANNING:  -- more metaphysical than I --
18   I -- what I -- and I'll re -- I'll maybe rephrase my
19   question a little bit.
20             MR. MILLS:  I think the record would read a
21   little -- I -- my concern is that his answer would --
22   would -- would read that he accepted the modification,
23   if you will, of outside, and I don't think that's the
24   case --
25             MR. MANNING:  Well --
```