Michael R. Mills, ABA# 8911074
Michael A. Grisham, ABA# 9411104
DORSEY & WHITNEY LLP
1031 West Fourth Avenue, Suite 600
Anchorage, AK 99501-5907
(907) 276-4557

Attorneys for FMI Food Marketers International, Ltd.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FMI FOOD MARKETERS INTERNATIONAL, LTD. <br><br> Plaintiff <br><br> vs. <br><br> GLOBAL SEAFOODS NORTH AMERICA, LLC <br><br> Defendant | **REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Case No. 3:06-CV-00011 JWS |

Plaintiff FMI Food Marketers International, Ltd., ("FMI") filed its Motion for

Partial Summary Judgment on November 22, 2006, seeking an Order granting summary

judgment in FMI's favor on its claims of breach of contract, tortious interference with

contract / business opportunity, violation of the Alaska Unfair Trade Practices Act, and

conversion.  FMI also sought dismissal of Global's counterclaim.  FMI requested an

Order establishing Global's liability for damages to FMI in the base amount of $345,397,

establishing FMI's entitlement to treble damages and attorney's fees under the Alaska

Unfair Trade Practices Act, and establishing FMI's entitlement to have a jury consider its

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

claims for loss of reputation damages and for punitive damages against FMI.

After significant extensions of time, Global has opposed FMI's Motion in its entirety. Global's Opposition, however, is larded with obtuse and often non-responsive arguments, which are themselves based on faulty logic, unsupported assertions of fact, and, more importantly, assertions of fact that directly contradict the earlier sworn testimony of Global's principals. As Global's Opposition fails as a matter of law to undermine FMI's demonstrated entitlement to a ruling in its favor, FMI's motion for summary judgment should be granted.

## I.    FMI IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIMS

FMI's Motion clearly established that Global was in breach of several aspects of the Global Contract: it failed to deliver fish of the required quality, failed to meet the quantity requirements of the contract, breached the covenant of good faith and fair dealing in its interactions with FMI and FMI's customers, and failed to honor the right of first refusal it granted FMI. Global's central response is essentially a grossly misconceived argument that FMI breached the contract first, followed by a descent into nitpicking pettifoggery that does nothing to undermine FMI's central claims. These arguments do not undermine FMI's entitlement to summary judgment on the quantity, quality, implied covenant, and right of first refusal breaches FMI established in its Motion.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

A.    Global's "Fundamental Breach" Defense Is Factually Unsupported and Legally Untenable.

The heart of Global's opposition to FMI's breach of contract claims is Global's "fundamental breach" argument.  Global asserts that its need for continuous cash flow through the production season was central to the Global Contract, and that a letter of credit ("L/C") was used for the specific purpose of dealing with Global's cash flow concerns.  In an effort to manufacture an issue of fact, Global asserts – for the first time in this litigation – that Bent Holme, on behalf of FMI, agreed that FMI would guarantee waivers of all discrepancies in the presentation of documents necessary to secure payment under the applicable letters of credit.  Global then asserts that FMI's failure to "routinely" secure such waivers made the L/Cs it did obtain "unworkable," and amounted to a breach of contract.  This "fundamental breach," Global asserts, excuses Global's later breaches with respect to quantity, quality, the implied covenant, and the right of first refusal.[1]

This "fundamental breach" defense is, to put it mildly, pure bunk.  The factual averments underlying this defense are *directly contradicted* not just by FMI's testimony, but by the sworn deposition testimony of Global's own CFO, who was responsible for dealing with letter of credit issues.  Such internally inconsistent allegations cannot suffice to manufacture an issue of fact for trial.[2]  Moreover, Global's continued insistence that

---

[1] This is the only defense Global raises to FMI's assertion that Global breached the quantity provisions of the contract.

[2] *Disc Golf Ass'n v. Champion Discs, Inc.* 158 F.3d 1002, 1008 (9th Cir. 1998) (a party cannot avoid summary judgment "merely by contradicting his or her own sworn deposition testimony with a later declaration."); *see also Sea-Land Service, Inc. v. Lozen Intern., LLC.*, 285 F.3d 808, 820 (9th Cir. 2002); *Orr v. Bank of America, NT*, 285 F.3d

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

FMI somehow failed to have appropriate letters of credit in place is simple nonsense –

letters of credit in appropriate amounts have <u>always</u>, from well before the first delivery of

fish, timely been in place.  As set forth in FMI's Motion, FMI has continually

demonstrated this from the beginning of this matter, and even created a supplemental

affidavit to its opening Motion <u>at Global's request</u> specifically demonstrating that all

L/Cs were properly in place to ensure that this was not an issue here.  Global's continued

and obtusely nonsensical averments to the contrary are nothing but vexatious.  Finally,

and most importantly, Global's argument fails as a matter of law, not just because FMI

did not in fact make the agreement now alleged by Global, but because FMI <u>could not</u>

have made such an agreement as a matter of law, and because Global <u>could not</u> as a

matter of law have reasonably believed that FMI had made such an agreement.

       1.    <u>Global's "Fundamental Breach" Argument Is Factually Unsupported</u>

Much of Global's brief is dedicated, as a backdrop to its "fundamental breach"

argument, to complaints about its own cash flow issues.  Global asserts that cash flow

was a paramount, life-or-death issue for it during the production season, that concern for

cash flow permeated all of Global's actions (including the contract negotiations at issue

here), and that this case must be viewed through the lens of Global's dire need for

---

764, 780 (9th Cir. 2002); *Dotson v. Delta Consol. Industries, Inc.*, 251 F.3d 780, 781 (8th Cir. 2001) ("we have held many times that a party may not create a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition"); *Herring v. Canada Life Assurance Co.*, 207 F.3d 1026, 1030 (8th Cir. 2000) ("… a party cannot create a 'sham' issue of fact in an effort to defeat summary judgment by filing an affidavit directly contradicting prior deposition testimony. … if testimony under oath could be 'abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment.'") (internal citations omitted).

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

REPLY IN SUPPORT OF MOTION FOR        <u>FMI FOOD MARKETERS v. GLOBAL SEAFOOD</u>
SUMMARY JUDGMENT
Page 4                          Case No. 3:06-cv-00011 JWS

consistent cash flow.  Although cash flow is a matter of general concern to any business, Global's assertions and focus on this issue, and its efforts to link the issue to the Global Contract, are overblown, unwarranted, and less than credible.

Indeed, the entire foundation of Global's position is nonsensical.  Global expects the Court to believe on the one hand that the very existence of its business depended upon avoiding any interruption in cash flow, and that this issue was paramount in the parties' discussions of the Global Contract.  Global also, however, expects the Court to believe that despite the purportedly dire importance of this issue, Global got nothing regarding this in writing (even though it did interlineate new provisions into the contract regarding bruising issues).[3]  Global further expects the Court to believe that the only protection it even sought on this supposedly paramount, life and death issue was to rely on an alleged oral, informal, extra-contractual representation by FMI that it would arrange for other parties, whom FMI clearly did not control (including large international banks) to "routinely" waive their own L/C protections, for Global's sole benefit, because everyone knew they had to be careful about Global's cash flow.

This argument is simply not rational.  If the issue were indeed so important, why did Global fail to get anything in writing, or even send a confirming e-mail documenting the alleged discussions of this issue?  Why would Global expect that anyone, much less the large international banks involved in the L/C process here, would volunteer to go out of their way to protect Global's cash flow?  The irrationality of this argument is further

---

[3] *See* Motion for Partial Summary Judgment, Clerk's Docket 34 at Exh. 2.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

heightened by the fact that Global is a company with significant assets – for example, it owns a fish processing plant in Kodiak, with an assessed value of $1,300,000, free and clear – and so had many other means available to protect itself from cash flow problems.[4] If a cash flow problem were really potentially fatal to the company, Global could easily have obtained relief by some other more conventional and reliable means, like a seasonal line of credit.  Why would Global rely completely on such an insecure, Rube Goldberg mechanism to protect itself on such a supposedly important issue, instead of using one of the many other mechanisms available to it to deal with a cash flow crunch?

These logical weaknesses point out that, in fact, cash flow was not the paramount concern that Global now pretends it was.  Global has simply never been in a position where it was going to dry up and blow away because of a late payment, and its florid averments to the contrary undermine the credibility of its arguments.  Moreover, the loose and informal nature of the arrangements Global alleges it relies on, and the fact that it made no other effort to protect itself by more standard and reliable means, undermines the notion that this was a "fundamental" aspect of the parties contract arrangements, or that these purported cash flow concerns are in any way material to this case.

In this light, the fact that Global's allegations regarding its "fundamental breach" argument lack any appropriate support in the record is fatal to the argument.  Global's only support for its "fundamental breach" defense (i.e. that protecting Global's cash flow was a central aspect of the Global Contract and that FMI agreed to "routinely" waive all

---

[4] See Deposition testimony of Thomas Hennessey, attached hereto as **Exhibit 67**, at 78, 98, 108.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

discrepancies in L/C documents in order to assure that Global received advance payment) is the self-serving affidavit of Oleg Nikitenko.  No contemporaneous writing of any sort exists to support Nikitenko's allegation that his supposed cash flow issues were ever mentioned to FMI, much less that they were a central part of the Global contract. Although he was questioned regarding the negotiation of the Global Contract, Nikitenko's deposition contains no testimony supporting such an allegation.[5]  In fact, Bent Holme has testified that Global never mentioned cash flow issues to FMI during or after the negotiation of the Global Contract, that Global did not demand a guarantee of discrepancy waivers, and that FMI made no such guarantee.[6]

The evidentiary support for the fact that Bent Holme did not promise Global that he would guarantee the "routine" waiver of document presentation discrepancies[7] is not limited to FMI's testimony, but also includes the sworn deposition testimony of Global's own CFO, who was responsible for dealing with L/C issues.  Thomas Hennessey admitted (in *direct contradiction* to Nikitenko's statements) that he understood that the end buyers and their banks, not FMI, were the parties who could waive document discrepancies, and that FMI was not responsible for obtaining such waivers.[8]  Holme did indicate that FMI would, as it did in 2004, *ask* the purchasers and their banks to waive timing discrepancies in document presentation, and that FMI would make reasonable

---

[5] *See* Deposition of Oleg Nikitenko, attached hereto as **Exhibit 68**.
[6] *See* Second Supplemental Affidavit of Bent Holme.
[7] *Id.*
[8] *See* Hennessey Depo. (Exhibit 67 at 62, 164-65, 232).

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

efforts to obtain such waivers.[9]  FMI did not, however, make any promise or guarantee that discrepancies actually would be waived, and <u>Global did not actually believe that FMI was responsible for obtaining such waivers</u>.[10]

In short, the record is clear that: (1) protection of Global's cash flow was not an aspect of the contract; (2) no guarantee of "routine" waivers of document presentation discrepancies was made a term of the contract, and; (3) Global did not in fact rely on FMI's purported agreement to obtain waivers.  The only contract term in this regard is that the parties would use a transferable, documentary letter of credit of the type and terms used in 2004.[11]  The factual predicates for Global's "fundamental breach" argument are not supported by the record, and this Court can disregard the argument on that basis.

> 2.  <u>Global's "Fundamental Breach" Argument Is Legally Untenable.</u>

Beyond the fundamental weaknesses of Global's factual averments regarding cash flow, letters of credit, and waiver of document discrepancies, there is no need for this Court to engage Global's arguments on this issue.  This is because Global's central assertion – that FMI, as part of the contract, promised that it would arrange waivers of any and all document presentation discrepancies with respect to the applicable letters of credit – could not as a matter of law been a part of the contract arrangements in this case.

---

[9] *See* Second Supplemental Affidavit of Bent Holme.
[10] *See* Hennessey Depo. (Exhibit 67 at 232).  Again, Global's present attempts to contradict its own prior deposition testimony is insufficient to raise a genuine issue of material fact.  *See Disc Golf Ass'n*, *supra*, 158 F.3d at 1008.
[11] Clerk's Docket 34, Exh. 2.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

Global's discussion of the letter of credit payment mechanism reads as if L/Cs existed solely to serve Global's interest in maintaining its cash flow, and their terms must be interpreted in that light.  This is nonsense.  Letters of credit are creatures of international law that are commonly used in complex international transactions in which **all** sides – buyers, sellers, and banks – require protection.  As such, L/Cs have been purposefully designed with clear, specific, and strictly enforceable provisions regarding when payment is and is not required, which are entirely independent of any provision of the underlying contracts.  The large body of law surrounding letters of credit clearly and fatally undermines the averments made by Global regarding its agreement with FMI.

The rules regarding negotiation and interpretation of letters of credit are codified in a publication sponsored by the International Chamber of Commerce ("ICC"), known as the Uniform Customs and Practice for Documentary Credits.[12]  The latest version of the rules is ICC Publication No. 500, 1993 Revision (the "UCP 500"), in force as of January 1, 1994.[13]  These standard rules are enforceable in the courts of the United States, and are commonly applied throughout the world.[14]

A standard letter of credit involves the purchaser ("applicant"), who applies for the letter of credit at the bank of its choice, and the seller ("beneficiary"), who receives the

---

[12] *See* International Chamber of Commerce Publication No. 500, Uniform Customs and Practice for Documentary Credits, 1993 Revision (the "UCP 500"), Article 9(d); *See also*, *e.g.*, *Courtaulds North America, Inc. v. North Carolina National Bank*, 528 F.2d 802 (4th Cir. 1975); *DBJJJ, Inc. v. National City Bank*, 123 Cal. App. 4th 530 (Cal. App. 2004).
[13] *Id.*
[14] *Id.*

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

payment.[15]  Arrangements like the one at issue here (involving brokers reselling goods)

commonly make use of "transferable" letters of credit.[16]  In a transferable letter of credit,

the seller/first beneficiary **[FMI]** may request the issuing bank to make the credit

available in whole or in part to one or more second beneficiary(ies) **[Global]**.[17]  Finally,

where a letter of credit is defined as "documentary" or "at-sight," this means that once the

beneficiary **[Global]** has presented certain documents to the issuing bank (in compliance

with the terms of the letter of credit), the bank is obliged to pay irrespective of any

instructions to the contrary.[18]

Because the issuing bank of a documentary letter of credit has no choice but to pay

the entire letter of credit amount upon presentation of the required documents, issuing

banks strictly enforce these documentation requirements, including timeliness

requirements.[19]  The UCP-500 imposes three significant timeliness requirements for

letters of credit: a date by which goods must be shipped, a date by which documents must

be presented, and an expiry date for the letter of credit.[20]  The date for presentation of

documents is considered so significant in letters of credit that, if a letter of credit does not

---

[15] *See* Black's Law Dictionary 903-904 (6th Ed. 1990).
[16] "Applicant Ad Hoc Waiver of Discrepancies in the Documents Presented Under Letters of Credit," 58 S.M.U. Law Rev. 1453 (2005).
[17] *Id.*
[18] *Id.*; *DBJJJ*, *supra*, 123 Cal. App. 4th at 530-32.
[19] *See*, *e.g.*, *Courtaulds North America, Inc. v. North Carolina National Bank*, 528 F.2d 802 (4th Cir. 1975).  The Global Contract specifically referenced the documents that Global would be required to present in order to receive payment pursuant to the letters of credit: the original commercial invoice; the original packing list; the "clean on-board" ocean bill of lading; a certificate of origin; a health certificate, and; a non-wood packing material designation.  Exh. 2.
[20] UCP-500 Art. 42.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

contain a date by which documents must be presented, the UCP 500 imposes a 21 day limit, after which banks are not required to accept documents.[21]

It is true that a buyer <u>and</u> an issuing bank *may* <u>jointly</u> agree to waive discrepancies in letter of credit documents (including failure to timely present documents) and issue payment even if the documents do not comply exactly with the letter of credit requirements.[22]  A beneficiary such as Global or FMI, however, has no power to *require* that such discrepancies be waived.[23]  Further, the UCP-500 makes clear that no such waiver can take place unless the issuing bank, the confirming bank, if any, and the applicant **all jointly** agree to it.[24]  **Any of these parties may refuse to waive discrepancies for any reason**.  If any of them refuses to waive, no payment will be made under the L/C and the beneficiary has no further recourse under the L/C.

For example, the *Courtalds* case involved a buyer that had gone into bankruptcy. Although the buyer/applicant agreed to waive discrepancies, the bankruptcy trustee (standing in the shoes of the buyer/applicant) would not agree to waive discrepancies, because making payment under the letter of credit would reduce the bankruptcy estate.[25] The court in *Courtalds* clearly acknowledged the buyer/applicant's <u>absolute</u> right to agree or not agree to waive document discrepancies.

---

[21] *See* UCP-500 Art. 43.
[22] *See Courtaulds North America*, *supra*, 528 F.2d at 804.  This happened several times in the dealings between Global and FMI in 2005.
[23] *Id*.; *AMF Head Sports Wear v. Ray Scott's All-Am. Sports Club*, 448 F. Supp. 222 (D. Arizona, 1978); *Leaseamerica Corp. v. Northwest Bank Duluth, N.A.*, 940 F.2d 345 (8th Cir. 1991) (upholding bank's right not to amend LC).
[24] UCP-500, Article 9(d).
[25] *See Courtaulds North America*, *supra*, 528 F.2d at 804.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

In another case, both the buyer/applicant and seller/beneficiary jointly sought to amend a letter of credit to correct a discrepancy.[26]  The issuing bank, however, had failed to check the financial status of its customer (buyer) prior to issuing the letter of credit.[27] The bank had subsequently learned that its customer (buyer) might not be able to reimburse it if the bank paid the letter of credit, and so it refused to accept discrepant documents simply in order to cover up for its own prior lack of due diligence.[28]  The district court held that, despite the seeming inequity of the bank's position, an issuer bank has absolutely no duty to amend the specific terms of a letter of credit even if the customer (buyer) <u>and</u> beneficiary (seller) jointly request a waiver of the discrepancy.[29]

Moreover, it is clear that no discrepancy is too small to justify a bank's unilateral refusal to pay under an L/C.  In one case, the court held that misspelling the name of the party to be notified was a discrepancy which justified a bank's refusal to pay under an L/C.[30]

Because banks can unilaterally, under the clearly established and understood rules regarding the use of letters of credit in international transactions, refuse to pay where documents have been presented late or have other discrepancies, FMI clearly had no power to waive a timing discrepancy under any circumstance, "routinely" or otherwise.

---

[26] *AMF Head Sports Wear v. Ray Scott's All-Am. Sports Club*, 448 F. Supp. 222 (D. Arizona, 1978).
[27] *Id.* at 223, 225.
[28] *Id.*
[29] *Id*; *see also Leaseamerica Corp. v. Northwest Bank Duluth, N.A.*, 940 F.2d 345 (8th Cir. 1991) (upholding bank's right not to amend LC).
[30] *Beyene v. Irving Trust Co.*, 596 F. Supp. 438 (S.D.N.Y.), *affirmed*, 762 F.2d 4 (2nd Cir. 1985).

REPLY IN SUPPORT OF MOTION FOR          <u>FMI FOOD MARKETERS v. GLOBAL SEAFOOD</u>
SUMMARY JUDGMENT
Page 12                                                    Case No. 3:06-cv-00011 JWS

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

While the end customers (buyers) could have made such a request of the issuing bank if they wanted Global's fish, they were not bound to do so, nor was the bank bound to accede to such a request.[31]

Moreover, because these rules are a matter of clear and long-established law,[32] the applicable provisions of the CISG bind Global to this common understanding under international law. "The usages and practices of the parties or the industry are automatically incorporated into any agreement governed by the Convention, unless expressly excluded by the parties."[33] Here, the provisions of the UCP-500 constitute the relevant industry practice with respect to L/C's. Under the applicable provisions of the UCP-500, FMI could not make the banks and buyers agree to accept discrepant documents. While FMI could ask the banks and buyers to waive discrepancies, whether or not they did so was entirely up to them. As the contract did not "expressly exclude" this understanding, it applies to Global here.

Furthermore, any protestations by Global that it was some kind of naïf with no understanding of how the process worked simply does not hold water. Global was an experienced fish processor with a long history in international transactions.[34] Global's principle Nikitenko had long worked as both a broker and a processor, and so must have

---

[31] Certainly, the customers were entitled to request a condition from Global – i.e., inspection of the fish – prior to doing so.
[32] *Courtaulds North America*, *supra*, 528 F.2d at 804; *Leaseamerica*, *supra*, 940 F.2d at 350; *AMF Head Sports Wear*, *supra*, 448 F. Supp. at 225.
[33] *Geneva Pharmaceuticals*, *supra*, 201 F.Supp.2d at 281, *citing* CISG Art. 9, 15 U.S.C.A. App. at 340.
[34] *See* Nikitenko Depo. (Exhibit 68 at 16, 187, 318).

REPLY IN SUPPORT OF MOTION FOR          <u>FMI FOOD MARKETERS v. GLOBAL SEAFOOD</u>
SUMMARY JUDGMENT
Page 13                                                   Case No. 3:06-cv-00011 JWS

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

used and seen letters of credit in operation countless times.[35]  The manner in which letters of credit operate is hardly some kind of secret – to the contrary, they are commonplace and commonly understood among businesspeople of many nations.  Global has presented no reason – compelling or otherwise – why it should be excluded from this common understanding of the way the payment mechanism *that it chose* actually worked.

Most importantly, the deposition testimony of Global's CFO Hennessey, who dealt with letter of credit issues, clearly establishes that Global *actually did* understand that FMI had no ability to waive discrepancies on behalf of the customers and banks.[36]

In short, FMI as a matter of law had no ability to "routinely" waive document discrepancies, Global as a matter of law could not have reasonably understood anything else to be the case, and Global has admitted that it in fact did understand that this was the case.  The oral addendum to the contract that Global now (for the first time) alleges could not have existed as a matter of law, and Global's deposition testimony establishes no actual reliance on any such "promise" by FMI.  FMI thus could not have breached any such contractual provision, and Global's "fundamental breach" defense fails as a matter of law.[37]

---

[35] *Id*.
[36] *See* Hennessey Depo. (Exhibit 67 at 62, 164-65, 232).
[37] The Court should not be concerned with any protestations of unfairness by Global.  If Global had wanted to effectively protect itself from "unreasonably short" document presentation periods, it could easily have done so by requesting a longer presentation period for the documents.  For example, instead of stating that payment was to be by "transferable documentary letter of credit, payable 'at-sight,'" as the contract actually said, Global could have inserted a provision stating that payment was to be by "transferable documentary letter of credit, payable 'at-sight,' *with document presentation periods of no less than (X) days*."  This would have been consistent with the rest of the contract, which specifically laid out the nature of the L/C requirements (down to what

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

3.    <u>Conclusion</u>.

The bottom line is that Global's assertion of an oral contract provision requiring FMI to obtain "routine" waivers of document discrepancies is pure, after-the-fact, fabrication.  It simply makes no sense.  Global is far too sophisticated an operator in the international fish market to argue in good faith that it relied on FMI, a broker, to arrange "routine" waivers of discrepancies, when it knew FMI was not the ultimate purchaser and had no power to waive the timing discrepancies.  And Global's averment that there was some sort of open-ended requirement that <u>any</u> document discrepancies be waived is absurd – what protection would such an arrangement leave the issuing bank and the purchaser?[38]  Indeed, the whole course of this defense is nonsensical.  Global avers on the one hand that the life of its business depended upon avoiding any interruption in cash flow, and then on the other hand asserts that the only protection they sought on this point was to rely on an alleged oral, extra-contractual representation by FMI that it would arrange for other parties whom it did not control (including large international banks) to "routinely" waive their L/C protections, for Global's sole benefit.  This is simply not rational.

---

specific documents would have to be presented), and would have been consistent with Global's interlineations of other clarifications.  Global, however, did not make such a request and so the contract contains no such provisions.  Exh. 2.  This is Global's own doing.

[38] In fact, the record is clear that the parties were very concerned with ensuring that documents accurately reflected the requirements of the letters of credit and avoiding discrepancies.  Numerous e-mails went back and forth on details like the names of government certificates and shipping numbers to ensure that the documents precisely matched the letter of credit requirements.  *See* Exhs. 14, 15.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

The obvious reality of this situation is that, at the time of contracting, Global simply chose not to sweat this particular detail.  In deposition testimony, both Nikitenko and Hennessey, who dealt with the letter of credit issues, admitted they could have made a request for a longer time frame for document presentation in 2005 but did not do so.[39] There had been no problem with getting waivers in 2004, FMI said it would request waivers again if necessary, and so Global decided not to worry about it.  That is why there is nothing written down about this supposedly significant aspect of the contract. That is why Global did not interlineate any extended document presentation period into this contract, as it did with respect to the bruising issue.

Global's unspoken presumption that it would all work out o.k., however, is a far cry from an enforceable contract provision.  There was not, and as a matter of law there could not have been, any requirement that FMI "routinely" arrange for third parties beyond its control to waive document discrepancies.  As such, FMI could not have been in breach of such a requirement, and Global's "fundamental breach" argument fails as a matter of law.

This "fundamental breach" argument is essentially Global's only defense to FMI's claim of breach of the quantity provisions of the contract.  Because this argument fails as a matter of law, FMI is entitled to summary judgment in its favor on the quantity breach claim.[40]

---

[39] *See* Hennessey Depo. (Exhibit 67 at 71, 120, 122, 125).
[40] Global also persists in its frivolous argument that the required L/Cs were not actually in place.  As noted in the opening brief, FMI consistently demonstrated that the necessary L/Cs were in place, and Nikitenko's averments to the contrary were simply confused.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

B.    <u>Global's Defenses Against FMI's Claims of Quality Breaches Are Meritless</u>

    1.    <u>Proof Issues</u>

Global has asserted that FMI failed to submit competent evidence of Global's various breaches of the quality requirements of the contract, submitting picayunish objections regarding the authentication and foundation for FMI's exhibits. These objections are simply off point. While the authentication requirements of the Federal Rules of Evidence must be met, they do not present a difficult standard.[41] Indeed, authentication can be inferred from knowledgeable discussion of documents in affidavits and deposition.[42] Insofar as the authenticity of the documents questioned by Global was not established by the previous deposition and affidavit testimony of Mr. Holme, who used each one of them as part of his work with respect to this matter, his supplemental affidavit submitted herewith suffices to establish the necessary authenticity and dispose of Global's objections.[43]

Global's hearsay and related admissibility objections are just as easily dismissed. All of the questioned documents were produced and maintained as business records. Evidence Rule 803(6) allows the admission of business records when "two foundational

---

*See* Exhs. 36, 37. In the context of this case, the Supplemental Affidavit of Bent Holme, created at Global's request, very clearly lays out that all required L/Cs, in appropriate amounts, were timely in place. *See* Supplemental Affidavit of Bent Holme, Clerk's Docket 45. Global's argument that L/Cs were not in place is frivolous, and its continued pursuit of that argument vexatious.

[41] "A document can be authenticated [under Rule 901(b)(1)] by a witness who wrote it, signed it, used it, or saw others do so." 31 Wright & Gold, *Federal Practice & Procedure: Evidence* §7106, 43 (2000).

[42] *See, e.g., Barthelemy v. Air Lines Pilots Ass'n,* 97 F.2d 999, 1018 (9th Cir.1990) (per curiam) (inferring personal knowledge from affidavits).

[43] *See* Second Supplemental Affidavit of Bent Holme.

REPLY IN SUPPORT OF MOTION FOR          <u>FMI FOOD MARKETERS v. GLOBAL SEAFOOD</u>
SUMMARY JUDGMENT
Page 17                    Case No. 3:06-cv-00011 JWS

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

facts are proved:  (1) the writing is made or transmitted by a person with knowledge at or near the time of the incident recorded, and (2) the record is kept in the course of regularly conducted business activity."[44]  As established by Mr. Holme, the documents at issue, as they facially purport, meet both of these requirements.[45]  The quality inspection reports, for example, were created by licensed inspectors from Wolfgang Plath (a well-respected food quality inspector) at FMI's request, and were verified and signed by the inspectors.[46]  All other documents were e-mail letters and memoranda kept in the ordinary course of business.[47]  Global's objections are meritless.

Global's "foundation" objections are simply groundless.  The quality inspection reports, for example, specifically refer to both shipment and box number, which can be checked for verification against the ETS Shipping documents FMI has submitted to the Court.[48]  Global's complaint that there is no proof that <u>its own</u> quality inspector (from whom it now comically seeks to distance itself) actually was discussing Global's fish is ludicrous.  The report specifically states that he reviewed Global's shipment.[49]  The inspector was accompanied by Sam Lim and a representative from Merry China, who

---

[44] *United States v. Miller*, 871 F.2d 1219, 1237 (9th Cir.1985).  With respect to e-mail and electronic documents, "[f]or the purposes of Rule 803(6), it is immaterial that the business record is maintained in a computer rather than in company books."  *Sea-Land Service, Inc. v. Lozen International, LLC*, 285 F.3d 808, 819 (9th Cir. 2002)
[45] Second Supplemental Affidavit of Bent Holme.
[46] *Id.*
[47] *Id.*
[48] *Cf.* Exhs. 28, 29 and Exhs. 14-15.
[49] *See* Exh. 24.

both witnessed the inspection and indicated that they inspected Global's fish.[50]  This objection is without merit.

### 2.    FMI Established Breaches of the Quality Provisions

Nikitenko and Hennessey acknowledge the fundamental importance of meeting the quality standards under the FMI contract.[51]  They further agree that Global's obligation to meet the quality requirements is independent of the letter of credit issues.[52] They also admit that a buyer could assert a quality claim, such as the ones made here, after payment was made provided the complaint was made within the 15 day period.[53] As quality provisions were central to the contract, it is also clear that the parties were aware of and accepted the possibility that purchasers might make quality claims and demand satisfaction in this regard.

In the face of the parties' clear understanding of the central importance of the quality provisions, Global's efforts to evade responsibility for producing #1 Quality fish are ineffective.  One essential breach of the quality provisions has been clearly admitted. Global admits that it did not grade the pink salmon it processed or take any other steps to ensure that FMI got a specific quality of fish.[54]  Global has provided no information to support any averment that it did anything to ensure quality.  Instead, FMI got "ocean run"

---

[50] *See* Exhs. 23, 27.
[51] *See* Nikitenko Depo. (Exhibit 68 at p.28-31, 33, 93, 189, 203); Hennessey Depo. (Exhibit 67 at p. 62-63, 76, 77).
[52] Id.
[53] *See* Nikitenko Depo. (Exhibit 68 at p. 189).
[54] *See* Hennessey Depo. (Exhibit 67 at p. 20, 24, 29); Nikitenko Depo. (Exhibit 68 at 68, 72, 73).

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

salmon – the quality of fish FMI received depended on whatever Global happened to purchase from the tender.  This falls short of the quality requirements of the contract.

Global's averment that it had a "quality control program" is off point.  The program Global refers to is simply an HACCP plan ("Hazard Analysis Critical Control Points") – this is just a government-required food processing safety plan to avoid bacterial contamination of food.[55]  It is "quality control" only in the narrow sense of avoiding food contamination – it has nothing to do with meeting the quality requirements of the Global Contract.  The fact is that Global did not inspect or grade fish with an eye to the quality requirements at all.  Global has admitted that it took no steps to ensure that the fish it sent FMI met the specific quality standards of the contract.[56]  The failure to even attempt to meet these quality provisions is clearly a breach of contract.

Global's other arguments on quality issues are a series of red herrings.  As established in the opening motion, the contract had specific, enumerated quality requirements, and "#1 Quality" was simply the general rubric describing these specific contract requirements.  Global obviously knew what this meant because it used the exact phrase "#1 Quality" in other contracts – for example, the Dell Trading contract FMI submitted with its brief.[57]

The "inside/outside" bruising issue discussed extensively by Global is also a red herring.  The problem with the bruising here was that it was excessive, and an

---

[55] *See* 21 C.F.R. Parts 123, 1240.
[56] *See* Hennessey Depo. (Exhibit 67 at 20, 24, 29); Nikitenko Depo. (Exhibit 68 at 68-69).
[57] Exh. 9, 10.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

excessively bruised fish simply cannot be of #1 quality.  Global could not have

negotiated its way out of responsibility for meeting the overall requirement of producing

top quality fish by adjusting one of the sub-requirements – its overall responsibility was

still to produce top quality salmon, and excessively bruised product could not meet that

standard.  Global's own inspector noted that Global's fish was up to 17% unusable

because of the quality problems, including excessive bruising, and believed the quality

complaints were well-taken – these were simply not "#1 Quality" fish.[58]

More importantly, FMI established that bruising was not the only quality problem.

The verified inspections submitted by FMI show not just bruising problems, but also

issues with color, smell, and meat condition, all of which were the subject of specific

contract provisions.[59]  Global's failure to meet these standards is a breach of the

fundamental quality provisions of the contract.

These are simply and clearly breaches of contract under the applicable provisions

of the CISG.  In the *Delchi* case cited by FMI in its opening brief, the court held that,

under the CISG, a buyer has a claim for a "fundamental breach" arising from the delivery

of nonconforming goods.[60]  Under Article 35 of the CISG, the seller must deliver goods

of the quantity, quality, and description required by the contract.[61]  Additionally, Article

---

[58] Global's attempts to evade the effects of its own inspector's reports are transparently laughable.  As noted above, FMI would obviously not agree to pay for a report it would never have a right to see.  Nikitenko hid the report and lied about its contents to FMI because the report advised Nikitenko to cheat FMI and reported that 17% of fish was unusable.

[59] Exh. 24.

[60] *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024 (2d Cir. 1995).

[61] *Id.*

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

36 of the CISG states that the seller is liable in accordance with the contract and the Convention for any lack of conformity.[62]

Again, the facts in *Delchi* are instructive, as they mirror the facts in this case. A manufacturer (Delchi) contracted with a specialty cooling system manufacturer (Rotorex) to supply parts for air conditioning units.[63] Prior to shipment, Rotorex sent Delchi a sample product and written performance specifications.[64] Delchi accepted one shipment, released payment under a letter of credit, and had a letter of credit in place to cover a second shipment.[65] While the second shipment was en route, Delchi's inspection of the first shipment indicated that it did not conform with the written quality specifications or with the sample product sent by Rotorex.[66] Delchi rejected both shipments and cancelled the contract. On these facts, the Second Circuit affirmed the district court's grant of summary judgment on liability, holding that "there was thus no genuine issue of material fact regarding liability, and summary judgment was proper."[67]

The same is true here. The Global contract specifically required Global to deliver "#1 Quality" H&G pink salmon, as defined by specified quality provisions.[68] Contrary to Global's protestations, "#1 quality" an accepted and uniformly understood industry

---

[62] *Id.*; *see also Mitchell Aircraft Spares, Inc. v. European Aircraft Service AB*, 23 F.Supp.2d 915 (N.D.Ill. 1998); *Magellen Intern. Corp. v. Salzgitter Handel GmbH*, 76 F.Supp.2d 919 (N.D. Ill. 1999).
[63] *Delchi, supra,* 71 F.3d at 1026-27.
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.* at 1028.
[68] Exhs. 2, 7.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

standard referring to a specific quality range of fish.[69]  The fact that Global knew and understood what this commonly used term means is established clearly in the record by the fact that Global also used this *same terminology* in its contracts with other customers in 2005.  In the Dell Trading contract signed by Global that was submitted with FMI's opening motion, Global again committed itself to providing "#1 Quality" fish.[70]  There was no misunderstanding of the meaning of this provision, moreover, because the Global Contract laid out in specific detail what was meant by "#1 Quality," by reference to independent Alaska Seafood Marketing Institute standards regarding meat quality, firmness, consistency, and color.[71]

FMI has, in short, clearly established breaches of the applicable quality provisions of the contract, through its verified inspection reports and the report of Global's own inspector.  Summary judgment is appropriate on this issue.

C.    Global's Defenses to the Right of First Refusal Claim Are Meritless

Global's defenses to FMI's assertion that Global breached the right of first refusal boil down to Global asserting that it cannot be held liable for breach of contract because it committed the tort of fraud in the inducement.  Global asserts that it had some sort of unfettered right to maintain "flexibility" in committing its pink salmon – presumably to

---

[69] Holme Affidavit at ¶ 7.  Again, this commonly understood meaning was, under the CISG, incorporated into the Global Contract.  *Geneva Pharmaceuticals, supra*, 201 F.Supp.2d at 281, *citing* CISG Art. 9, 15 U.S.C.A. App. at 340 ("The usages and practices of the parties or the industry are automatically incorporated into any agreement governed by the Convention, unless expressly excluded by the parties."); *see also Treibacher Industrie, A.G. v. Alleghany Technologies, Inc.*, --- F.3d ----, 2006WL2595225 (11th Cir. Sept. 12 2006).
[70] *See* Exh. 9.
[71] Exh. 8.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

take advantage of higher prices that might present themselves.  In other words, Global argues that FMI somehow had no right to rely on Global's specific promise of a right of first refusal, because Global had no intent of honoring it.

This argument, while remarkable for its gall, is legally devoid of merit.  As clearly established in FMI's motion, the right of first refusal was a fully enforceable contract provision.  In exchange for a significantly higher price per ton for its fish, Global offered FMI, as an inducement, a right of first refusal on all fish beyond the 1,000 MT covered by the contract.  Global has submitted no evidence that it informed FMI of specific contracts or specific amounts that it may have committed to other buyers.  Indeed, Global admits that it "did not have any binding pre-season contracts" when it agreed to the right of first refusal.[72]  Despite Global's frankly bizarre assertion of some inchoate right of "flexibility," FMI's acceptance of the right of first refusal as consideration for agreeing to pay a higher price had the precise effect of eliminating Global's "flexibility" and obligating Global to offer all H&G pink salmon of #1 quality to FMI.  Yet it is uncontroverted that Global continued to make deals behind FMI's back, and offered no fish under the right of first refusal.  This is clearly and obviously a breach of contract.

D.     **Global's Defense To The Implied Covenant Claim Is Meritless.**

Global's legal defense to FMI's implied covenant claim is frivolous.  Global avers that the covenant of good faith does not apply to this contract.  However, Global has raised no argument or authority to dispute FMI's assertion that Alaska law applies to

---

[72] *See* Clerk's Docket 60 at p. 5, 12-13.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

FMI's state law claims, which were in fact brought in an Alaska state court.  Under

Alaska law, it has long been abundantly clear that "[a] covenant of good faith and fair

dealing is an implied component of all contracts as a matter of law."[73]  Even if the law of

some other state applied here, the implied covenant doctrine "is now recognized in some

form in most jurisdictions."[74]  Global's averment that the doctrine does not apply in UCC

cases is equally wrong, as "[t]he doctrine's widespread acceptance is due in large part to

the inclusion of the duty of good faith in the Uniform Commercial Code."[75]  The implied

covenant applies to the Global Contract.

     Global's arguments that it did not breach the implied covenant here, while not

technically frivolous, are clearly meritless.  FMI contracted to receive "#1 Quality" fish

that met specified quality standards, and could reasonably expect that Global would take

whatever actions were reasonably necessary to ensure that FMI would get the benefit of

that bargain.  And Global admits that it was Global's responsibility to produce fish of the

required quality and in the required quantity.[76]  Yet Global also admits that it did not

grade (i.e. inspect for quality) the fish that it processed, and admits that it took essentially

no steps to ensure that FMI received fish of the proper quality.[77]  Moreover, FMI has

---

[73] *Alaska Pacific Assurance Co. v. Collins*, 794 P.2d 936, 947 (Alaska 1990); *see also ERA Aviation, Inc. v. Seekins*, 973 P.2d 1137 (Alaska 1999).
[74] "Losing Faith: Extracting the Implied Covenant of Good Faith from (Some) Contracts," 84 Or. L.Rev 227, 228 (2005); *see also* Restatement (Second) of Contracts § 205.
[75] *Id*. (internal citations omitted, emphasis added).
[76] Nikitenko Depo. (Exhibit 68 at p.28-31, 33, 93, 189, 203); Hennessey Depo. (Exhibit 67 at p. 62-63, 76, 77).
[77] *See* Hennessey Depo. (Exhibit 67 at 20, 24, 29); Nikitenko Depo. (Exhibit 68 at 68-69).

REPLY IN SUPPORT OF MOTION FOR          FMI FOOD MARKETERS v. GLOBAL SEAFOOD
SUMMARY JUDGMENT
Page 25          Case No. 3:06-cv-00011 JWS

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

established that Global hid its inspector's report from FMI and *specifically lied about its contents*.[78]  These are all ways in which Global acted to deprive FMI of the benefit of its bargain, which is the heart of a covenant claim.

Global's efforts to spin FMI's covenant claim that Global had an obligation to assist in dealing with quality issues into a "remarkable claim" seeking imposition of a "new service" are entirely off the mark.  Because Global was necessarily responsible for product quality, and because FMI had a right to a specified quality of fish, it was clearly reasonable for FMI to expect that Global would defend the quality of its product, as fish processors generally do.  The "interest of the processor" is beside the point – the point is that the processor has a duty to ensure that the purchaser gets the benefit of the quality of fish it contracted to receive, and dealing with quality based claims is reasonably within the scope of that duty.  What is certainly outside of the scope of that duty, however, is what Global undeniably did:

- get your purchaser to pay for an inspection report[79]

- lead your purchaser to believe that you are going to do a quality inspection

- put off the inspection for so long that the purchaser has no other opportunity to inspect

---

[78] Exh. 26.
[79] Nikitenko's new averment that he "regarded the report as confidential" is pure after-the-fact confabulation.  Why on earth would FMI agree to pay for an inspection report that it would never have the right to see?  The e-mails cited by FMI in its opening motion establish that the purpose of the inspection was for FMI and Global to jointly deal with the quality claims.  *See* Exhs. 20, 22, 36.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

REPLY IN SUPPORT OF MOTION FOR          FMI FOOD MARKETERS v. GLOBAL SEAFOOD
SUMMARY JUDGMENT
Page 26                                                  Case No. 3:06-cv-00011 JWS

- receiving an unfavorable report (admitting that the quality claims had merit, that 15-17% of the fish was "unusable," and that Global should give a discount, and indicating that Global and its inspector had discussed stealing FMI's customers), and then

- hiding the report from the purchaser and <u>specifically lying about its contents</u>.[80]

The same is true of Global's obstreperous refusal to allow inspection of later shipments. Under the contract, Global was responsible for presenting L/C documents in a timely fashion.[81] It clearly failed to do so. As a reasonable accommodation for arranging waiver of these discrepancies, the end customer simply asked to inspect the fish. There was no question that Global was going to get paid – the customer just wanted to see the fish first. Global has <u>admitted</u> that this was a reasonable request, and that <u>Global would have done the same thing under the circumstances</u>.[82] Yet Global simply refused to grant this reasonable accommodation, even though the contract clearly had provisions for making quality based claims and it had failed to meet the L/C document presentation requirements.

Global's actions with respect to quality issues were simply and clearly in bad faith. FMI was entitled to the benefit of #1 Quality fish, and Global's actions deprived it of that benefit. This is a violation of the implied covenant.

---

[80] Exh. 26.
[81] Exh. 2.
[82] *See* Hennessey Depo. (Exhibit 67 at 235).

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

Global's two other arguments are simply ridiculous.  First, FMI has clearly established that Global essentially extorted an extra-contractual $110,000 cash advance from FMI, by holding hostage fish from an unrelated transaction that had already been paid for.[83]  FMI was unconditionally entitled to the release of those fish under the contract, and FMI's extortionate behavior interfered with that contract right, in violation of the implied covenant.  Finally, Global's claim that it did not breach the covenant because it did not interfere with any attempt by FMI to sue Global under the CISG is grossly obtuse.  The point of the covenant is that parties must treat each other fairly and make reasonable efforts to give the other party the full benefit of their deal – that Global didn't bar the courthouse door is hardly full satisfaction of that duty.

## II.     GLOBAL'S DEFENSES TO FMI'S UNFAIR TRADE PRACTICES ACT CLAIMS ARE INSUFFICIENT TO PREVENT SUMMARY JUDGMENT

Global asserts two purely legal defenses to FMI's claims under the Alaska Unfair Trade Practices Act: Global makes a cursory and vague assertion that such claims are preempted by application of the CISG, and that its statements regarding quality of fish were not "advertisements" within the meaning of the Act.[84]  Global then argues that FMI has not shown causation of the damages it asserts and has not introduced "admissible" evidence to support its claims.[85]  Finally, Global asserts its own spin on the actions it indisputably took, apparently disputing that such actions constitute violations of the Act.

---

[83] Exhs. 35, 36, 37 (at FMI 358-60), 49.
[84] *See* Clerk's Docket 60 at p. 18 (asserting that state Unfair Trade Practices Act "should not be" applicable "to an international sale transaction governed by the CISG.")
[85] *Id*. at 18-19.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

REPLY IN SUPPORT OF MOTION FOR                    FMI FOOD MARKETERS v. GLOBAL SEAFOOD
SUMMARY JUDGMENT

None of these arguments hold water, and none of them undermine the clear showing made in FMI's opening brief that Global's actions were in violation of the Unfair Trade Practices Act.

**A.**    Global's Preemption Argument Is Groundless.

Global's cursory preemption defense is utterly groundless to the point of being frivolous. Global cites no authority in favor of its position, for the simple reason that none exists. Moreover, in tossing together its muddled "policy-based" argument, Global turns the law of preemption on its head and ignores specific case authority cited by FMI establishing that the CISG does not have any pre-emptive effect as to other state law claims.

Contrary to Global's argument, the law is abundantly clear that FMI was not required to demonstrate a lack of preemption. Instead, the longstanding legal presumption against preemption requires a party asserting a preemption defense to demonstrate specific federal intent to preempt any state laws.[86] "Under general principles of preemption, however, courts must be reluctant in finding federal preemption of a subject 'traditionally governed by state law.'"[87]  Global's vague and groundless "policy" arguments do not demonstrate any such specific federal intent, and so simply cannot suffice to establish preemption.

---

[86] *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).
[87] *Time Warner Cable v. Doyle*, 66 F.3d 867, 874-75 (7th Cir. 1995), *quoting CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

Moreover, Global has ignored the <u>specific authority</u> that FMI cited in its Motion that runs directly contrary to its argument.  In the *Caterpillar*, *Usinor Steel*, and *Geneva Pharmaceuticals* cases, courts specifically rejected the notion that the CISG preempted state law claims.[88]  These courts concluded that the CISG has only "limited" preemptive effect, and preempted <u>only</u> UCC claims brought by parties to the contract regarding their rights under that contract.[89]  More importantly, the Courts in the cases cited by FMI <u>specifically</u> <u>determined</u> that non-UCC state law claims, even where closely related to the contract, are <u>not</u> preempted by the CISG.[90]  FMI's Alaska state law claims do not fall under the CISG, and are not preempted.

## B.    Application of Unfair Trade Practices Act

The Alaska Unfair Trade Practices Act is a remedial statute of broad application, covering many commonplace commercial transactions.[91]  The Act contains a list of actions that are specifically deemed "unfair trade practices."  FMI relied upon 5 of those specific provisions, and upon the "catch-all" provision following them, in asserting its claims.[92]

---

[88] *See Caterpillar, Inc. v. Usinor Industeel*, 393 F.Supp.2d 659, 673-75 (N.D. Ill. 2005); *Geneva Pharmaceuticals Technology Corp. v. Barr Labs., Inc.*, 201 F.Supp.2d 236, 286 (S.D.N.Y. 2002).

[89] *Caterpillar, supra*, 393 F.Supp.2d at 674.  Again, FMI has not challenged the application of the CISG to its contract claims.

[90] *Id.* at 675-76 (promissory estoppel claims not preempted under CISG); *see also Geneva Pharmaceuticals, supra*, 201 F.Supp.2d at 287 (same); John Honnold, *Uniform Law for International Sales Under the 1980 United Nations Convention* (hereinafter "Honnold") at 60-62 (2d ed. 1991) (addressing principles for interpretation of CISG).

[91] *See* AS 45.50.471; *Western Star Trucks, Inc., v. Big Iron Equipment Service, Inc.*, 101 P.3d 1047, 1050-54 (Alaska 2004) ("The act applies to all unfair or deceptive acts 'in the conduct of trade or commerce,'" and so applies in commercial transactions.).

[92] FMI relied upon AS 45.50.471(b)(4), (6), (8), (12), and (14), as well as AS

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

Global takes exception only to the application of AS 45.50.471(b)(8), on the grounds that Global's misrepresentations were not "advertising." First and notably, Global does not contest that the other 5 clauses FMI relied upon apply to its actions. Second, Global's limited interpretation of this remedial statute is incorrect. Under Alaska law, remedial statutes are to be construed liberally in order to effectuate their purpose.[93] "Advertise" simply means "to make known," or "to make generally known."[94] The case cited by Global does not limit the meaning of "advertise" to the specific context of that case, and provides no reason why making specific representations in a commercial context could not be considered "advertising."

## C.    Global's Actions Are Clear Violations of the Act

Global's defense of the Unfair Trade Practices claims involve the same kind of nitpicking and misdirection that characterize its other defenses. Global's claims of failure of proof and failure to show causation are groundless. FMI specifically asserted that the factual predicates for its Unfair Trade Practices Claims were the same as for its breach of contract and breach of the implied covenant claims.[95] Alaska law is clear that the same actions can give rise to both breach of contract and Unfair Trade Practices Act claims.[96] FMI specifically asserted that its damages were the same as the damages described under the breach of contract claims, and it clearly demonstrated causation for

---

45.50.471(c).
[93] *State for Use of Smith v. Tyonek Timber, Inc.*, 680 P.2d 1148 (Alaska 1984).
[94] Webster's Third New International Dictionary (1986).
[95] Clerk's Docket 34 (Motion for Summary Judgment) at 53-55.
[96] *Western Star Trucks*, *supra*, 101 P.3d at 1050-54.

REPLY IN SUPPORT OF MOTION FOR                    FMI FOOD MARKETERS v. GLOBAL SEAFOOD
SUMMARY JUDGMENT
Page 31                                           Case No. 3:06-cv-00011 JWS

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

those claims.[97]  As discussed in detail above, there is no failure of proof or failure to show causation on these claims.

Finally, Global's assertion that its egregious actions did not constitute unfair trade practices is simply wrong.

- Global made specific representations to FMI that it would produce fish that met with specifically delineated quality standards, all of which fell under the rubric of "#1 Quality."  It is indisputably clear, however, that Global did nothing to ensure that FMI received the quality of fish it had specifically contracted to receive.[98] This is clearly "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services," and in violation of the Act.

- Whatever spin Global may attempt to put on it, the record is indisputable that Global extorted an extra-contractual $110,000 advance payment out of FMI, and refused to return it despite its failure to deliver any additional fish.  Again, despite the fact that Global had been paid in full by check for a delivery to Chotiwat, Global refused to release documents to allow that shipment to leave customs until it received an extra-contractual $110,000 cash advance payment on fish that was

---

[97] Clerk's Docket 34 (Motion for Summary Judgment) at 55.
[98] See Hennessey Depo. (Exhibit 67 at 20, 24, 29); Nikitenko Depo. (Exhibit 68 at 68-69).

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

slated for delivery *to other customers*.[99]  This is nothing but extortion, and clearly fits within the general definition of "unfair trade practices."

- Global obtained a significant increase in its price by promising FMI it would have a right of first refusal as to all pink salmon it produced, but then proceeded to completely disregard this promise.  Global went behind FMI's back and made contract arrangements to sell that fish to others without informing FMI.  This is also "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services," and in violation of the Act.

- Global threatened to halt all deliveries under the Global Contract in order to extract extra-contractual guarantees of up-front payment, and eventually carried through on that threat, failing to make deliveries it had promised in order to "punish" FMI, and specifically misrepresenting to FMI that it had sold and shipped FMI's fish in order to exert pressure on FMI and its customers.

- Global conspired with its inspector to cut FMI and Sang Jin out of the deals they had brokered, and lied to FMI about the contents of the inspector's report.  This is clearly an "unfair trade practice."

---

[99] Exhs. 19, 22 (at FMI 311-12), 37, 47, 52.

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

FMI's has established that Global's actions are not just breaches of contract, but cross the line into breaches of the Unfair Trade Practices Act as well. Summary judgment is appropriate on this point.

## III.   **GLOBAL'S DEFENSES TO FMI'S OTHER CLAIMS ARE MERITLESS.**

### A.   CONVERSION

Global's unsupported claim that money cannot be the subject of a conversion action is simply wrong. Money can clearly be the subject of a conversion action where the party charged with conversion was under an obligation to return the money, and the bundle of money at issue can be specifically identified.[100]   That is FMI's claim here. Contrary to Global's unsupported assertion, there is no evidence in conflict on this claim. The $110,000 cash advance was a pre-payment for future deliveries of fish.[101]   It is undisputed that no further deliveries were ever made. Global admits it did not return the $110,000. Summary judgment is appropriate on this claim.

### B.   TORTIOUS INTERFERENCE

Global's defense to FMI's intentional interference claim simply gets the law of intent wrong. The tort requires intent "in the sense that the defendant must have either desired to bring about the harm to the plaintiff or have known that this result was substantially certain to be produced by his conduct."[102]   As established in FMI's opening

---

[100] *State v. Twitchell*, 832 P.2d 866 (Utah App. 1992); *Public Utility Dist. No. 1 of Lewis County v. Washington Public Power Supply System*, 705 P.2d 1195, *reconsid. den., modified* 713 P.2d 1109 (Wash. 1985); *Ferguson v. Coronado Oil Co.*, 884 P.2d 971 (Wyo. 1994).
[101] Exhs. 19, 22 (at FMI 311-12), 37, 47, 52.
[102] Restatement (Second) of Torts, Chapter 37 Introductory Note at p. 5.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

motion, Global indisputably knew that FMI was brokering the fish, and indisputably was aware that failing to deliver the required quantity and quality of fish would result in FMI's being unable to avoid breaching its obligations under its own contracts.  That is all that is required.  Summary judgment is appropriate on this claim.

## IV.  SUMMARY JUDGMENT AGAINST GLOBAL'S COUNTERCLAIM IS WARRANTED

Global's defense on this issue can most charitably be described as deliberately obtuse.  Global's assertion that FMI had some duty to avoid demurrage charges to Global suffers from two fatal weaknesses.  First, the demurrage charges would not have been incurred if Global had delivered the fish to FMI as required under the contract.  In other words, the fact that Global also suffered damages because it breached its contract with FMI cannot as a matter of law impose any obligation on FMI.  Global damaged itself, and must bear the consequences.  Second, Global specifically misrepresented to FMI, immediately after it refused to deliver the fish to FMI's customer, that it had sold and shipped the fish it now claims sat in demurrage for so long.[103]  The only possible result of this misrepresentation was to induce FMI to believe that the fish had been sold – it necessarily relieves FMI of any responsibility to identify a purchaser for this fish, and thus of any responsibility to pay demurrage costs.

---

[103] Global's averment that Nikitenko simply made "an error" in thinking that $200,000+ worth of fish had been sold, when in reality it had not been sold, is significantly less than credible.  The e-mail traffic submitted by FMI with its opening motion clearly indicates that Nikitenko was monitoring this situation closely, and the amount of fish involved here was simply too large to be the subject of a "mistake."  Moreover, if true, Nikitenko's statement would contradict his earlier averments regarding Global's purportedly desperate cash flow situation and Global's supposed close monitoring of its cash flow.

REPLY IN SUPPORT OF MOTION FOR                    FMI FOOD MARKETERS v. GLOBAL SEAFOOD
SUMMARY JUDGMENT
Page 35                                                                    Case No. 3:06-cv-00011 JWS

DORSEY & WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

V.     **GLOBAL'S DAMAGES DEFENSES ARE OVERREACHING**.

Two of Global's points on damages are well-taken.  The others are clearly over-reaching.

First, FMI was indeed, as Global asserts, obligated to pay Sang Jin a 2% commission on the C&F price to the end customers, and had other expenses that were not accounted for in its original damages calculation.  FMI regrets the error, and herewith submits a corrected damages spreadsheet accounting for the Sang Jin Commission and other expenses, reducing FMI's profit from $130/MT to $94.60/MT.

Second, FMI has submitted for the first time with this motion a statement of its total tonnage produced in 2005. [104]  FMI's assertion in its motion regarding the amount produced was based on the information that had been supplied by Global up to that point, when depositions were not yet completed.  The documents Global had provided did not clearly account for what happened to tonnage that had first been shipped to FMI, but later diverted to other customers, so it is possible that there was an element of double-counting in that regard.  Again, FMI's revised damages spreadsheet accounts for the total tonnage that Global has now supported with documentation, of 1,489.57 MT.[105]

Global's other defenses as to damages are without merit.  FMI is not required to "prove" the hypothetical of whether it could have gotten L/C's in place for future

---

[104] It is worth noting that FMI has been waiting for 5 months for an answer to an interrogatory to Global specifically requesting the quantity of Global's 2005 production of pink salmon.  Now Global criticizes FMI for not having the numbers quite right.  If FMI's numbers are inaccurate, it is entirely due to Global's vexatious refusal to appropriately answer interrogatories in discovery.
[105] *See* Revised Damages Analysis spreadsheet attached as **Exhibit 69**.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

shipments that were not made.  Instead, this is an affirmative defense, for which Global has failed to provide proof.  FMI had gotten L/Cs as promised for all shipments up to the time of breach, and Global has submitted no evidentiary support for the notion that FMI would not have been able to pay.  This argument must be disregarded.

Global's argument that only bloodline out fish can be counted on right of first refusal damages is an attempt to profit from its own breaches of contract.  In point of fact, the right of first refusal does not specify whether fish should be b/o or b/i.  Moreover, FMI, through significant effort, convinced customers to accept b/i fish, and there is no reason to believe FMI would not have been able to find additional buyers (as Global did) for such fish in a seller's market.

### CONCLUSION

Global's Opposition has done nothing to undermine FMI's case for summary judgment.  FMI's motion established that FMI is entitled to summary judgment as to liability.  Given Global's tardy new disclosures herein regarding its total production, FMI's base damages can now be properly calculated corrected amount of $275,210.54. Global seeks an order that it is entitled to treble damages and attorney's fees under the Alaska Unfair Trade Practices Act.  Moreover, having established Global's liability as to tort claims, FMI is entitled to have a jury hear its claims for punitive damages against Global, and is further entitled to have a jury consider its loss of reputation damages.  FMI requests that partial summary judgment to this effect be granted.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

DATED this 10th day of January, 2007, at Anchorage, Alaska.

DORSEY & WHITNEY LLP

By:   /s/ Michael A. Grisham
Michael R. Mills, ABA# 8911074
Michael A. Grisham, ABA# 9411104
DORSEY & WHITNEY LLP
1031 West Fourth Avenue, Suite 600
Anchorage, AK 99501-5907
(907) 276-4557

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 9, 2007, a true and correct copy of this document was served on:

- Mark C. Manning

by first class regular mail, if noted above, or by electronic means through the ECF system as indicated on the Notice of Electronic Filing.

/s/ Michael A. Grisham
Michael A. Grisham

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557