UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

------------------------------------------------------------

FMI FOOD MARKETERS              )

INTERNATIONAL, LTD.,            )          COPY

       Plaintiff,            )

    vs.                         )    NO. 3:06-CV-000111 JWS

GLOBAL SEAFOODS NORTH           )

AMERICA, LLC,                   )

      Defendant.              )

------------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

TOM HENNESSEY

------------------------------------------------------------

9:10 a.m.

November 28, 2006

1420 Fifth Avenue, Suite 3400

Seattle, Washington

Lauren G. Harty

Court Reporter

EXHIBIT 67
Page 1 of 23

Page 20

1    A.    Yeah.

2    Q.    This question is more generally not cod or

3 those other bottom fish that you guys might produce

4 but the salmon.  When would it be that you would not

5 include a grade on a salmon?

6    A.    Whenever -- whenever it was determined by

7 Oleg that it wasn't relevant.

8    Q.    And would Oleg be the determiner?  I mean,

9 would he be the one that instructed you whether or not

10 to include a grade --

11    A.    He --

12    Q.    -- on a particular --

13    A.    -- would not instruct me to.  It would be

14 with the -- either the plant manager or the production

15 manager.

16    Q.    Just --

17    A.    And -- and --

18    Q.    -- describe how that process would -- would

19 come about.  I mean, Oleg would call the plant manager

20 and tell him for this --

21    A.    Either the plant manager --

22    Q.    -- group of product --

23    A.    -- or the production manager, yes.

24    Q.    Okay.  And in what circumstances that you're

25 familiar with would Oleg not designate a product, a

EXHIBIT 67
Page 2 of 23

Page 24

1 that's sort of plus or minus the average -- what you

2 typically figure is your production?

3    A.    Yes.

4    Q.    And of that 2000 metric tons how much of

5 that would be grade one or number one quality?

6    A.    We do not grade --

7    Q.    So you don't grade pinks?

8    A.    -- pink salmon.

9    Q.    Other salmon you would grade?

10    A.    I don't know.  I would have to check.

11    Q.    Okay.  But you are familiar that pink salmon

12 are not graded?

13    A.    Yes.

14    Q.    Okay.

15          And when you say are not graded, maybe you

16 know these details of the production side or not.

17 Does -- does that mean that all of the pink salmon

18 that are purchased by Global let's say for headed and

19 gutted are all processed together in the same manner;

20 there's no sorting that goes on or grading as part of

21 that process?

22    A.    I do not have any expertise in that area, so

23 I do not know sufficient enough to answer your

24 question.

25    Q.    How do you know that the pink salmon are not

EXHIBIT 67
Page 3 of 23

Page 29

1  numbers one, two or three.  Do you see that?

2      A.   I -- I see that.

3      Q.   And then after that point in time, I think

4  if you look at the -- the rest of the document,

5  there's an NA?

6      A.   Uh-huh.  You won't see any more.

7      Q.   Okay.  Did -- did you ask anyone or do you

8  have any reason to -- any understanding of why the

9  grading stopped at that point in time?

10     A.   I don't know.

11     Q.   Okay.  Did you --

12     A.   I did not ask, no.

13     Q.   You did not ask either.

14     A.   No, no.

15     Q.   Okay.

16         MR. MILLS:  Why don't I --

17     A.   So -- I mean, as a percent of the total

18  volume, that's, you know, less than one percent.

19     Q.   (By Mr. Mills)  Yeah.  So less than one

20  percent that are captured by this 2005 production of

21  headed and gutted have a grading designation?

22     A.   That's what it appears to be, yes.

23     Q.   Okay.

24         MR. MILLS:  Why don't we mark this one.

25             (Discussion off the record.)

EXHIBIT 67
Page 4 of 23

Page 62

1      A.    -- we would be dependent upon the customer

2  waiving that discrepancy.

3      Q.    And --

4      A.    And so your -- your guarantee of payment has

5  gone out the window.

6      Q.    Okay.  And in that situation, if there was a

7  timeframe, say eight days, if the documents were not

8  presented within that eight-day timeframe, if I

9  understand right, Global would be reliant upon the

10 customer, let's say Chinese customer, to waive that

11 timing issue, waive the discrepancy, if you will.

12     A.    Yes.

13     Q.    Okay.

14     A.    The -- the -- the issuer of the letter of

15 credit.

16     Q.    Would the issuer typically be the -- the

17 entity that was going to get the product at the

18 destination, the -- or their bank?

19     A.    I believe so, yes.

20     Q.    Okay.

21           Let me ask sort of a slightly different

22 question.  If there are quality provisions contained

23 in a contract, I assume that you would agree that

24 those quality provisions are important terms of a

25 particular contract.

EXHIBIT 67
Page 5 of 23

Page 63

1    A.    Yes.

2    Q.    The buyer from Global is relying upon

3 obtaining whatever the quality that's in the contract

4 that Global has agreed to supply.  Is that -- that

5 would be your understanding of a --

6    A.    Yes.

7    Q.    -- of the arrangement?

8    A.    Yes.

9    Q.    Okay.  And look at the end of this contract,

10 if you would.  This is the 2004 contract.  There's a

11 "Remark" section which said, "Claims (if any) to be

12 submitted in writing within 15 days after arrival of

13 goods..." in China.

14        Would that 15-day timeframe for making

15 claims include the buyer's right to make a claim that

16 the product did not meet the quality parameters, the

17 quality terms of the contract?

18    A.    I think the remark speaks for itself.  It's

19 clear.

20    Q.    But I'm asking for your -- it says claims.

21 Would that include quality claims as well?

22    A.    My read of it would be yes.

23    Q.    Okay.

24    A.    But -- but, again, this is not my -- my --

25 my bailiwick.

EXHIBIT 67
Page 6 of 23

1          MR. MILLS:  But the witness is the person in

2   the organization that deals with the letters of

3   credit.  He's the person that implements the letter of

4   credit mechanisms.  That's -- that's what I'm leading

5   to, and I'll -- I'll --

6          MR. MANNING:  Okay, but --

7          MR. MILLS:  I'll tie it in.

8      Q.  (By Mr. Mills)  Oleg negotiated this

9   contract.

10     A.  Yes.

11     Q.  Is that -- okay.  So I -- I will ask Oleg

12  about what went into this contract.

13         Did you tell Oleg after the 2004 season that

14  there were any problems that needed to be corrected in

15  the letter of credit payment mechanism that you

16  implemented in 2004 with respect to the FMI contract?

17     A.  I don't recall.

18     Q.  Okay.  I assume, based on your role, that

19  you were the individual that implemented this 2005

20  arrangement with FMI; is that correct?

21     A.  Say that again?

22     Q.  That you --

23     A.  That I implemented the arrangement with FMI?

24     Q.  Let me clarify that.  That -- that you were

25  responsible for presenting the documents under the

EXHIBIT 67
Page 7 of 23

1      A.    Well, a sale is one thing.  A commitment is

2 another.  The answer to your question is no, we -- we

3 don't keep track of -- or I certainly don't keep track

4 of commitments.

5      Q.    I maybe -- I maybe use the words wrong.

6      A.    Okay.

7      Q.    I mean commitment, an agreement to sell

8 somebody product.  Would you consider that a sale or

9 is that a commitment?

10     A.    It's -- a sale is after -- after product is

11 shipped and title's passed.

12     Q.    Okay.

13     A.    So a commitment --

14     Q.    Commitment.  Okay.

15     A.    -- it's -- it's more like an order.

16     Q.    Okay.  Would these documents, Exhibit 5 and

17 6, then, in your view, be commitments to the customer

18 to supply product?

19     A.    That's what they look like, yes.

20     Q.    All right.  And if -- if there's a

21 commitment to the customer to supply a thousand metric

22 tons of a certain quality pink salmon, would that

23 be -- would it be your understanding that Global is

24 required to comply with those contractual terms?

25          MR. MANNING:  Objection; foundation.

EXHIBIT 67
Page 8 of 23

Page 77

1      A.   We -- we -- we live up to our commitments.

2      Q.   (By Mr. Mills)  Okay.

3      A.   We try to.

4      Q.   And -- and if there's a right of first

5 refusal that is agreed upon, it would be Global's

6 obligation to honor that right of first refusal if it

7 was written into a contract?

8      A.   I would think so.

9      Q.   Okay.

10          MR. MILLS:  Actually, I -- in looking at

11 that, I may have given you the wrong document there to

12 mark.  Let's -- why don't we mark this one as the next

13 one.

14               (Marked Deposition Exhibit No. 7.)

15     Q.   (By Mr. Mills)  I'm sorry.  Mr. Hennessey,

16 I'm going to look -- I'm going to show you a different

17 document.  I'll call you Tom.  Is that okay?

18     A.   I've been called worse.

19     Q.   You can call me Mike, yeah.

20          This is a document that's been marked

21 Exhibit 7.  I think I mistakenly gave you -- the one

22 that was marked Exhibit 6 was FMI's document with its

23 customer.  Okay.  I just want to keep the record

24 clear.  This document is also dated April 29th of

25 2005.  Does it have Oleg's signature or at least what

EXHIBIT 67
Page 9 of 23

Page 120

1    Q.    Okay.

2        And then you continue to say, "I have

3  instructed Ellen... to expedite all documents."  And

4  again, this acknowledges that you interface with Ellen

5  as part of this process?

6    A.    Uh-huh.

7    Q.    Okay.

8        And at -- at this point in time -- this is

9  August 12th -- you didn't have any -- there were no

10 problems, no issues with respect to the letter of

11 credit arrangements that were going to be put into

12 place to pay for this product?

13   A.    I don't recall.

14   Q.    Is that your --

15   A.    I don't recall.

16   Q.    Okay.  It doesn't reflect any --

17   A.    I mean, it's -- there's nothing -- obviously

18 nothing in here on that.

19   Q.    Correct.

20       MR. MILLS:  Let's look at the next one, be

21 187.

22           (Marked Deposition Exhibit No. 15.)

23   Q.    (By Mr. Mills)  Do you have a document,

24 0187 at the bottom, that's marked Exhibit 15?

25   A.    Yes.

EXHIBIT 67
Page 10 of 23

Page 125

1      A.    He -- yes, he's detail oriented.

2      Q.    And I just conclude that by looking at these

3 e-mails.  I don't know Bent all that well, but he

4 seems to include --

5      A.    Some are masterpieces.

6      Q.    Okay.  In what sense?

7      A.    Well, I -- I don't need to answer that.

8      Q.    Did you start dealing with Bent in 2004 in

9 connection with the first FMI contact?

10     A.    Yes.

11     Q.    And -- and, again, you didn't have any

12 problems or issues that arose in 2004.

13     A.    I don't recall.

14     Q.    And -- and Bent was the person that --

15     A.    We -- we ultimately got paid for everything.

16     Q.    Sure.  Do you remember dealing with Bent in

17 2004 as well as 2005?

18     A.    Yes.

19     Q.    He was sort of FMI's -- the person at FMI

20 responsible for dealing with Global on these payment

21 issues.

22     A.    Yes.

23     Q.    Okay.

24           MR. MILLS:  Let's go to the next one.  This

25 would be 184.

EXHIBIT 67
Page 11 of 23

Page 160

1      A.    Yes.

2      Q.    If it was an FOB contract --

3      A.    Buyer beware.

4      Q.    Yeah, but if it was an FOB contract, the

5  buyer is taking possession of the product for

6  practical purposes and in reality at the FOB point,

7  whether it's Kodiak or -- or Dutch Harbor.

8      A.    No, I understand.

9      Q.    Call it Kodiak.  In that case, the buyer

10 should to protect itself perhaps have an inspection

11 done at the point that it takes possession of the

12 product, right?

13     A.    Yes.

14     Q.    Okay.  And in the c&f situation the -- the

15 transfer of control of the product doesn't occur until

16 the destination -- in this case China -- occurs; is

17 that right?

18     A.    Yes.

19     Q.    Yeah.  So in c&f -- what you said before was

20 in a c&f situation the inspection would take place at

21 the destination, whereas in an FOB an inspection

22 should -- or would have to take place at the point of

23 departure, if you will.

24     A.    Right.  My response is that once that

25 container's closed and handed over to APL, we can't

EXHIBIT 67
Page 12 of 23

Page 164

1    A.    Okay.

2          MR. MILLS:  Let's see.  Let's look at two --

3  258.

4          (Marked Deposition Exhibit No. 24.)

5    Q.    (By Mr. Mills)  This is 24?

6    A.    Yes.

7    Q.    Okay.

8          Again, this e-mail's between you and Bent,

9  September 8th it looks like.  I'll have you look

10 through it.  There's -- there's some -- and this I

11 think picks up one of your points, is the -- the

12 letter of credit must be met precisely with the terms,

13 and a particular certificate had a different name than

14 was anticipated, so there was a discrepancy that had

15 to be dealt with; is that right?

16   A.    Yes.

17   Q.    Okay.  And this is Bent and you trying to

18 figure out what the issue is and then figure out how

19 to deal with it?

20   A.    Uh-huh.

21   Q.    Okay.  I mean, would you agree --

22   A.    Yes.

23   Q.    Would you agree that Bent was attempting to

24 work as best he could to make sure that the terms of

25 the letter of credit were met so that you -- so that

EXHIBIT 67
Page 13 of 23

1 Global could be paid?

2     A.    Yes.

3     Q.    Okay.  I mean, you don't -- you don't --

4     A.    He -- he was responsive.

5     Q.    Yeah, he was responsive and -- and in good

6 faith attempting to try to make the letter of credit

7 situation work.

8     A.    Yes.

9     Q.    Okay.

10          MR. MILLS:  316.

11          (Marked Deposition Exhibit No. 25.)

12     Q.    (By Mr. Mills)  Again, e-mails between you

13 and Bent, first from you to Bent on the bottom,

14 September 8th.  You said, "I think I have everything

15 figured out except these two containers.  Please

16 confirm that they go on L/C 192."  And then Bent

17 confirms that that's the case.

18          So at this point in time -- this is

19 September 8th of 2005 -- it doesn't appear that there

20 were any significant problems with respect to the

21 letter of credit payment mechanisms.  Is that a fair

22 statement?

23     A.    Not necessarily.

24     Q.    Okay.  Would -- do you recall there being

25 any problems at this point in time?

EXHIBIT 67
Page 14 of 23

1 to Oleg in response.  There's L/C money available for

2 the 13 containers, and he lists them out.  Is -- is

3 that -- I mean, the L/C numbers that he listed there,

4 would those be L/C numbers then that you would have

5 received from your bank?

6      A.   Yes.

7      Q.   Okay.  So you would have --

8      A.   I mean, those -- those look like valid L/C

9 numbers, and I think I recognize them.

10      Q.   And so once these L/C's were in place, you

11 would have received them, looked at the terms and --

12 and pro -- if there were any problems, made a

13 complaint or quibbled about the terms, but if they

14 were accepted, then you would have security, as you

15 put it, for getting paid this money when those goods

16 arrived.

17      A.   Assuming there were no discrepancies.

18      Q.   Okay.

19           MR. MILLS:  Okay.  The next one, 303, a

20 question on that.

21              (Marked Deposition Exhibit No. 30.)

22      Q.   (By Mr. Mills)  You are cross-copied on

23 this one again, September 22nd.  It talks about cash

24 payments.  Would this presumably have been for those

25 Thai goods?

EXHIBIT 67
Page 15 of 23

Page 194

1    A.   No.  I mean --

2    Q.   Why --

3    A.   -- my --

4    Q.   -- would --

5    A.   My take on this, most things generally, is

6 if somebody has a direct question, they'll ask it of

7 me.  If they want to copy me on stuff, I typically

8 just put it off to the side.

9    Q.   Okay.  And then Bent was attempting to keep

10 you in the loop on this -- this deal I guess --

11   A.   Yeah.

12   Q.   -- that -- does -- does it appear that what

13 Bent was trying to get was the documents that would

14 allow the customer to get control of the product

15 related to the cash payment deal?

16   A.   That's what it appears, yeah.

17   Q.   Okay.

18   A.   Yeah.

19   Q.   Okay.

20        MR. MILLS:  Okay.  Let's take a break, a

21 lunch break.

22             (Deposition recessed at 1:25 p.m.)

23

24

25

EXHIBIT 67
Page 16 of 23

1 e-mails between you and Oleg?

2      A.    Sure.

3      Q.    And does Oleg typically e-mail the customers

4 that he's marketing to and dealing with?

5      A.    Yes.

6      Q.    Okay.  And does Oleg typically e-mail

7 individuals at the plant in Kodiak --

8      A.    Yes.

9      Q.    -- plant manager, production manager,

10 whatnot?

11     A.    Yes.

12     Q.    And is that a common means of -- for Oleg to

13 communicate with people --

14     A.    Yes.

15     Q.    -- using -- use of e-mail?

16           And I would assume the same is true with

17 yourself.  If -- if you need to communicate something

18 to the Kodiak plant, Mila, for instance, you would

19 send her an e-mail typically.

20     A.    Typically, no.

21     Q.    Okay.

22     A.    It's --

23     Q.    Typically --

24     A.    It's -- it's one of many ways.

25     Q.    Okay.

EXHIBIT 67
Page 17 of 23

Page 228

1    A.    Yes.

2    Q.    Okay.

3    A.    Yeah.

4    Q.    And I think we've talked -- back to this

5 Exhibit 8 sheet, the -- the -- I think subject to

6 verification, you believe that the first group of

7 seven was in fact paid for through a letter of credit.

8    A.    Yes.

9    Q.    Okay.

10        The second group of six you believe were

11 paid for through a more direct means, a courier check,

12 something like that --

13   A.    Yes.

14   Q.    -- correct?  Okay.

15        The second group of seven products, do you

16 recall there being a situation where there was a

17 letter of credit in place to pay for the second seven

18 group of containers, but the -- there was a

19 discrepancy, meaning the timing -- the documents

20 weren't presented in time.  There was a need for the

21 end customer to waive that timing discrepancy, but the

22 end customer wouldn't waive it until they could

23 inspect the product?  Do you remember that situation?

24   A.    Yes.

25   Q.    Okay.  And what do you recall as Global's

EXHIBIT 67
Page 18 of 23

1 before they inspected the product?

2     A.    I don't know.

3     Q.    Do you -- do you recall --

4     A.    It -- it --

5     Q.    Go ahead.

6     A.    It would have had to been on product they'd

7 already seen.

8     Q.    Do you recall that the customer purchasing

9 the second seven containers was the same customer that

10 received one or more of the first seven that had the

11 alleged product deficiencies?

12     A.    I don't know.

13     Q.    Okay.  And -- assume it was the same

14 customer -- we can look at the record -- and Yilufa is

15 the customer.

16     A.    Right.

17     Q.    Assume it was the same customer.  Would that

18 give that customer a basis for asking for a right to

19 inspect the product?

20     A.    If I was them, I would have done the same.

21     Q.    Okay.  And was there ever in -- any internal

22 discussion that you recall between you and Oleg

23 presumably about allowing the customer to inspect the

24 product in order to move the situation forward?

25     A.    No.

EXHIBIT 67
Page 19 of 23

Page 247

1 China?

2      A.    That's what it says, yeah.

3      Q.    Okay.  Maybe this is an Oleg question, but

4 I'll throw it out for you.  Why did it take so long to

5 sell this product?

6      A.    I don't know.

7      Q.    Okay.

8            And it looks like, if you look at

9 Exhibit G -- do you see that, 0446 at the bottom?

10     A.    Okay.

11     Q.    -- that that -- Exhibit G looks to be an

12 invoice to Baltexpress?

13     A.    Yes.

14     Q.    Okay.  And the price that was received

15 was -- does the unit price of 1.63 -- would translate

16 to --

17     A.    It -- this should be --

18     Q.    -- $1600 per metric ton?

19     A.    Yes.

20     Q.    Am I --

21     A.    16.30.

22     Q.    -- translating that properly?

23     A.    Yes.

24     Q.    So the -- the sale price was 16.30 per

25 metric ton, which was $300 or more higher than the FMI

EXHIBIT 67
Page 20 of 23

Page 248

1  price --

2      A.   Yes.

3      Q.   -- is that correct?

4      A.   Yes.

5      Q.   Okay.  And -- okay.  The same question

6  about -- let's look at the -- the second column.  Or

7  not column but, you know, horizontal column.  It looks

8  like the sale of the second batch was in June, if you

9  look at B, the -- the shipping invoice, it looks like

10 June of 06, and that's also to Klaipeda?

11     A.   Klaipeda.

12     Q.   Klaipeda?  But that's referenced Dell Trade.

13 So Dell Trading purchased this product?

14     A.   Yes.

15     Q.   And it's one point -- I think if you look,

16 then H has the invoice.  Unit price, 1.8, that would

17 be $1800 per metric ton?

18     A.   It -- there's two prices.

19     Q.   Okay.

20     A.   17.10 and 1800.

21     Q.   I see.  I'm sorry.  Yeah, you're right.

22 There's two pages there.

23          Okay.  So 17.10 and 1800, so still a higher

24 price, if you will.

25     A.   Yes.

EXHIBIT 67
Page 21 of 23

Page 251

1    Q.   Let's -- let's -- assuming there's

2 15 percent bad product, doesn't meet the contract, and

3 assume that Global gave a 15 percent credit,

4 reduction.   The 15 percent reduction would be based

5 upon the contract price that FMI had with Global,

6 which is the $202,000.   So that would have meant a

7 $30,000 reduction by Global with that set of

8 assumptions, correct?

9    A.   Correct.

10   Q.   Which -- which -- which would in fact have

11 been a lot smaller than the $124,000 of damages that

12 Global now claims.   Agreed?

13   A.   Agreed.

14   Q.   Okay.   Last couple.   Then I'll move on.

15 Then we'll be done I mean.

16        When -- when Oleg gave you contracts or

17 letters of credit to evidence sales that he had made,

18 what did you do with those pieces of paper?

19   A.   He would give me contracts only.   He would

20 not give me letters of credit --

21   Q.   Right.

22   A.   -- to clarify.   I would --

23   Q.   The letters of credit would come --

24   A.   From the bank.

25   Q.   -- right ahead of the product being shipped

EXHIBIT 67
Page 22 of 23

Page 256

1      Q.    Who is in charge of sort of maintaining the

2  files?

3      A.    We're all responsible for maintaining our

4  own.

5      Q.    Okay.  So if there was an e-mail from Oleg

6  to somebody at Dell Trading, you -- Oleg wouldn't

7  print that and give that to you --

8      A.    No.

9      Q.    -- for instance.  All right.

10          Would Oleg cross-copy you on e-mails?

11     A.    Has he cross-copied me on e-mails?

12     Q.    Sure.

13     A.    Yes.

14     Q.    Is -- you mentioned Global was suffering

15  some financial difficulties in latter part of 2005,

16  which prevented Global from obtaining the second seven

17  shipments to -- containers out of demurrage?

18     A.    Yes.

19     Q.    When did that -- those financial

20  difficulties begin in 2005?

21     A.    Cash is always tight.

22     Q.    Earlier you testified that when the $52,000

23  was received from FMI, that Global did have the money

24  to make -- to buy the vacuum machine, but using other

25  people's money was a good business decision --

EXHIBIT 67
Page 23 of 23