WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)   294

```
 1                UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3   ------------------------------------------------------
 4   FMI FOOD MARKETERS            )
 5   INTERNATIONAL, LTD.,          )
 6              Plaintiff,         )
 7         vs.                     )  NO. 3:06-CV-000111 JWS
 8   GLOBAL SEAFOODS NORTH         )
 9   AMERICA, LLC,                 )
10              Defendant.         )
11   ------------------------------------------------------
12             DEPOSITION UPON ORAL EXAMINATION
13                           OF
14                     OLEG NIKITENKO
15                       VOLUME II        ORIGINAL
16   ------------------------------------------------------
17                       9:45 a.m.
18                   December 1, 2006
19             1420 Fifth Avenue, Suite 3400
20                   Seattle, Washington
21
22
23
24   Lauren G. Harty
25   Court Reporter
```

EXHIT 98
Page 1 of 96

MILLS & LESSARD (206)292-9063 www.dep-reporters.com

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)        314

MR. MILLS: Yes.

(Discussion off the record.)

MR. MILLS: Okay. Let's go back on.

Q. (By Mr. Mills) So I guess where I was is, do you recall continuing to commit to sell additional pink salmon during the summer of 2005 or increase the quantities that you committed to existing customers?

A. I don't remember any particular conversation with any customers. If you can show me something to refresh my memory, it would be great, but I doubt that I'm increasing or decreasing or negotiate additional volume during the season.

Q. Would you have records -- how would -- how would one find out with the Global records to determine whether Global continued to commit fish for sale after April of 2005?

A. Only if you scan my brain --

Q. Yeah.

A. -- I believe, because I don't have --

Q. You don't keep paper records of the amount of fish that you've committed to sell?

A. Usually I rely on my memory.

Q. Do you make notes -- do you have a piece of paper that you have commitments for pink salmon for 2005; FMI, 1,000 metric tons; Dell Trading, 50 metric

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)            318

1         But you recall there being some discussion
2   with parameters with Bent about quantity for 2005.
3       A.   Oh, definitely.
4       Q.   Okay.
5         Was Global -- did Global suffer cash flow
6   problems in the fall of 2005?
7       A.   Yes.
8       Q.   Okay.  Is the revenue for Global roughly --
9   in 2005 was it roughly $18 million, overall revenue?
10      A.   Yes.
11      Q.   Okay.  And does Global run a line of credit
12  to deal with cash flow issues?
13      A.   We don't have line of credit.
14      Q.   Mr. Hennessey indicated that there was a
15  line of credit.
16      A.   It was maybe -- I don't remember -- 50 or a
17  hundred thousand dollars.
18      Q.   Okay.  A small one.
19      A.   Small one.
20      Q.   And in 2005 was the Kodiak plant free and
21  clear of liens, owned --
22      A.   Yes.
23      Q.   -- owned free and clear?
24      A.   Yes.
25      Q.   So you could borrow against the plant if you

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS) 322

1  September of 2005?
2      A.  I believe I told that -- Bent that unless we
3  can be paid by -- by FMI for -- for his cargo in
4  timely matter, we -- without -- without cash we cannot
5  survive.  We -- we have no choice.
6      Q.  Okay.  But you threatened to sell --
7      A.  Yes.
8      Q.  -- sell the product.
9      A.  Yes.
10     Q.  I don't have any more on that exhibit.
11         MR. MILLS:  Mark this, please.
12         Okay.  This will be Exhibit 109.
13             (Marked Deposition Exhibit No. 109.)
14     Q.  (By Mr. Mills)  This is an e-mail at the
15  bottom from Fujun Zhang, who I think is referred to --
16  we've referred to him commonly here as QC Johnson; is
17  that correct?
18     A.  Yes.
19     Q.  Okay.  So he had sent you an e-mail on
20  September 22nd.  Do you remember receiving this
21  e-mail?
22     A.  I don't remember exact moment when I receive
23  it, but I guess I have to receive it.
24     Q.  You assume -- I mean, is it fair to assume
25  you did receive it?

EXHIT 98
MILLS & LESSARD (206)292-9063 www.dep-reporters.com Page 4 of 96

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)      323

1   A.   Yes.

2   Q.   Okay.

3        Do you notice in the second paragraph he
4   says he's talked to Mr. Tony, "...he told me by
5   phone..."  Then he goes on, second paragraph, and he
6   told me by phone that about 70 to 80 percent of the
7   fish has bruise and Yilufa, final buyer, wanted to
8   return other containers because they worry about the
9   quality.

10       Do you remember this indication of
11  significant bruising of the product?

12  A.   I don't -- this indication about the
13  bruising.  It -- nothing said about significant or not
14  significant.

15  Q.   Well, 70 to 80 percent has bruise, would you
16  consider that significant?

17  A.   Yes.

18  Q.   Okay.

19       Down in the cen -- the next paragraph -- let
20  me back up.  Would you consider that to be severe
21  bruising, 70 to 80 percent?

22  A.   Please clarify what is --

23  Q.   Severe.

24  A.   -- severe.

25  Q.   Let's -- let's just move on.

EXHIT 98

1    In the next paragraph there's an indication
2    of she called -- he called Ms. Caroline, and we're
3    talking about the shipping aspects of the certain
4    container. Ellen would be Ellen Thompson, I believe,
5    your -- your freight forwarder or -- for ETS, to
6    release exchange and also said that the freight has
7    not been paid.
8    Was it Global's obligation to pay the
9    freight on the shipments pursuant to the 2005 FMI
10   contract, which were c&f China?
11   A.    Yes.
12   Q.    Okay.
13   And then QC Johnson indicates in the next
14   paragraph in the bolded paragraph, "I think the most
15   important thing is to ask APL Agent Qingdao to
16   release/exchange the B/L...," bill of lading.
17   What is he suggesting by making that
18   statement?
19   A.    He suggesting that we pay for freight and in
20   this case APL will release goods, but we cannot pay
21   for freight because we don't -- we have significant
22   cash shortage, and in normal world we paid for the
23   fish. We use part of money to pay for APL and it's
24   for shipment. And the customer get the -- the
25   product. But product arrive to China. We haven't

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)                328

1    Q.   Okay.

2    A.   -- 15 days.

3    Q.   So even though you can't change the quality
4  once it's in the container and it -- and it's shipped
5  out, there's still an obligation for you to address a
6  quality problem if the customer discovers a quality
7  problem and makes a timely claim.

8    A.   Yes, it's ours obligation, and we fulfill
9  it.

10   Q.   Okay. We've just gone through this e-mail.
11 At the top you have an e-mail to Bent that says,
12 "Please, find report of my person in China. You see I
13 have no room for negotiation with you any more."

14        What -- what were you -- why was there no
15 room for negotiation anymore in light of this report,
16 which says there was significant -- 70 to 80 percent
17 bruising, as you've admitted. Global had not paid the
18 freight. Mr. Johnson was recommending that you get
19 the APL agent to release the bill of lading.
20 Mr. Johnson was suggesting -- or he was indicating
21 that Caroline had asked him to go to Qingdao to
22 inspect the fish with her. What aspect of this e-mail
23 led you to state to Mr. Holme, to Bent, that there was
24 no room for negotiation anymore?

25   A.   I believe I -- that this comment relating to

MILLS & LESSARD (206)292-9063 www.dep-reporters.com

EXHIT 98
Page 7 of 96

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)                                331

```
 1    schedule with all of the backup pieces of paper to
 2    show precisely the letters of credit, when they were
 3    put into place for the benefit of Global, and we'll
 4    have all of the backup.  So we will be producing
 5    that -- you know, within the next week or two we will
 6    transmit that to you as part of an agreement we -- we
 7    reached yesterday so we don't have to continually
 8    debate over whether letters of credit were in place or
 9    not.
10         A.    I think it would be much easier if you
11    subpoena Wells Fargo and subpoena Wells Fargo and
12    produce all letters of credit, when opened by date,
13    and in this case you will not argue who --
14         Q.    But I believe -- I'm sorry to interrupt.  I
15    believe FMI -- I believe FMI has all of those
16    documents in its possession --
17         A.    And --
18         Q.    -- so --
19         A.    -- is the reason why we here.  I don't
20    believe you believe us.  Let's focus on deposition.
21    You believe that FMI opened the L/C in timely matter.
22    I believe FMI did not open L/C in timely matter.
23         Q.    My -- my point is we will -- we will be able
24    to demonstrate with pieces of paper, whether it's from
25    FMI or we have to get them from Wells, when the
```

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)  332

1  letters of credit were open, for what amounts they
2  were open.  We can also demonstrate with pieces of
3  paper when product was shipped.  So we don't need to
4  debate that but -- but we will be able to pin that
5  down with very -- with precision.
6      A.   No doubt about it.
7      Q.   Yes.
8           When you received notice from Johnson --
9  this is on September 22nd -- that -- that your product
10 was -- according to Johnson, he was told had 70 to
11 80 percent bruise, what was your reaction as a -- as a
12 producer of that product?
13     A.   I feel bad.
14     Q.   Do you -- did you feel that you, you Global,
15 as the producer of the product, had a good faith
16 obligation to investigate to see if the product was
17 acceptable product or it was as bad as being alleged?
18     A.   I don't remember this particular feeling in
19 my head, but we did the best to investigate the case
20 and investigate the claim.
21     Q.   You did embark on an investigation to
22 determine whether the product was acceptable or not?
23     A.   What we did?
24     Q.   I'm asking you --
25     A.   Can you repeat the question?

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)   333

1   Q.   You -- you did -- you're -- you're saying you did -- Global did attempt to investigate the quality complaints?

4   A.   We investigated.

5   Q.   And how did you do that?

6   A.   We -- I think I answered on --

7   Q.   The other day?

8   A.   -- other day and you can find it.

9   Q.   Okay.

    Wasn't there a delay from this date, September 22nd -- and I believe we went through some e-mails on Wednesday. Around September 20th, 21st, 22nd you had e-mails back and forth with Bent. In one e-mail you said, "We'd like to send our QC person to investigate the product, but I need your permission."

    And -- and Bent immediately replied, "You have my permission. Should I get a hotel for your QC person?"

    Do you recall those e-mails?

20  A.   Something.

21  Q.   Like that?

22  A.   Yes.

23  Q.   Okay.

    Mr. Johnson didn't get to Qingdao to look at the product and inspect the product until roughly

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)                334

1    October 10.  Do you recall that?
2         A.   Close.
3         Q.   And -- and why was there such a delay
4    between September 20, 21, 22, when Global committed to
5    get Johnson to Qingdao, and him getting there?  I know
6    there was a holiday period, October 1 through 8.  So
7    there was a few -- there's a holiday period.  But
8    why -- why didn't Johnson go the next day or the day
9    after that to investigate the product?
10        A.   I think, Counselor, you mislead yourself.
11   Johnson, he is not ours worker.  He's independent
12   broker who's got his business other than Global
13   Seafood, and on extent he's got some interests not
14   only in the fishing business.  It's always something.
15   And plus it was across the sea and, you know, I have
16   to find the -- he have to find the time to do it.  I
17   have to find the Johnson in China.  And just
18   everything take time.
19        Q.   Didn't you -- didn't you represent in your
20   earlier e-mail to Bent that you could have him,
21   Mr. Johnson, there on September 22nd?
22        A.   Probably I did.
23        Q.   Yeah.  And -- and let's get back to his --
24   what he did.  I think you admitted he's not an expert
25   in fish quality issues on Wednesday.

EXHIT 98
MILLS & LESSARD (206)292-9063 www.dep-reporters.com  Page 11 of 96

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)                335

1    A.    Yes.
2    Q.    Okay.  Why didn't Global arrange for an
3  independent inspector for $500, as you said, to go to
4  Qingdao, presumably the next day, to investigate so
5  that you would have independent knowledge of the
6  quality?
7    A.    I don't know anybody in -- in Qingdao
8  personally, and for me to contact in -- find
9  independent inspector, hire him, make agreement and
10 all procedure, I believe it would take significantly
11 longer than --
12   Q.    But you indicated you thought it would cost
13 $500.  On what basis do you believe that?
14   A.    Some ours customer did independent QC
15 reports, and they send us time to time independent QC
16 reports from independent party, and in Qingdao I
17 believe it's big company, independent company, world
18 famous for QC reports.
19   Q.    In Qingdao?
20   A.    In Qingdao.
21   Q.    So why couldn't you have called that company
22 and had somebody go across town to inspect the product
23 the next day?
24   A.    You know, I told you I don't have any
25 records of phone or -- maybe -- maybe I can find the

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)            338

1   Q.   Let me back up then and make the question
2   more specific.
3        Did you tell FMI that if they pay $1500 so
4   that Mr. Johnson could go to Qingdao and -- and review
5   the product, that Global would honor whatever
6   conclusions Mr. Johnson came to about the quality of
7   the product?
8   A.   It's compound question, and I would like to
9   break, Counsel, on two answers.  First answers, yes, I
10  told FMI that if they pay to Johnson $1500, the
11  Johnson will come to Qingdao and -- and be involved in
12  inspection of the product, but I don't remember that I
13  told that I will listen to Johnson's recommendation.
14  And the Johnson role was to come and look in the
15  quality of the product, indicated what the problem and
16  what the customer complain.
17  Q.   Okay.  Let me -- let me ask another
18  question.
19       Did FMI pay the $1500 -- or agree to pay the
20  $1500 immediately?
21  MR. MILLS:  Let me strike that,
22  "immediately."
23  A.   I -- I think they did not agree to do it
24  immediately, but I can be wrong.
25  Q.   (By Mr. Mills)  The e-mails would reflect

1   Sam Lim to Bent Holme, last year recovery was
2   83 percent of the bruising. And it's looks like the
3   product was better than last year.
4        Q.   But the recovery of the product you're
5   talking about is some sort of processing -- I mean,
6   I'm not sure what that percentage relates to, but --
7        A.   Regarding you take hundred tons of product
8   and you make 85 tons of fillets, and in 2000 -- in
9   2004 FMI processed -- FMI processed our fish blood in,
10  the recovery was 83 percent and in 2005 it was
11  85 percent.
12       Q.   And are you saying that the -- are you
13  saying that there's -- it's an apples-to-apples
14  comparison between the recovery of product and the
15  conclusion of -- of Johnson that there was 15 to
16  16 percent bruising of the product that -- that
17  couldn't be used, that that's a direct comparison?
18       A.   It's very close. If you use blood out
19  product, your recovery have to be around 90 percent.
20  If you use blood in product, your recovery is less.
21           MR. MILLS: Let me have another exhibit
22  marked. This is 110.
23           (Marked Deposition Exhibit No. 110.)
24       Q.   (By Mr. Mills)  This is an exhibit that's
25  September 20 -- looks like a fax probably -- from Bent

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)                343

1   the bruising, but the meat color was an issue with
2   Yilufa?
3       A.  No.
4       Q.  Why did you not understand that when she
5   highlighted that as a concern in her report?
6       A.  If you call this is quality report, you
7   will -- I believe you significantly mislead you.
8       Q.  Let me not call it a quality report.  Let me
9   call it a letter from Jason Zhang of Yilufa.  In this
10  letter Yilufa was -- Mr. Zhang was saying that there
11  was bruising problems as well as pale meat problems,
12  correct?
13      A.  He --
14      Q.  That's what he says?
15      A.  It's -- he says, yes.
16      Q.  Yeah.  I'm not saying that you agree with
17  that, but I'm saying, you were put on notice by
18  receiving this on September 20 that the customer,
19  Yilufa, was concerned with bruising as well as pale
20  meat color.  Were you aware of -- not that you agree
21  with it, but you became aware of this complaint.
22      A.  Yes --
23      Q.  Okay.
24      A.  -- I was aware.
25      Q.  Okay.  And I assume you looked through

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)                    348

1   since you were focused on the subject line, says,

2   "Johnson's inspection report."  Do you -- would you

3   understand then the subject of this e-mail to be the

4   report that Mr. Johnson, your -- the person that

5   Global recommended to go to Qingdao to look at the

6   first container, that this is the report that he

7   produced to you on October 10th?

8       A.   Yes.

9       Q.   Okay.  And this is a request again by FMI

10  for a copy of that report.

11      A.   Yes.

12      Q.   Okay.  And in response to this request did

13  Global provide a copy of that report to FMI?

14      A.   I don't remember.

15      Q.   You don't remember.

16      A.   I don't remember what is -- I believe during

17  the QC report or -- or during the inspection or after

18  that if Mr. Johnson signed some kind of -- usually

19  both have to sign piece of paper, which was all

20  indication -- for example, they -- they take box.  On

21  box say, "Global Seafoods," weight of the box and all

22  details.  And it's very common then by after

23  inspection both is -- somebody making one, you know,

24  standard checking this report, and after that they

25  sign -- both had to sign this checking list, but I

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)                    350

1     A.    More or less, yes.
2     Q.    Okay.
3           That report, did you ever turn that report
4    over to FMI?
5     A.    No.
6     Q.    Okay.  And why not?
7     A.    Because FMI refused to give me different
8    report.
9     Q.    What's different report?
10    A.    About inspection of ours goods in
11   Thailand --
12    Q.    Okay.
13    A.    -- blood out goods which we ship to
14   Thailand, four containers.
15    Q.    And by -- a Wolfgang Plath report?
16    A.    I don't recall the name of the company, but
17   blood out product.  The whole point of ours --
18    Q.    Are you saying -- let me -- let me
19   interrupt.
20    A.    Okay.
21    Q.    Are you saying that -- are you saying that
22   you requested some quality inspection report from FMI
23   and FMI refused to give that to you?
24    A.    Yes.
25    Q.    And is there any e-mails or any pieces of

WITNESS: OLEG NIKITENKO (V2) 12/1/2006 (MIKE MILLS)        352

1   conclusion.

2       Q.   And where do you -- where -- did you e-mail

3   FMI -- is there anything in the record that you can

4   point to to indicate that you had requested some

5   inspection report that FMI wouldn't provide to you?

6       A.   I just point to you, Counselor, Exhibit 111.

7   I pointed to letter.

8       Q.   Okay.  This is your -- this is -- your

9   testimony is this is an indication that FMI was hiding

10  something from you.

11      A.   Yes.

12      Q.   Okay.

13      A.   Or refuse to help assist us with full

14  investigation of the problem.

15      Q.   So F -- wait.  FMI was -- was -- was getting

16  in your way, Global's, was -- was putting road blocks

17  or hurdles up so Global wouldn't get proper

18  information about the quality of the product?

19      A.   Yes.

20      Q.   What possible benefit was that to FMI?

21  Because FMI wanted to conclude the sale so it could

22  get paid for the product.

23      A.   Okay.  It will be little bit longer answer,

24  but I think it's very important for you, Counselor, to

25  understand.

1    Q.   Shipping from Alaska.
2    A.   I don't remember.
3    Q.   Did FMI -- I'm sorry.  Global didn't ship
4  any more than -- any -- Global did not ship any
5  further product to FMI after the 13 containers.  Is --
6  do you --
7    A.   I believe the 13 containers, it was last --
8    Q.   That was the last shipment?
9    A.   Last shipment.
10   Q.   Yes.  And why didn't -- that was -- that
11 only totaled 750 metric tons.  You recall Exhibit 8,
12 where we -- we had the -- the various categories that
13 totaled 750 metric tons.  Why didn't Global ship the
14 additional 250 metric tons under the FMI contract
15 requirement?
16   A.   Under FMI contract requirement as I
17 understand ours obligation is shipped product after
18 L/C open, not before the L/C open and --
19   Q.   Did you tell FMI at this point in time or in
20 late September that you were not shipping any more
21 product to them?
22   A.   I don't remember.  Prob -- maybe yes.  Maybe
23 no.  I don't remember.
24   Q.   Okay.  But you were threatening on
25 October 3rd to sell the 13 containers and said you had